AO 93 (SDNY Rev. 05/10) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

### for the

Southern District of New York

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No.   14 MAG 1429 |
| A VERIZON INCREDIBLE CELLULAR TELEPHONE WITH MEID NUMBER A10000136980C6 | ) ) ) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Southern_____ District of _____New York_____
*(identify the person or describe the property to be searched and give its location)*:
A VERIZON INCREDIBLE CELLULAR TELEPHONE WITH MEID NUMBER A10000136980C6

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____7-8-14_____
*(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.     ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the Clerk of the Court.
☐ Upon its return, this warrant and inventory should be filed under seal by the Clerk of the Court. _____
*USMJ Initials*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for _____ days *(not to exceed 30).*
☐until, the facts justifying, the later specific date of _____.

Date and time issued:     6-24-14 @ 3:40 pm     _Lucas C. McCar___
_Judge's signature_

City and state:     6/24/2014 _____     _____HON. JUDITH C. McCARTHY_____
*Printed name and title*

SICA-US000320

AO 93  (Rev. 01/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the Court.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

SICA-US000321

## EXHIBIT A

### Information to be taken from the TARGET CELLPHONE

1. Any subscriber information or contact information, including, names, addresses, telephone numbers, e-mail addresses, and/or other identifiers;

2. Records of all call activity, including incoming and outgoing calls and other communications and lists of stored telephone numbers and other identifying information, such as names;

3. Address books and contact lists;

4. Calendar or other scheduling information;

5. Voicemail and all SMS (simple message service) messages, data messages, text messages, stored e-mail, MMS (Multimedia Messaging Service), and any other messages or other information stored on the TARGET CELLPHONE pertaining to a conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846 (the "TARGET OFFENSE");

6. All files containing text, photos, sound recordings, or videos stored on the TARGET CELLPHONE pertaining to the TARGET OFFENSE; and

7. Any other user or system files and data on the TARGET CELLPHONE that would constitute evidence of violations of the TARGET OFFENSE.

SICA-US000322

AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) )    Case No.   14 MAG 1429 |
| A VERIZON INCREDIBLE CELLULAR TELEPHONE WITH MEID NUMBER A10000136980C6 | ) ) ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

A VERIZON INCREDIBLE CELLULAR TELEPHONE WITH MEID NUMBER A10000136980C6

located in the        SOUTHERN        District of        NEW YORK        , there is now concealed *(identify the person or describe the property to be seized):*

PLEASE SEE ATTACHED AFFIDAVIT AND RIDER.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

   ☑ evidence of a crime;

   ☑ contraband, fruits of crime, or other items illegally possessed;

   ☑ property designed for use, intended for use, or used in committing a crime;

   ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sections 846. | CONSPIRACY TO DISTRIBUTE CONTROLLED SUBSTANCES |

The application is based on these facts:

PLEASE SEE ATTACHED AFFIDAVIT AND RIDER.

   ☑ Continued on the attached sheet.

   ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

 

*Applicant's signature*

SPECIAL AGENT LOUIS SCHMIDT, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date:        06/24/2014

*Judge's signature*

City and state:  WHITE PLAINS, NY

HON. JUDITH C. McCARTHY
*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -  X
                                       :
IN THE MATTER OF THE APPLICATION OF    :  TO BE FILED UNDER SEAL
THE UNITED STATES OF AMERICA           :
FOR A WARRANT TO SEARCH A VERIZON      :  AFFIDAVIT IN SUPPORT
INCREDIBLE CELLULAR TELEPHONE WITH     :  OF AN APPLICATION FOR
MEID NUMBER A10000136980C6.            :  A SEARCH WARRANT
                                       :
- - - - - - - - - - - - - - - - - - -  X

STATE OF NEW YORK          )
COUNTY OF WESTCHESTER       )  ss.:
SOUTHERN DISTRICT OF NEW YORK )

     I, LOUIS SCHMIDT, being duly sworn, do hereby depose and
state as follows:

### INTRODUCTION

     1.  I am employed as a Special Agent with the Drug
Enforcement Administration ("DEA"), and I am one of the case
agents with responsibility for this investigation.  As an DEA
agent, I have participated in numerous investigations of
unlawful narcotics distribution, in violation of 21 U.S.C.
§§ 841 and 846, and have conducted or participated in wire and
physical surveillance, surveillance of undercover transactions,
the introduction of undercover agents, the execution of search
warrants, debriefings of informants and reviews of taped
conversations and drug records.  Through my training, education,
and experience, I have become familiar with the manner in which

1

imported and distributed; the way in which illegal drugs are prepared, packaged, and sold on the street; some of the methods of payment for such drugs; and some of the methods that are used to disguise the source and nature of the profits made by narcotics dealers.

2.    This Affidavit is respectfully submitted, pursuant to Federal Rule of Criminal Procedure 41, in support of an Application for a warrant to search the memory of a Verizon Incredible cellular telephone with MEID number A10000136980C6 (the "TARGET CELLPHONE") for the items set forth in Exhibit A hereto.

3.    I make this affidavit, in part, on personal knowledge based on my participation in this investigation, and, in part, upon information and belief.  The sources of my information and belief include: conversations with other DEA agents, and with other law enforcement officers, including officers and agents who are members of the Dutchess County Drug Task Force (the "Task Force"), which investigates, among other things, drug activity in Dutchess County.  I have also reviewed reports and other documents prepared by law enforcement officers, and records and reports relating to the investigation or obtained from public sources.

4.    Because this Affidavit is being submitted for the

2

SICA-US000325

limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.  Throughout this affidavit, where I assert that a statement was made, I was not the individual to whom the statement was made, unless I specifically so state. Furthermore, the facts and circumstances of this investigation have been summarized for the specific purposes of this application.  In making this application, I am relying only on the facts stated herein.

### THE TARGET CELLPHONE

5.   The TARGET CELLPHONE, is a Verizon Incredible cellular telephone with MEID number A10000136980C6.  The TARGET CELLPHONE is currently in the custody of the Drug Enforcement Administration in White Plains, New York and is believed to belong to DENNIS SICA ("SICA").

6.   As set forth in greater detail below, there is probable cause to believe that SICA has conspired to distribute heroin and fentanyl in and around Dutchess County, New York, in violation of title Title 21, United States Code, Section 846 (the "TARGET OFFENSE").

3

SICA-US000326

7.     Moreover, for the reasons set forth in this
Affidavit, I respectfully submit that there is probable cause to
believe that a search of the contents of the TARGET CELLPHONE
will lead to evidence of the TARGET OFFENSE, as well as the
identification of other individuals who are engaged in the
commission of the TARGET OFFENSES along with SICA.

### THE INVESTIGATION

8.     Since in or about December 2013, the DEA, in
cooperation with the Task Force has been investigating a string
of heroin overdoses in and around Dutchess County, New York.
The investigation has focused in particular on three individuals
who have died as a result of heroin overdoses -- the first,
Anthony Delello, on or about December 30, 2013, and the other
two, Laura Brown and Thomas Miller, in separate incidents on or
about February 1, 2014.

9.     On or about June 17, 2014, the Honorable Lisa
Margaret Smith, United States Magistrate Judge for the Southern
District of New York, approved a felony complaint (the
"Complaint") charging DENNIS SICA and JOHN ROHLMAN, with
conspiring to supply and supplying the heroin that resulted in
the deaths of Delello, Brown, and Miller.  A copy of the
Complaint, which is incorporated by reference herein, is
attached hereto as Exhibit B.

4

10.   As set forth in the complaint, the investigation has revealed that SICA and ROHLMAN used a cellular telephone with a dial number ending "7208" to distribute Breaking Bad heroin.

11.   I have spoken with a member of the Task Force ("Detective-1") who has, in turn, interviewed a witness who is referenced in paragraph 36 of the complaint (the "Witness"). As set forth in the Complaint, the Witness is a close associate of SICA's and was with him at the time of his February 2, 2014 arrest.  According to Detective-1, the Witness provided him with the TARGET CELLPHONE and told him that it was the phone used by SICA to distribute heroin.

### REQUEST TO SEARCH

12.   Based on my training, experience, and participation in this and other narcotics investigations, as well as my conversations with other law enforcement agents, I have learned the following, in substance and in part:

a.   It is common for drug traffickers to possess multiple cellular telephones in order to prevent detection or interception by law enforcement.  Such persons also frequently possess multiple cellular telephones in order to insulate the contact that one member of the conspiracy has with another.

5

SICA-US000328

b.    A cellular telephone's "subscriber identification module," or "SIM" card, contains certain stored user information, including a list of the services to which a user has access, and can be transferred between different cellular telephones.

c.    Secure Digital Cards, or "SD Cards," are a form of removable digital storage used for various electronic devices, including cellular telephones.  So-called "Micro SD Cards" are among the smallest SD Cards and are the type of SD Card most commonly used in cellphones.  Such cards can be used to expand a cellular telephone's digital memory, to back up files, or to facilitate the transfer of data between cellular telephones.

d.    Cellular telephones with camera functions permit the cellular telephone user to take photographs that are stored on the cellular telephone itself.  Similarly, cellular telephones with video functions permit the cellular telephone user to take videos that are stored on the cellular telephone itself.  Drug traffickers commonly have photographs of themselves, their associates, their property, and occasionally their drugs stored on electronic devices like cellular telephones, SIM cards, and SD Cards.

6

SICA-US000329

e.   Drug traffickers who need to arrange and coordinate their illicit transactions, often use cellular telephones to do so.  A search of the data on a cellular telephone would reveal the dial number associated with that telephone, allowing investigators to subpoena relevant telephone records.

f.   Drug traffickers commonly maintain contact information, including names, telephone numbers, and/or direct-connect numbers for their criminal associates in the memory of their cellular telephones.  A search of the data on a cellular telephone used by a narcotics trafficker often reveals names, contact numbers, and communications that can help to determine the identity of co-conspirators.

g.   Cellular telephones typically contain records of recent call activity, both incoming and outgoing calls, and lists of stored telephone numbers and other identifying information, including names, and may contain "caller ID" features that allow the user to identify his or her recent callers and/or recent calls.

h.   Cellular telephones typically have voicemail and/or text-messaging features, which permit the cellular telephone user to send and receive voicemail and/or text messages.  Voicemail and text messages are typically stored on

7

SICA-US000330

the computer network of the provider of the cellular telephone's service, which network is external to the cellular telephone. Sent and received voicemail and text messages may also be stored on the cellular telephone itself.

　　　　i.　　Some cellular telephones also have the capability to send and/or receive electronic mail ("e-mail"), which may also be stored on the cellular telephone itself. A search of a cellular telephone may reveal e-mail communications that reveal the identities of unidentified co-conspirators or the timing of events related to the narcotics conspiracy.

　　　　j.　　Cellular telephones with calendar functions allow the user to keep a record of appointments. Such cellular telephones also frequently allow the user to have the cellular telephone alert the user to appointments and/or events.

　　　　k.　　The information described above usually remains accessible in the cellular telephone, memory card, or SIM card even if the device has lost all battery power, and has not been used for an extended period of time.

　　　　13. Based on the facts set forth in this affidavit, I submit that there is probable cause to believe that there will be found in the TARGET CELLPHONE evidence and instrumentalities of violations of Title 21, United States Code, Sections 812, 841, and 846, including subscriber information, missed, incoming

8

SICA-US000331

and outgoing calls, opened voicemail and text messages, e-mail, telephone numbers, address books, photographs, and caller identification information, as set forth in the Rider attached hereto as Exhibit A.

14.   Furthermore, based upon my training and experience, and based upon consultations I have had with agents specifically trained in the seizure and retrieval of electronically stored information, I have learned that to properly retrieve and analyze all electronically stored data, to document and authenticate such data, and to prevent the loss of data either from accidental or deliberate programmed destruction, requires on-site and laboratory analysis by a qualified specialist.  I anticipate that law enforcement personnel who have been specially trained in the seizure, retrieval and handling of electronically stored information will assist in the search.  As a law enforcement officer, I am trained and experienced in identifying communications relevant to the crimes under investigation.  I also know that the manner in which data is preserved and analyzed may be critical to the successful prosecution of any case based upon this evidence.

9

WHEREFORE, I respectfully request that a search warrant issue, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, allowing the DEA, with proper assistance from other law enforcement officers, to search the TARGET CELLPHONE for evidence of violations of Title 21, United States Code, Sections 812, 841, and 846, as set forth in the Rider annexed hereto as Exhibit A.


LOUIS SCHMIDT
Special Agent
Drug Enforcement Administration


Sworn to before me this
24th day of June, 2014


HONORABLE JUDITH C. McCARTHY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

10

SICA-US000333

## EXHIBIT A

### Information to be taken from the TARGET CELLPHONE

1. Any subscriber information or contact information, including, names, addresses, telephone numbers, e-mail addresses, and/or other identifiers;

2. Records of all call activity, including incoming and outgoing calls and other communications and lists of stored telephone numbers and other identifying information, such as names;

3. Address books and contact lists;

4. Calendar or other scheduling information;

5. Voicemail and all SMS (simple message service) messages, data messages, text messages, stored e-mail, MMS (Multimedia Messaging Service), and any other messages or other information stored on the TARGET CELLPHONE pertaining to a conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846 (the "TARGET OFFENSE");

6. All files containing text, photos, sound recordings, or videos stored on the TARGET CELLPHONE pertaining to the TARGET OFFENSE; and

7. Any other user or system files and data on the TARGET CELLPHONE that would constitute evidence of violations of the TARGET OFFENSE.

SICA-US000334

ORIGINAL

Approved: _____
SCOTT A. HARTMAN
Assistant United States Attorney

Before:   THE HONORABLE LISA MARGARET SMITH
United States Magistrate Judge
Southern District of New York

14 MJ 1380

------------------------------------- X
                                      :
UNITED STATES OF AMERICA              :   **SEALED COMPLAINT**
                                      :
              -v.-                     :   Violations of
                                      :   21 U.S.C. §§ 846,
DENNIS SICA and                       :   841(a)(1),
JOHN ROHLMAN,                         :   and 841(b)(1)(B).
                                      :
              Defendants.             :   COUNTY OF OFFENSE:
                                      :   DUTCHESS
------------------------------------- X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        LOUIS SCHMIDT, being duly sworn, deposes and says
that he is a Special Agent with the Drug Enforcement
Administration ("DEA"), and charges as follows:

COUNT ONE

        1.   From at least in or about 2013 up to and
including on or about February 2, 2014, in the Southern District
of New York and elsewhere, DENNIS SICA and JOHN ROHLMAN, the
defendants, and others known and unknown, intentionally and
knowingly did combine, conspire, confederate, and agree together
and with each other to violate the narcotics laws of the United
States.

        2.   It was a part and an object of the conspiracy
that DENNIS SICA and JOHN ROHLMAN, the defendants, and others
known and unknown, would and did distribute and possess with the
intent to distribute controlled substances, in violation of 21
U.S.C. § 841(a)(1).

        3.   The controlled substances that DENNIS SICA and
JOHN ROHLMAN, the defendants, conspired to distribute and
possess with the intent to distribute were: (1) 100 grams and
more of mixtures and substances containing a detectable amount

SICA-US000335

of heroin, in violation of 21 U.S.C. § 841(b)(1)(B); and (2) 40 grams and more of mixtures and substances containing a detectable amount of N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide, commonly known as fentanyl, in violation of 21 U.S.C. § 841(b)(1)(B).

4.    The use of controlled substances distributed by DENNIS SICA and JOHN ROHLMAN, the defendants, resulted in the deaths of: an individual on or about December 29, 2013, and two individuals on or about February 1, 2014.

(Title 21, United States Code, Section 846.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

5.    I have been involved in the investigation of the above-described offense.  I make this affidavit, in part, on personal knowledge based on my participation in this investigation, and, in part, upon information and belief.  The sources of my information and belief include: conversations with lay witnesses, with other DEA agents, and with other law enforcement officers, including officers and agents who are members of the Dutchess County Drug Task Force (the "Task Force"), which investigates, among other things, drug activity in Dutchess County.  I have also reviewed reports and other documents prepared by law enforcement officers, and records and reports relating to the investigation or obtained from public sources.

6.    In addition to the sources of information already described, I have reviewed text messages stored on a cellular telephone belonging to JOHN ROHLMAN, the defendant, (the "Rohlman Cellphone"), which was examined pursuant to a search warrant issued by the Honorable Ronald L. Ellis, United States Magistrate Judge for the Southern District of New York on April 4, 2014.

7.    Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

8.    Since in or about December 2013, the DEA, in cooperation with the Task Force has been investigating a string

2

SICA-US000336

of heroin overdoses in and around Dutchess County, New York.
The investigation has focused in particular on three individuals
who have died as a result of heroin overdoses -- the first,
Anthony Delello, on or about December 30, 2013, and the other
two, Laura Brown and Thomas Miller, in separate incidents on or
about February 1, 2014.  As set forth below, the investigation
has revealed that DENNIS SICA and JOHN ROHLMAN, the defendants,
conspired to supply and did supply the heroin that resulted in
the deaths of Delello, Brown, and Miller.

       9.    In the course of my investigation, I have spoken
to multiple witnesses who have purchased heroin from DENNIS SICA
and/or JOHN ROHLMAN, the defendants.  From these witnesses, I
have learned the following:

       a.    Since at least late 2013, SICA has offered
for sale a particularly potent form of heroin, bags of which are
stamped with the brand name "Breaking Bad."  SICA is the only
known source of supply of "Breaking Bad" in Dutchess County, New
York.  SICA sells "Breaking Bad" at a cost of $60-$100 per
bundle, a price consistent with the market price for other
brands and potencies of heroin in the Dutchess County region.

       b.    ROHLMAN assists SICA in distributing
"Breaking Bad."  Because SICA seldom if ever drives, ROHLMAN has
driven SICA to meet with many of the witnesses to whom I have
spoken, and has distributed "Breaking Bad" to customers when
SICA was unavailable.

       10.    Based on my training, my experience, and my
conversations with other DEA agents, I know that a bundle of
heroin consists of 10 glassine bags, each of which typically
contains 0.1 grams of heroin.  Moreover, based upon my training
and experience, I know that stamps like the "Breaking Bad" stamp
that appears on heroin sold by SICA are generally used by heroin
sellers to identify their heroin and distinguish it from product
sold by other dealers.

### Anthony Delello Dies from Heroin Provided by SICA

       11.    From reviewing a report created by detectives
with the Dutchess County Sheriff's Office, I know that on or
about the morning of December 29, 2013, law enforcement officers
responded to a home in Beekman, New York to find a young male,
later identified as Anthony Delello, dead from an apparent drug
overdose.

3

SICA-US000337

12.   I have also reviewed the report prepared by a medical examiner with the Office of the Medical Examiner for Dutchess County regarding the autopsy that was performed on Delello's body.  The report concludes that Delello, a 20-year-old male, died from "acute heroin intoxication."

13.   I have spoken with a witness who was romantically involved with Delello before his death ("Witness-1").  From speaking with Witness-1, I have learned the following information, in substance and in part:

a.   On or about the night of December 28, 2013, Witness-1 contacted a friend she knew as "Tim," who worked at a local Dunkin' Donuts, regarding the possibility of purchasing heroin.  "Tim" provided Witness-1 with the name of his heroin supplier "Dennis," and the telephone number where "Dennis" could be reached (XXX-XXX-7208).

b.   Later that evening, Witness-1 and Delello met "Dennis" outside of Dennis's apartment in the Chelsea Cove apartment complex in Hopewell Junction, New York, for the purpose of purchasing one bundle of heroin.  Delello, who had arranged the meeting, drove them there; Witness-1 was in the front passenger's seat.  The individual who Witness-1 believed to be "Dennis" approached the car on the driver's side and handed Delello a bundle of heroin.  In exchange, Delello handed "Dennis" $100.

c.   After receiving the bundle of heroin from "Dennis," Delello handed it to Witness-1.  Witness-1 unwrapped the bundle and noticed that each of the glassine bags bore a distinctive mark that read "Breaking Bad" in letters mimicking the logo of the popular television show.

d.   Delello and Witness-1 drove back to Witness-1's house and parked outside.  While sitting in the car, Witness-1 snorted 1 bag of the "Breaking Bad" heroin and Delello snorted 2 bags.  Sometime later, after the couple entered the house, Delello snorted a third bag of heroin inside of Witness-1's bedroom.

e.   Witness-1 stated that the quantities of heroin that she and Delello used that night were consistent with the quantities they had used in the past.  They fell asleep at approximately 3:00 a.m.

f.   The next day, December 29, 2013, at approximately 3:00 p.m., Witness-1 awoke to find Delello lying

4

on the ground next to her bed, face down.  Witness-1 attempted to rouse Delello, but he did not respond.  She rolled his body over to discover that his mouth was covered in dark spit or foam.

14.    I have also spoken with the mother of Witness-1 ("Witness-2"), who is also the owner of the house in Beekman, New York where Delello was found dead.  From speaking with Witness-2, I have learned the following:

a.    At approximately 10:00 a.m. on the morning that Delello was found dead, Witness-2 entered Witness-1's bedroom and found Delello vomiting a red substance into a trash can.  Witness-2 asked Delello whether he was okay; he replied that he was.

b.    Approximately 3 hours later, Witness-2 came back into the bedroom to find Delello lying on the bedroom floor facedown.  Witness-2 assumed that Delello was sleeping, covered him with a blanket, and left the room.  A short time later, Witness-2 learned from her daughter that Delello was dead.

c.    While waiting for the paramedics to arrive, Witness-2 found four or five glassine bags, at least some of which were full, on her daughter's desk underneath a book.  The bags had the words "Breaking Bad" stamped on them.  Witness-2 took the bags outside, tore them open, and allowed the product inside to be blown away by the wind.  She then discarded the bags.

### After Learning of Delello's Death, SICA and ROHLMAN Continue to Distribute "Breaking Bad"

15.    On or about January 2, 2014, an individual who I believe to be JOHN ROHLMAN, the defendant, used the Rohlman Cellphone to send the following text messages:

a.    To Thomas Miller, who later died from a heroin overdose:  "Yoo im taking over for dennis so I have his shit for now on. So if u need something we dont gotta take a ride anymore ill have it on me personally. So im sellin now."

b.    To another apparent customer:  "Yea ill have them at work I work from 12 to 6 and the stamp is called Breaking Bad and im telling you now its rediculously good. Shit is way better than anything around right now. Best iv had in months. 10 a bag 100 a bun. Worth it."

5

SICA-US000339

      c.    To a third apparent customer: "Yo im takin over for dennis if u ever need call my phone or his 7208 number I have his phone."

    16.   The same day, the following exchange of text messages occurred between the Rohlman Cellphone and a number identified in the contacts of the Rohlman Cellphone as "Dennis," which I believe was being used by DENNIS SICA, the defendant:

| | |
|---|---|
| SICA | Wow well ill figure it out listen erase every message out of my phone I gave u now I meant to do it |
| ROHLMAN | Ok I got you |
| SICA | Goto messages the. Hit Menu button on bottom left then put check in every thread then hit delete button n will erase all do that now cuz been worried with shot |
| SICA | that happened with kid |
| SICA | Let me know u did it do I can go to bed |
| SICA | Let me know if ha e problem just check every thread of messages in right corner then hit delete |
| ROHLMAN | Doing it as I speak..taking a sec to delete them all there was a lot of threads |
| SICA | Gotta check everyone at once then press it don't do one at a time put check on everyone then hit the delete button |
| ROHLMAN | Yea thats what I did. Its just taking long to delete it all at once cause there was a lot of messages |
| SICA | Leave it alone fog five minutes then check n make sure as ll gone. Then let me know n be smarter than me n don't text too much n if get any calls from tim dunk |
| SICA | or anyone who says his name ad friend of don't answer n if anyone calls n says anything bout u know nothing found phone weeks ago n can't find owner so answer |
| SICA | tryin to figure who's phone ii t is |
| SICA | I'll show u numbers not to answer tomorrow but that should start ringing early so be ready n send Steve to;me dud erase all yet |

SICA-US000340

| ROHLMAN | Ok I gotcha. Dont text too much. Dont answer tim and dont answer anyone whos says there a friend of...... and if anyone calls and says something about you know what I know nothing and I found the phone and im trying to find the owner.. and u want me to send steve to you |
|---|---|

17.   Based on my training, experience and participation in this investigation, I believe that during this exchange, DENNIS SICA, the defendant, was instructing JOHN ROHLMAN, the defendant, to delete messages from the cellular phone that SICA used to distribute heroin, because SICA was worried about the repercussions of Delello's death from "Breaking Bad" ("been worried with sh[i]t that happened with kid").   I also believe that SICA was instructing ROHLMAN not to answer any calls from the Dunkin' Donuts employee "Tim" ("tim dunk"), who placed Witness-1 and Delello in contact with SICA the night that Delello died.   Furthermore, I believe that SICA was instructing ROHLMAN to tell anyone who might call to inquire about Delello or the manner of his death ("you know what") that ROHLMAN had only recently found the phone and that he was attempting to locate its owner.

18.   I have spoken with multiple witnesses who purchased "Breaking Bad" from DENNIS SICA and/or JOHN ROHLMAN, the defendants, in the weeks following Delello's death.   One witness who bought heroin from SICA during that period and has known him for over 10 years ("Witness-3") described a conversation with SICA during which SICA said that he was selling approximately 250 bundles of "Breaking Bad" per day due to the drug's popularity in Dutchess County.

19.   Another witness ("Witness-4") recounted that she purchased heroin from DENNIS SICA, the defendant, on at least four occasions between December 2013 and January 31, 2014, and that, on multiple occasions, SICA was driven to the meeting by JOHN ROHLMAN, the defendant.   The last time Witness-4 bought heroin from SICA was on January 31, 2014.   ROHLMAN drove SICA to Witness-4's house.   Witness-4 traded Klonopin, a prescription drug, for "Breaking Bad."   Witness-4 shot two bags of the "Breaking Bad" she received from SICA that night and overdosed. She was later told by an emergency medical technician that she had stopped breathing due to the overdose and that naloxone had been used to restart her respiratory system.

20.   The glassine envelopes of "Breaking Bad" that Witness-4 had not yet used at the time of her overdose were

7

SICA-US000341

recovered by crime scene detectives with the Dutchess County Sheriff's Office and are currently in the possession of the DEA. A photograph of some of those envelopes is attached hereto as Exhibit A.

### Laura Brown Dies After Overdosing on "Breaking Bad"

21.   Regarding the death of Laura Brown, I have learned the following information from speaking with Witness-3:

a.   On or about January 31, 2014, Witness-3 made contact with DENNIS SICA, the defendant, for the purpose of purchasing "Breaking Bad" for himself and his sister, Laura Brown.   SICA told Witness-3 that he was en route to his supplier to obtain additional "Breaking Bad."   SICA told Witness-3 that if he wanted heroin immediately, Witness-3 could contact an associate of SICA's, who would provide him, on SICA's behalf, with a different brand of heroin also distributed by SICA known as "Dunkin' Donuts."

b.   Witness-3 agreed to buy "Dunkin' Donuts" heroin.   He and Brown drove to SICA's apartment, where they purchased "Dunkin' Donuts" from SICA's associate.   Witness-3 and Brown then returned to their respective homes.

c.   Later that evening, Brown called Witness-3 and told him that she was still craving "Breaking Bad."   Witness-3 then contacted SICA again and learned that SICA had returned home with a fresh supply of "Breaking Bad."

d.   Brown picked up Witness-3 at approximately 7:30 p.m. and together they drove to SICA's apartment at the Chelsea Cove apartments, where they met SICA.   SICA got into Brown's car and Brown purchased 2 bundles of "Breaking Bad" from him for $180.   Brown gave Witness-3 two bags from the other bundle and indicated that she intended to shoot some of what was left when she got home.   Brown did not use the "Breaking Bad" in Witness-3's presence.

e.   Witness-3 did not hear from Brown the following day, a Friday.   On Saturday, February 1, 2014, Witness-3 became concerned.   He and his father traveled to Brown's home in New Milford, Connecticut and knocked on the door numerous times.   When no one answered the door, Witness-3 broke into the apartment and found Brown lying dead on a bathroom floor.

8

SICA-US000342

22.   I have reviewed reports prepared by investigators with the New Milford Police Department regarding their investigation into Brown's death.  From these sources, I know that in the bathroom where Brown's body was found, a police officer also found 3 needles, 2 measuring spoons and 6 empty glassine bags.  Numerous additional glassine bags were found in Brown's bedroom.  All of the glassine bags recovered from Brown's apartment were vouchered and placed into a single evidence bag.

23.   I have personally inspected the glassine bags recovered from Brown's apartment.  Among them are several glassine bags stamped "Breaking Bad."

24.   I have also seen a photograph of the empty glassine bags found in Brown's bathroom near her body.  A cropped version of that photograph is attached hereto as Exhibit B.  The bags depicted in the photograph are stamped with a brand, but the name of the brand is not fully legible in the photograph.  Based upon my participation in this investigation and having inspected all of the glassine bags that were recovered from Brown's apartment, the bags depicted in the photograph appear to me to carry the "Breaking Bad" stamp.

25.   I have also reviewed a report prepared by a medical examiner with the Office of the Chief Medical Examiner for the State of Connecticut regarding the autopsy that was performed on the body of Brown.  The report concludes that Brown, a 35-year-old female, died from "acute heroin and fentanyl intoxication."

**Thomas Miller Dies After Overdosing on "Breaking Bad"**

26.   I have reviewed a report prepared by a sheriff's deputy employed by the Dutchess County Sheriff's Office ("Deputy-1").  From that report, I have learned the following information, in substance and in part:

a.   On or about February 1, 2014, Deputy-1 responded to a residential home in Pawling, New York after being informed that a 31-year-old resident of the home, later identified as Thomas Miller, had been found dead from an apparent drug overdose.

b.   Deputy-1 entered Miller's bedroom and observed a hypodermic needle and an empty glassine bag with the words "Breaking Bad" stamped on it sitting on top of a dresser approximately 3 feet from the bed where Miller's body was found.

9

SICA-US000343

      c.    Deputy-1 conducted a further search of the bedroom and discovered, underneath Miller's body, a used hypodermic needle and 4 additional, empty glassine bags, each stamped with the words "Breaking Bad." Also in the bed, Deputy-1 found a clear plastic bag inside of which were two glassine envelopes stamped with the words "Breaking Bad," each containing an unidentified substance (the "Miller Envelopes").

      d.    Detective-2 interviewed Miller's mother (the "Mother"), who stated that the night prior to the discovery of Miller's body, Miller had been picked up from the home by an unknown friend at approximately 8:30 or 9:00 p.m.  Miller returned home at approximately 10:00 p.m., after which the Mother had no further contact with him.

      27.    I have reviewed a laboratory report summarizing chemical analysis performed on the contents of the Miller Envelopes.  The report indicates that the Miller Envelopes each contained a mixture of heroin, fentanyl, and quinine.

      28.    I have also reviewed the report prepared by a medical examiner with the Office of the Medical Examiner for Dutchess County regarding the autopsy that was performed on the body of Miller.  The report concludes that Miller, a 31-year-old male, died from "acute intoxication by the combined effects of heroin and fentanyl."

      29.    I have spoken with two witnesses who have purchased heroin from DENNIS SICA, the defendant, and who were acquainted with Miller before his death.  These witnesses were present on various occasions in the past when Miller purchased "Breaking Bad." According to these witnesses, Miller was not able to deal with DENNIS SICA, the defendant, directly; instead, Miller always purchased "Breaking Bad" through JOHN ROHLMAN, the defendant.

      30.    On or about March 11, 2014, I interviewed JOHN ROHLMAN, the defendant, at the Dutchess County Jail, where ROHLMAN was detained in connection with New York State charges unrelated to this investigation.  Prior to the interview, I read ROHLMAN his Miranda rights.  ROHLMAN waived those rights and provided the following information, in substance and in part:

      a.    ROHLMAN acknowledged that he knew Miller prior to Miller's death and that he was acquainted with DENNIS SICA, the defendant.

SICA-US000344

b.    ROHLMAN admitted that SICA sold "Breaking Bad" heroin and that he had occasionally driven SICA to make sales of "Breaking Bad" and to pick up "Breaking Bad" from SICA's source of supply.

c.    ROHLMAN denied having any knowledge of how Miller obtained "Breaking Bad" on the night that Miller died. ROHLMAN acknowledged, however, that he had received a telephone call from Miller on the night of Miller's death. ROHLMAN declined to elaborate on the nature of that call.

31.    On the night that Miller died, the following exchange of text messages occurred between the Rohlman Cellphone, which I believed was being used by JOHN ROHLMAN, the defendant, and a telephone number that I have been informed belonged to Miller:

| MILLER | 6:46:14 PM EST | Whats up? |
| ROHLMAN | 6:46:30 PM EST | Sup |
| ROHLMAN | 6:46:56 PM EST | ? |
| MILLER | 6:47:10 PM EST | Not much, anything around? |
| ROHLMAN | 6:47:26 PM EST | Ya |
| MILLER | 6:48:00 PM EST | How you feeling? |
| ROHLMAN | 6:48:17 PM EST | Horrible |
| MILLER | 6:48:25 PM EST | Where you at? Lets go |
| ROHLMAN | 6:48:59 PM EST | Home why u got money now |
| MILLER | 6:49:01 PM EST | Come get me lets go |
| ROHLMAN | 6:49:17 PM EST | Ok |
| MILLER | 6:49:52 PM EST | A little, i can get us each a couple |
| ROHLMAN | 6:49:58 PM EST | Ok |
| MILLER | 6:50:38 PM EST | Where do we have to go close? |
| ROHLMAN | 6:50:50 PM EST | Dennis |
| MILLER | 6:51:55 PM EST | Oh good im home come asap im sick |
| MILLER | 6:54:41 PM EST | You coming? Dont tell sophie your coming here |
| ROHLMAN | 7:01:17 PM EST | Yea im coming ill be there in 20 leaving now. Do u have any change or singles for a littpe gas. And |

11

SICA-US000345

| | | after tonight u wont see me for a while im going to detox |
|---|---|---|
| MILLER | 7:05:14 PM EST | Oh wow... Well than ask dennis if i can get his number....yeah i have something for gas |
| ROHLMAN | 7:06:24 PM EST | Yea I got you man ill see you in a bit im leaving now |
| MILLER | 7:17:32 PM EST | Ok thanks |

32.   Approximately 1.5 hours later, Miller exchanged the following text messages with JOHN ROHLMAN, apparently after the two had met up and procured "Breaking Bad":

| MILLER | 8:57:44 PM EST | You ok? That state boy got me nervous |
|---|---|---|
| ROHLMAN | 9:01:12 PM EST | Yea im cool and dennis dont want his number out to anyone else so I mean you can go through sophie or greg or something I guess. Hes shady as fuck |
| MILLER | 9:02:55 PM EST | Alright thanks anyway |
| ROHLMAN | 9:03:52 PM EST | I tried man. I told him you were cool but he doesnt want anymore people I guess. I dont get it. Money is money but whatever |
| MILLER | 9:05:24 PM EST | Alright thanks anyway |
| ROHLMAN | 9:06:14 PM EST | No prob man. Sorry. If u need something tomorrow before I go away at like 1 give me a call |

## SICA is Arrested While in Possession of "Breaking Bad" and Acknowledges Responsibility for the Deaths

33.   From speaking with a member of the Task Force, I know that, on or about February 2, 2014, a vehicle in which DENNIS SICA, the defendant, was riding was stopped by the East Fishkill, New York Police Department.  After the vehicle was stopped, a police officer observed what appeared to be glassine envelopes of heroin lying on the floor of the vehicle (the "February 2 Envelopes").  SICA was placed under arrest for criminal possession of a controlled substance, in violation of New York Penal Law.  Subsequent examination revealed that the

12

February 2 Envelopes were each stamped with a "Breaking Bad" stamp identical to the one that appeared on the Miller Envelopes. A photograph of some of the February 2 Envelopes is attached hereto as Exhibit C.

34. I have reviewed a laboratory report summarizing chemical analysis performed on the contents of the February 2 Envelopes. The report indicates that the February 2 Envelopes each contained a mixture of heroin, fentanyl, and quinine.

35. In addition, I have reviewed a text message exchange that took place on February 4, 2014, between JOHN ROHLMAN, the defendant, and an individual who purchased heroin from DENNIS SICA, the defendant, in the past ("Witness-5"). During the exchange, ROHLMAN made reference to the fact that SICA was in jail. When Witness-5 asked why, ROHLMAN replied, "Man slaughter. People died from breaking bad bags and there tryna get him for it." Shortly thereafter, Witness-5 texted ROHLMAN that she had just called Miller's house and learned of Miller's death. ROHLMAN replied, "Holy shit I cant even believe that. This is why dennis is in trouble im guessing."

36. From speaking with a witness who is a close associate of DENNIS SICA, the defendant, and was with him at the time of his February 2, 2014 arrest, I learned that SICA maintained a safe deposit box at the Poughkeepsie, New York branch of TD Bank in which he stored the proceeds of his drug sales. On or about February 26, 2014, DCDTF officers searched the safe deposit box pursuant to a New York State search warrant and found over $10,000 inside.

37. After Witness-4 overdosed on "Breaking Bad," she was imprisoned at the Dutchess County Jail for a violation of parole. At the jail, Witness-4 spoke with DENNIS SICA, the defendant, while the two were receiving treatment in the medical unit for heroin withdrawal. According to Witness-4, during that conversation, SICA confessed to her that three people had died from using heroin sold by him. SICA identified Brown by her first name as one of the people who had died and stated that Brown was the sister of Witness-3.

38. Witness-4 has also provided me with letters that DENNIS SICA, the defendant, sent to her while the two of them were detained at the Dutchess County Jail. In one of the letters, SICA wrote, in substance and in part, "[T]his time I finally realized that I gotta change cuz what doing out there actually affecting other people. That's why I'm done for good[.] I aint' just saying it[.] I mean it. Yeah[,] what I

13

was talking to you about in medical[,] I think is over[.]  They
gave up on it cuz got nothing.  [Witness-3] wasn't mad at me[.]
I don't think he told me they gave up but I haven't heard back
from him[.]"

39.   Based on my conversations with Witness-4, as well
as my involvement in this investigation, I believe that in the
letter quoted above, SICA was referring to his belief that
prosecutors had given up investigating his role in the death of
Brown because of a lack of evidence that he had supplied the
heroin on which she overdosed.

WHEREFORE, the deponent respectfully requests that
arrest warrants be issued for DENNIS SICA and JOHN ROHLMAN, the
defendants, and that they be arrested, and imprisoned, or
bailed, as the case may be.

LOUIS SCHMIDT
Special Agent
Drug Enforcement Administration

Sworn to before me this
17th Day of June 2014

THE HONORABLE LISA MARGARET SMITH
United States Magistrate Judge
Southern District of New York

14

SICA-US000348

## EXHIBIT A



SICA-US000349

EXHIBIT B



SICA-US000350

EXHIBIT C



SICA-US000351