```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ----------------------------------x

 3   UNITED STATES of AMERICA,

 4             -against-                    14 Cr. 462 (CS)

 5   DENNIS SICA,

 6                   Defendant.

 7   ----------------------------------x

 8
                                   United States Courthouse
 9                                 White Plains, New York

10                                 February 20, 2015

11
     B e f o r e:
12
                         HON. CATHY SEIBEL,
13                               District Court Judge

14   A P P E A R A N C E S:

15   SCOTT HARTMAN
     BEN ALLEE
16           Assistant United States Attorneys

17

18   THEODORE GREEN
     RICHARD WILLSTATTER
19           Attorneys for Dennis Sica

20

21   ALSO PRESENT:
     Special Agent Louis Schmidt
22

23

24
     ANGELA A. O'DONNELL, RPR
25   Official Court Reporter
```

Angela O'Donnell, RPR, 914-390-4025

1                        P R O C E E D I N G S

2              THE COURT:  All right, good afternoon,

3    Mr. Hartman, Mr. Allee, Mr. Green and Mr. Willstatter and

4    Mr. Sica.  I guess we have a bunch of things to talk about;

5    some discovery issues and our looming trial date.  And I

6    gather those issues overlap to an extent, to a significant

7    extent.  Let me just ask one question before we start

8    because I want to talk about all the different issues

9    individually.  Is it still the Government's best guess we're

10   talking about a two-week trial?

11             MR. HARTMAN:  I mean, Judge, that's going to

12   depend a little bit on the length of the crosses, but as far

13   as our estimate of our case, I mean, we estimate 16 to 17

14   witnesses, so we think two weeks should be enough.

15             THE COURT:  Well two weeks should be enough

16   including cross or not including cross?  I mean, giving your

17   best guess.

18             MR. HARTMAN:  Our best guess is that we will be

19   done in two weeks.

20             THE COURT:  All right.  And Mr. Green,

21   Mr. Willstatter, do you also think we're talking about two

22   weeks or do you think longer?  You're both very

23   experienced --

24             MR. GREEN:  It's very hard to say --

25             THE COURT:  I'm not holding anybody to anything, I

1    just want your best guess.

2            MR. GREEN:  It's hard to say, especially given

3    some of these open issues, but it could conceivably bleed

4    into next week or two, it's really hard to say.

5            THE COURT:  I mean, two weeks sound a little bit

6    optimistic if everybody is really going to be slugging out

7    all these issues, but let's talk about them, and I guess I

8    will take them in the order they're raised in Mr. Green's

9    letter although some of them are sort of purely trial date

10   issues and some of them are discovery issues but we'll sort

11   it out.

12           First Mr. Green points out that the government has

13   recently, on the 6th of February, turned over what I gather

14   is the back-up for the lab reports on the drugs and this is

15   4500 pages and the defendant needs time to send that to a

16   defense expert.  And I believe all that, I just am not clear

17   on why the five weeks or more that will have elapsed between

18   that disclosure and the trial is not enough for a defense

19   expert to do that.  So I'm all ears.

20           MR. GREEN:  Yes, well, your Honor, we copied the

21   4500 pages and we provided them to our toxicologist.  There

22   were also some new information in one of the autopsy reports

23   which certainly ties in with the toxicology issue.  You

24   know, we got them to him promptly and he has them.

25           THE COURT:  But is he saying I can't possibly look

                 Angela O'Donnell, RPR, 914-390-4025

1    at these, this is too much for me to look at in the next

2    month?  I mean, if I understand, a lot of the back-up is

3    computer generated test results and that sort of thing, it's

4    not like you're going to be pouring over it.  I understand

5    your application --

6              MR. GREEN:  Well, it took him a while, it took me

7    a while to get to fully get briefed on the original set of

8    lab reports which was only 37 pages.

9              THE COURT:  Well that's where the real information

10   is.  I mean, as I understand it, the back-up, the stuff that

11   you just got ties in to the conclusions that are in the

12   reports, and I understand you're entitled to have your

13   doctor, your expert check the work of the Government's

14   expert.  I also understand your application for an

15   adjournment is based on a whole bunch of things besides

16   this.

17             MR. GREEN:  Yes.

18             THE COURT:  But I just want to understand with

19   respect to this narrow issue, your expert is not telling

20   you, I can't review this between now and March 16.  He's not

21   said that.

22             MR. GREEN:  Well, he hasn't told us when he's

23   going to be finishing the review.  We got it to him as

24   quickly as possible.

25             THE COURT:  I'm not doubting any of that.

1          MR. GREEN:  So I don't have an estimate of when

2    he'll finish, your Honor, unfortunately.

3          THE COURT:  Next Mr. Green's letter on page two

4    mentions that the government apparently inadvertently turned

5    over reports relating to drugs seized that the government

6    does not attribute to Mr. Sica but which were apparently

7    suspected of being similar in that they contain heroin and

8    fentanyl.

9          And the defense is now asking, if I understand

10   correctly, for any information that the government has about

11   heroin-fentanyl mixtures that were being distributed in

12   Dutchess County because I gather they may want to argue that

13   the drugs that killed the three victims in this case were

14   not the drugs that came from Mr. Sica, they came from

15   someone else or that the government hasn't proven that they

16   didn't come from someone else.  And the Government's

17   response, as I understand it, is we're not arguing that the

18   fact that there's fentanyl mixed with the heroin means it

19   came from Mr. Sica, we're going to have witnesses who are

20   going to say it came from Mr. Sica and texts and other

21   evidence that it came from Mr. Sica, which doesn't mean that

22   the defendant still may not want to defend by saying the

23   drugs that killed the people weren't from Mr. Sica.  So, the

24   parties are talking a little bit past each other as far as I

25   can tell.

Angela O'Donnell, RPR, 914-390-4025

1              I gather, and correct me if I'm wrong, that the

2      government is not going to dispute that other people in

3      Dutchess County in this timeframe of late 2013 early 2014

4      were selling heroin that had fentanyl in it.

5              MR. HARTMAN:  That's correct, Judge.  I believe

6      the two exhibits that were produced actually just contained

7      fentanyl for whatever that's worth.

8              THE COURT:  Oh, just fentanyl.  What exactly is

9      that anyway?

10             MR. HARTMAN:  Fentanyl is a synthetic opioid, it's

11     different from heroin, it's another pain medication.  It's

12     used on the battlefield for soldiers who are injured.  It

13     works like heroin, it's just a much more potent opioid.

14             THE COURT:  All right.

15             MR. HARTMAN:  But it's chemically distinct.  It's

16     a different substance.

17             THE COURT:  So the Government's theory quite

18     clearly is not, because there was fentanyl in these corpses

19     it must have been Mr. Sica's drugs.  At the same time the

20     defense is certainly entitled to argue that whatever killed

21     these people could have come from someone else and the

22     question is whether it's discoverable that the government is

23     aware of other potential suppliers of fentanyl and whether

24     that is either Rule 16 or *Brady*.  I always like to keep

25     things simple just to help in my own mind, so to use an easy

1    example, if the defendant were charged with robbing the

2    Chase Manhattan on Mamaroneck Avenue, the fact that somebody

3    else robbed banks wouldn't be discoverable and wouldn't be

4    *Brady* absent some unique MO or some other reason to believe

5    that that other person was connected to the Chase Manhattan

6    robbery the defendant was charged with.  So, for example, if

7    there was video of somebody else who was a bank robber

8    casing that Chase Bank around the relevant time, then I

9    would say, yes, that should be turned over.  But just the

10   fact that there's another person in White Plains who robs

11   banks doesn't entitle the defendant to that guy's name and

12   reports and all that.  Likewise if, you know it seems to me

13   in this case, if the people who died if there was any reason

14   to believe that they had other sources, it seems to me that

15   would be discoverable.  But just the fact that there are

16   other drug dealers in Dutchess County with no connection to

17   these people wouldn't seem discoverable.  So I'm thinking

18   that, if there's any evidence connecting other heroin slash

19   fentanyl dealers to these three victims, that would be *Brady*

20   in the sense that it suggests an alternative suspect and

21   that seems to me should be turned over.

22            I don't know if there is.  But, for example, if we

23   had the victims' phones and it seems like they have other

24   contacts who are drug dealers, that should be apparent and

25   if the -- well not apparent, but that should be discernible,

 1  and to the extent those people are known to the government

 2  and there's information about who they sold to or what they

 3  sold, I would think that would be discoverable.  If there's

 4  no connection, I don't know.

 5           Let me try to get my arms around what we're

 6  talking about.

 7           In this case the Government's charged that three

 8  deaths resulted from the drugs distributed by the defendant.

 9  How many other overdoses in the general timeframe were there

10  in the general area?  I mean, talking about five, are we

11  talking about 50?

12           MR. HARTMAN:  Judge, if I could confer with

13  Mr. Schmidt, he probably has a better sense of this.

14           THE COURT:  Sure.  He can come up.

15           MR. HARTMAN:  Judge, it's our understanding that

16  the DEA was investigating about 20 to 30 overdoses, not

17  overdose deaths, but 20 to 30 overdoses that were heroin or

18  fentanyl --

19           SPECIAL AGENT SCHMIDT:  Related.

20           MR. HARTMAN:  Not exclusively heroin, not

21  exclusively fentanyl, but heroin or fentanyl or some mix.

22           THE COURT:  And in how many of those cases do you

23  think you know who the supplier was?

24           MR. HARTMAN:  Not many.  Judge, I mean, the

25  exhibits that were turned over erroneously in this case were

1   connected with an investigation where we did believe we knew

2   who the supplier was.  There's a person who was supplying,

3   we believe, pure fentanyl.  We don't have any reason to

4   believe that supplier was connected with the deaths that

5   were at issue in this case.  We didn't find any connection

6   between that individual and these victims.

7           THE COURT:  So, let me ask Mr. Green, what exactly

8   are you asking for?  I mean, you're not asking for the name

9   of every heroin dealer in Dutchess County I assume.

10          MR. GREEN:  Well, we're asking for information on

11  those particular drugs.

12          THE COURT:  What particular drugs?

13          MR. GREEN:  The drugs that were involved in those

14  20 or 30 cases that the government knows, has just mentioned

15  or -- well we also understand from newspaper reports that

16  actually there were many more than that in Dutchess County

17  reported.

18          THE COURT:  Well what timeframe are we talking

19  about?  I mean, every overdose --

20          MR. GREEN:  I would say in late 2013 and into

21  2014.  The thing is that --

22          THE COURT:  Well I guess there's a few concentric

23  circles of information here.  There are people who sell

24  heroin, which is a larger group than people who sold the

25  heroin that resulted in overdoses, and then there's an even

1   smaller group, which is, people who sold the heroin that

2   resulted in overdoses who the Government's been able to

3   identify and then an even smaller group of those who have

4   been charged.  And I do think there's -- whether or not

5   they've been charged is relevant.  If I tell them, give

6   Mr. Green the name of everyone you suspect is a drug dealer

7   but some are still on the street or being investigated, that

8   could be a slightly dicey thing.  But what reason --

9           MR. GREEN:  Well the government has a theory that

10  there was fentanyl or heroin-fentanyl and fentanyl found in

11  two of the people who are deceased, there was only heroin

12  found in the others, in the other, but the government is

13  trying to work on a theory that there could have been

14  fentanyl there.  You know, their theory, they've developed a

15  theory against Mr. Sica that seems to make a fentanyl or

16  possibly a heroin-fentanyl mix as a marker of the particular

17  drug that they're alleging that was sold in this case.

18          THE COURT:  I don't know, the way I understood

19  their theory is it was Breaking Bad that was the marker, the

20  brand, not just the existence of heroin.

21          MR. GREEN:  But the way that they're going to try

22  and circumstantially prove it is partly through the

23  toxicology results which they're going to offer which

24  contained, which, if they indicate fentanyl, the

25  Government's going to argue that that's a marker of, or an

1   MO, if you will, with respect to our client.  That's going

2   to be their allegation and their theory.

3           THE COURT:  Well I thought that they expressly

4   disavowed that theory that they were not going to be arguing

5   fentanyl means --

6           MR. GREEN:  Well how they characterize it --

7           THE COURT:  Mr. Sica.

8           MR. GREEN:  This is the way it's going to come out

9   at trial, I expect, based on reviewing the evidence.

10  They're going to be offering autopsy results --

11          THE COURT:  Well, let's ask.

12          MR. GREEN:  -- toxicology reports.

13          THE COURT:  Are you going to be making the

14  argument that because there's fentanyl in it it must be

15  Mr. Sica or are you going to argue there's fentanyl in it

16  that's consistent with Mr. Sica?

17          I understand you're also planning to present

18  direct evidence it was Mr. Sica, but what are you going to

19  argue about fentanyl?

20          MR. HARTMAN:  Judge, I think what we'll say about

21  fentanyl is that we have samples of Breaking Bad that we

22  have recovered that we have tested --

23          THE COURT:  From end of January, beginning of

24  February.

25          MR. HARTMAN:  That's correct.  Not from December

1    or from November, from early February, that contain a mix of

2    fentanyl and heroin.  That's consistent with what is found

3    in the bodies of Laura Brown and Tom Miller, both of whom,

4    as to whom we have direct evidence that they purchased drugs

5    from Mr. Sica.

6              THE COURT:  Right.  But, I mean, I'm gathering,

7    maybe I'm wrong, I'm gathering that what this trial is

8    really going to be about is not so much whether these people

9    got drugs from Mr. Sica, I mean I understand that is an

10   issue, but the big issue is whether the drugs they got from

11   Mr. Sica are what killed them and that's -- you know,

12   obviously the defendant is going to want to argue that there

13   were alternative sources, and I imagine you've got to need

14   something more than that, Mr. Green, to make it

15   discoverable.  I mean every case with a death-resulting

16   charge there will be alternative sources, that doesn't mean

17   the government has to turned over all the information about

18   all the drug dealers in the neighborhood.

19             MR. GREEN:  Well we see evidence in the discovery

20   that there were alternative sources, that there were other

21   forms of drug packaging found or that people were reaching

22   out to the people as potential sources of drugs.  The notion

23   that --

24             THE COURT:  Look I don't think there's any

25   question the government has to turn over any information

 1   suggesting that these three victims had other sources.  That
 2   seems clear to me.  So if Breaking Bad and some other brand
 3   were found in somebody's house and the government knows the
 4   source of the some-other-brand, that, it seems to me, they
 5   have to turn over.  But what you're asking for is so broad
 6   you're asking for the name of anyone else in the area who
 7   dealt that substance even with no reason to think that there
 8   was any connection between that substance and the people who
 9   died.  So that just seems way too broad to me.  And you
10   haven't given me any authority for the proposition that
11   you're entitled to that, so I don't think, you know, if
12   somebody's found OD'ing in Manhattan of a heroin-fentanyl
13   mix, the government doesn't have to call up the NYPD and
14   say, give us the name of everybody who sold heroin with
15   fentanyl mixed in it just because one of those other people
16   might be the source and the government doesn't have to turn
17   over all the reports relating to all those people.  There
18   has to be some, it seems to me, connection before those
19   reports become relevant.
20          MR. GREEN:  I think we need to look at the
21   reports.
22          THE COURT:  Well it doesn't work that way.  I
23   mean, I'm giving you a very simple example:  Philip Seymour
24   Hoffman turned up dead, I'll give you that example.  He OD'd
25   on heroin.  Is the guy who was charged with selling him that

1    heroin, would the NYPD have had to give over the reports of

2    every other heroin dealer in Manhattan?  Of course not.

3    It's just way, way too broad and it's not -- which is not to

4    say that you can't defend by saying the government hasn't

5    proven we were the source or there were other sources, but I

6    don't think it means the government has to turn over reports

7    relating to anybody in the vicinity who might have been

8    dealing the similar substance.  If there's any whisper of a

9    connection between any of those dealers and these victims,

10   then it's an entirely different story and then I do think

11   they need to turn it over.

12          MR. GREEN:  One moment, Judge.

13          MR. WILLSTATTER:  Your Honor, unless the defendant

14   can obtain the information concerning other seizures of

15   heroin and fentanyl in Dutchess County and attempt to tie

16   them up to the victims in this case ourselves, other than

17   that, relying strictly on the good faith of the government

18   to decide whether or not something is related or

19   unrelated --

20          THE COURT:  Well that's what *Brady* does.  I mean,

21   there's *Brady* and there's Rule 16.

22          MR. WILLSTATTER:  Well we think the material is

23   material to the defense because it's up to us to advance the

24   defendant's right to present a defense.  We're the ones who

25   are responsible for defending Dennis Sica.  Once we get the

1    information, it is the Court who will decide whether or not

2    that information is admissible, but to prevent us from

3    obtaining the information in the first place and attempting

4    to see if we can come up with something that might be

5    helpful to the defense is going to hamstring us because

6    otherwise --

7              THE COURT:  Well answer my question then.  Do you

8    think that every heroin dealer in Manhattan is relevant to

9    the defense of the guy who's charged with supplying Philip

10   Seymour Hoffman?

11             MR. WILLSTATTER:  I do not.

12             THE COURT:  Or is there some limiting principle?

13             MR. WILLSTATTER:  I do not, but in this case

14   they're alleging an unusual combination of heroin and

15   fentanyl in Dutchess County, New York in a limited time

16   period and from reading their complaint it is apparent that

17   the government is alleging that that Breaking Bad was the

18   source of all these deaths and it is a terrible thing this

19   particular person did.  When, in fact, according to the

20   information we have developed, as is well-known to the

21   government, there were many other sources of heroin and

22   fentanyl in that county, there were at least ten deaths, not

23   three as are limited in this case, but during the period of

24   time during approximately November and spring of 2014,

25   November of 2013 to the spring of 2014, there were some

1    reported ten deaths in Orange County and more in other

2    counties in the surrounding areas of the Hudson Valley and

3    some 260 overdoses reported in the County of Dutchess.  So

4    there are -- and, you know, many of those, according to the

5    published press reports, were linked to heroin-fentanyl

6    mixes.  And so we know that the victims in this case were

7    regular users of heroin and apparently and possibly regular

8    users of heroin-fentanyl mixes.  So they had other sources

9    that could have caused their deaths.  And unless we know

10   where -- you know, the government has this information

11   already.  They with decide what is helpful to them and what

12   is not helpful to them.  Pointedly, their papers over and

13   over again talk about what their theory is but we cannot be

14   bound by their theory.

15           THE COURT:  I agree with that.

16           MR. WILLSTATTER:  I know the Court knows this.

17   But we have an obligation to Mr. Sica to obtain the evidence

18   and to see if we can develop that evidence in a manner which

19   is admissible at this trial.  And naturally the Court will

20   be the gatekeeper of whether that information can be

21   admitted at trial, and we would not attempt to offer

22   evidence that was completely unrelated.  No, we were not

23   seeking every heroin dealer but we are seeking, and we're

24   not even seeking the names of dealer unless they know

25   they're specifically tied with these particular victims, but

 1    when it comes to seizures of heroin and fentanyl in the time

 2    period alleged in the indictment, it is entirely relevant

 3    for us, that is, material to our defense for us to obtain

 4    information that the government already has and can use or

 5    not use at their leisure to develop our defense.

 6             THE COURT:  So now you've narrowed.  Seizures of

 7    heroin-fentanyl mixtures in fall of 2013, spring,

 8    winter/spring of 2014.

 9             Why shouldn't the government have to turn that

10    over?  Reports of such seizures.  I don't know how many

11    there would be.

12             MR. HARTMAN:  Judge, if you could just give us one

13    second.

14             Judge, I think that's -- what we could do is we

15    could collect information about seizures of fentanyl-heroin

16    mixes in Dutchess County during the period from October --

17             THE COURT:  October 1, '13 through --

18             MR. HARTMAN:  February 2 or 3rd.  I mean,

19    that's -- I mean --

20             THE COURT:  Well the date of Mr. Sica's arrest;

21    how's that?  Which is what, the 4th?

22             MR. HARTMAN:  I think that's February 2.  We can

23    do that.  Certainly DEA has some of those and the Dutchess

24    County Sheriff's office which we worked with.  We can

25    inquire of them.

1            THE COURT:  I'm not going to make you go out to

2     each individual department, but the County and I would

3     imagine maybe the lab is a good place to centrally find

4     that, but it seems to me the DEA and the sheriff and maybe

5     the big cities, you know, Poughkeepsie.  But I'm not going

6     to make you go to every little hamlet and ask.  But all

7     right, that seems reasonable to me.

8            MR. HARTMAN:  And, Judge, if I can --

9            THE COURT:  You know, I won't give you a formal

10    deadline but do it with all -- I don't want to say with all

11    deliberate speed because I think historically that was

12    interpreted as take your sweet time and I don't want to you

13    take your sweet time.

14            MR. HARTMAN:  We will do it as quickly as

15    possible.

16            THE COURT:  All right.  And turn it over on a

17    rolling basis.

18            MR. HARTMAN:  We will do that, Judge.

19            As far as what we turn over, I mean, we'll discuss

20    that with defense counsel.  I think there is a concern that

21    the Court raised earlier about ongoing investigations into

22    individuals who are not arrested.  I mean, we can certainly

23    turn over property vouchers or lab results that indicate

24    mixes that were seized.

25            THE COURT:  Well to the extent there was an arrest

1   associated with the seizure and it's public, you should turn

2   over that as well.  If you have seizures that are not

3   associated with any name, obviously you can't give a name.

4   If you have seizures that are associated with a name but

5   there's a reason why you don't want to make that available,

6   such as, you know, there's a wiretap up on that person's

7   phone or whatever, you know, you'll have to come to me.

8            MR. HARTMAN:  Okay.  Thank you, Judge.

9            THE COURT:  All right, the next aspect of the

10  letter relates to what the defendant calls a new theory from

11  the medical examiner and what the government says is an old

12  theory of the medical examiner having to do with the fact

13  that there was no fentanyl in drugs that killed Mr. Del --

14           MR. WILLSTATTER:  Dellello.

15           THE COURT:  Dellello.  And I gather the medical

16  examiner's file included some notes of a conversation he had

17  had with the government about whether the fact that there

18  was no fentanyl in that gentleman's body meant that he had

19  not ingested any fentanyl or whether he might have ingested

20  it but whether there were reasons why it might not show up

21  on autopsy and the medical examiner came up with some

22  possibilities as to why it might not have shown up.

23           Defendant argues this should have been disclosed

24  as *Brady*.  I mean, the fact there was no fentanyl in his

25  body was disclosed in June of 2014, I gather.  I'm not sure

1   there's anything exculpatory about the medical examiner's

2   speculation.  Obviously it is Rule 16 material if the

3   medical examiner is going to be asked about it and that kind

4   of segues into another issue raised later in Mr. Green's

5   letter about the expert disclosure and it seems that what

6   the government has done is it's turned over for its

7   chemists, its toxicologists and its medical examiners the

8   laboratory reports and the CVs but that's it.  And you know

9   the rule says you have to turn over a written summary of any

10   testimony that the government intends to use.  So if the

11   government doesn't intend to ask anything beyond the four

12   corners of those reports, that's fine, but if, for example,

13   the government were to ask a question like what might

14   explain the absence of fentanyl, if that information was not

15   provided to the defendants in advance, I'm going to preclude

16   it.  So it seems to me it's a risky proposition to just say

17   that what's in the reports is a summary of the testimony.

18   But that's, you know, that's up to the government.  If, for

19   example, the chemist says, well, I ran this test and that

20   test and the other thing and here are the results and you

21   want to ask the witness to say, well, what do these tests

22   measure and how they work and that's not in the report, you

23   may well have an objection sustained.  So if there's

24   something that's outside the reports it seems to me you

25   ought to summarize it for the defense.  I'm going to hold

1    them to the four corners of what's been turned over.

2            And, you know, if the reports do not, I obviously

3    don't have them, but if they don't set out the bases and

4    reasons for the witness' opinions, that has to be turned

5    over, too.  You can't just turn over a piece of paper that

6    says, you know, the drunk driver's blood alcohol was .08.

7    You've got to turn over what the witness is going to say

8    about why he's concluded that it's .08 and what the bases

9    are for that opinion.  So I'm not at all sure that the

10   government has met its Rule 16 obligations with the experts,

11   but the way I police that is I preclude at trial anything

12   that hasn't been summarized and/or for which reasons and

13   bases for opinion have not been provided.

14           So, you know, I don't want to tell you how to do

15   your job but you know how I'm going to look at this.  And

16   I'm not saying you have to give a script where here's what

17   he's going to say about what chromatography is, but you have

18   to say the witness is going to explain how chromatography

19   works.

20           MR. HARTMAN:  Your Honor, based on what you just

21   said about what you require in terms of the disclosure, I

22   think we would like to expand on what we've done so far and

23   we'll do it as soon as we can.

24           THE COURT:  That's probably prudent.

25           Now cellphone records.  I gather we have four

1      categories of cellphone-related issues.  One is cell site

2      and call detail records that have already been turned over

3      that are voluminous.  One is I think moot because one was

4      the defendant's request for the full extraction reports from

5      the seized cellphones and the government is going to turn

6      those over today, it says.  Except I gather you're taking

7      out embarrassing selfies or whatever that's in there.  But

8      if there's anything, you know, arguably related, even if

9      it's embarrassing, it should be turned over.  If it's

10     completely irrelevant, obviously you can not turn it over.

11             Third is the bit-by-bit images, and those were

12     just recently requested.  The government has turned over one

13     and is going to turn over the rest by a week from today.

14             How long does it take a tech person to create

15     whatever report he or she wants to create?

16             MR. HARTMAN:  Judge, we believe that, based on our

17     conversations with the Dutchess County Sheriff's office, we

18     believe that they can do it within the next week.

19             THE COURT:  No, I'm saying like you, as I

20     understand it, when you have these bit-by-bit images, you

21     use this program Cellebrite which extracts everything that's

22     in it.  Is that lengthy process or is that a press of a

23     button?

24             MR. HARTMAN:  It is a press of a button.  I think

25     sometimes it can take a couple of hours.  I mean, what

1    they're going to do to generate these bit-by-bit images for

2    the phones for which it wasn't preserved is to engage in the

3    Cellebrite process again.  So, as I understand it, the

4    program actually creates in bit-by-bit image.

5               THE COURT:  I see.

6               MR. HARTMAN:  And then generates the report off of

7    that.

8               THE COURT:  So I guess I'm not clear, Mr. Green

9    and Mr. Willstatter, what you want to do with these

10   bit-by-bit images that's different from what the

11   government's already done or do you just want them to do it

12   and give it to you?

13              MR. WILLSTATTER:  Our experts are requesting the

14   physical bit-by-bit images of these phones to do their own

15   testing on them, to do their own searches on them.  That's

16   what they want to do.

17              THE COURT:  So they don't need the physical phone

18   but they want the image.

19              MR. WILLSTATTER:  Yes, it's the image of the

20   phone.  If they had the physical phone they would have to

21   extract the --

22              THE COURT:  You're entitled to it.  You're entitle

23   to inspect and copy.  You'll have that next Friday.

24              MR. WILLSTATTER:  That's what they want.

25              Couple things of on this.  One is, we've noticed

1   in the letter yesterday from the government that for the

2   first time they revealed to us that they have iPhones that

3   belonged to Laura Brown and Thomas Miller.  They say in

4   their letter that they couldn't access them because, like

5   everybody else's iPhone, it's password protected; however,

6   in speaking to our experts, what we have learned is that

7   Apple can get around that with a subpoena or an order from

8   the Court.

9          And, secondly, that almost everybody's iPhone

10  through WiFi links an iCloud account.

11          THE COURT:  If they have one; right?

12          MR. WILLSTATTER:  If they have one.  But the way

13  the phone works is you have to set an iCloud account when

14  you first get it or most of the functions on the phone don't

15  work.

16          THE COURT:  So does that mean that I have one?  I

17  don't even know that I had one.  My phone works.

18          MR. WILLSTATTER:  If you want to make an app you

19  have to use that password to get, you know, to download an

20  app, like MLB, whatever you like, well that is through our

21  iCloud account.  And so what happens is that there is an

22  image on the server of the person's iCloud account.

23          So it's even quicker for Apple to obtain the image

24  of the iPhone through the person's iCloud account, and even

25  if they don't, even if we don't know the person's user name

1   and password, it's just physically easier, I'm told by our

2   experts, for Apple to acquire the image from the iCloud as

3   opposed to searching it.

4          What they tell me is that there is a function

5   that, if you find out how to do it, you could make it so

6   that, if you tried ten times to access your phone with a

7   series of numbers, after ten times it wipes your phone.

8   Right?  But you have to know how -- I didn't even know it

9   existed.  Okay?  Unless the person set that up, like maybe

10   they were Russian spy or something, they had some data that

11   they really needed to keep secret, maybe they worked for the

12   Government or something like that, any person whose like a

13   normal citizen who has an iPhone, unless they have that set

14   up, there is a program that our experts have that will go

15   through the combinations and can access the iPhone.  And it

16   does take time to do that, it can take days to do that.  And

17   you have to have, you know, you have to have access to the

18   phone to do that.  The government can do that.

19          THE COURT:  Sounds like it would be easier for the

20   government to do it.

21          MR. WILLSTATTER:  Yes.

22          THE COURT:  But are you planning to do that,

23   Mr. Hartman, Mr. Allee?

24          MR. HARTMAN:  Judge, we don't plan to do that.  We

25   tried to get in the phones at the time and we weren't able

1  to.

2      THE COURT:  Now you know that you could subpoena

3  Apple and they'll give you the magic word.  If you're not

4  interested in looking at it, then they may come to me and

5  ask me for a subpoena.

6      MR. WILLSTATTER:  We would do that.  So our point

7  is that we need to get those things.

8      THE COURT:  These are the victims' phones.

9      MR. WILLSTATTER:  Yes, they are.

10      THE COURT:  That seems like -- well I want to talk

11  about rule 17(c) in a moment.

12      MR. WILLSTATTER:  If the victims were in touch

13  with other persons who were drug suppliers, that could be

14  material to the defense.

15      THE COURT:  Yeah, it sure sounds like it.

16  Something that, if I were the government, I'd want to rule

17  out, or if it was out there, I wouldn't want to be surprised

18  by it at trial.

19      Look, the defense can subpoena it and it would

20  show up here on the morning of trial and you wouldn't even

21  know about it or they could subpoena it ahead of time if it

22  met the requirements.  I think, given that we're talking

23  about the victims' cellphones, if the government isn't going

24  to get those contents, I'm going to authorize the defense to

25  do it which would -- do you physically need the phone to do

               Angela O'Donnell, RPR, 914-390-4025

1    that?

2          MR. WILLSTATTER:  I think the phone has to get

3    sent to Apple unless they're going to try to do it through

4    the iCloud in which case they might -- I'm not 100 percent

5    sures on this.

6          THE COURT:  I'll give the government the choice.

7    But we're talking about the victims' cellphones and it seems

8    to me both sides would want to look into that phone to see

9    if the victim had other sources and if there was any

10   communication around the relevant time with the other

11   sources.  If you've got a text in there that says, you know,

12   to a third person saying, like, I've used up all my Breaking

13   Bad, can I get something else from you, before the death,

14   that's pretty huge for the defense.  Likewise, if there's

15   nothing like that in there, that's pretty huge for the

16   government.  So I'll let you inform -- I'll let the

17   government inform the defense on Monday whether it's going

18   to do it or whether it's not.  And, if not, I'll sign

19   whatever I need to sign for the defense to do it.

20          Now with respect to the stuff that has been turned

21   over, which is the cell site and call detail records for a

22   bunch of phones, including the Rohlman phone -- let me back

23   up and ask a question.

24          Does call detail includes the contents of texts

25   and emails?

                    Angela O'Donnell, RPR, 914-390-4025

1          MR. HARTMAN:  No, Judge, it's just the actual
2     transaction.  So it will show time, text message or call,
3     toll versus text.  And it will show the length of the
4     communication if it's toll.
5          THE COURT:  The Rohlman cellphone you have the
6     actual texts and the emails.
7          MR. HARTMAN:  Yes.
8          THE COURT:  And were those extracted from the
9     phone?  Not the phone company.
10          MR. HARTMAN:  They were extracted from the phone.
11          THE COURT:  Okay.  So the first argument is that
12     the call detail and the cell site information is voluminous
13     and defense has to confer with its own experts and they need
14     time for that.
15          Do you have, Mr. Green, any sense of how long your
16     experts are going to need with this material?
17          MR. GREEN:  We do.  We spoke with the expert very
18     recently.  After they get all the materials, which is still
19     coming in on a rolling basis, I think conservatively they
20     would need about two weeks to process it so that they could
21     put it into a usable form and then at least another two to
22     review it and confer with us about it.  So, a minimum of, I
23     think a bare minimum of four weeks but probably longer.
24     Four-to-six weeks, your Honor.
25          THE COURT:  All right.  And this report of

 1   Mr. Rohlman's phone I gather it's a lot of pages, but the
 2   Government's suggesting that, like the sample they attach to
 3   their letter, that a lot of those pages are computer
 4   gobbledygook and that, you know, it's not really 5000 pages.
 5           MR. GREEN:  It's many, many more pages and many
 6   more calls and texts than what we originally had.
 7           THE COURT:  That's clear.  That's clear.
 8           MR. WILLSTATTER:  Let me see if I can help here,
 9   your Honor.  What the experts have explained to us is that
10   the format that the government gave it to us a lot of this
11   is really hard to understand, but when we have the experts
12   for want of a better word break this down for us, they're
13   going to be able to help us understand what a lot of this,
14   what looks like gibberish, means.  You know, so, we have
15   to -- they provided this what's called an extraction report,
16   but that's the format that they decided to send it to us.
17   Our experts need to compare the physical data phones to the
18   CDR reports or call detail records reports and the historic
19   cell site data to put it all together in order to process
20   all that data and be able to come to us and explain to us
21   how it all fits together.  Like what some of these messages
22   mean.  We can't tell, a lot of this stuff is just looks like
23   gibberish, as I'm saying, you can't make any hide nor tail
24   out of it, that's because of the format that it's produced
25   in.

1          THE COURT:  Well, I'm looking at it.  Like most of

2    the gibberish that takes up the two middle pages and top of

3    the third page and starts on the bottom, it looks like a

4    short email:  Hi, just a reminder that you're receiving this

5    email because you've expressed an interest in

6    *HeadlineHerald*.  Don't forget to add us to your address

7    book.  And the rest is code.  It's like the font and all --

8    it's code.  So I don't know that that email has any

9    relevance at all or that those three pages have any

10   relevance.

11          MR. WILLSTATTER:  Maybe that's true, but there is

12   much data that needs to be assimilated and it's not just

13   from one source.  The data that you get from the phone has

14   to be compared with the call detail records and the

15   historical cell site information and put into a format that

16   we can use it.

17          THE COURT:  Right they're going to put it all in a

18   database and make sure it matches and all that.  I get that.

19   That takes time.  I'm not saying it doesn't need to be done,

20   I'm just saying it does look like, of course I only have

21   this one extract, but it does look like two of those four

22   pages you wouldn't have to study.

23          All right, and the last question is summary charts

24   and I think turning those over with the exhibits is fine.

25          So, let's talk about the trial date.  Right now

                    Angela O'Donnell, RPR, 914-390-4025

1   it's about three weeks away, four weeks away.  Three, I

2   guess.  And I can see that some additional time is going to

3   be necessary; however, I am starting another trial June 1,

4   that's four-to-six weeks and August is pretty much out for

5   me.  And I don't want to wait until September.  So I'm not

6   pushing this 60 days but I can push it -- I can probably

7   push it off a month, which it seems to me should be enough

8   time given not only the lawyer power but the expert power

9   that --

10          MR. GREEN:  Excuse me, can I clarify?  The

11   four-to-six week estimate that we got from our experts--

12   that's after they get all the stuff, which we're told that

13   things are going to be coming in February 27 and --

14          THE COURT:  Well they can start.

15          MR. GREEN:  Estimate may be later than that.

16          THE COURT:  They can start putting in their

17   database what they have now and as they get new things

18   they'll do it on a rolling basis and it will be complete

19   hopefully in early March and then they'll have more than

20   four weeks.

21          Does anybody have conflict, vacations or other

22   problems, in April or May that I need to work around?

23          MR. WILLSTATTER:  Yes.

24          THE COURT:  And what are they?

25          MR. WILLSTATTER:  The 17th through the 19th I will

1   be away, so I really don't want to start immediately after

2   that.

3             THE COURT:  Well, that may be unavoidable.

4             All right, anybody else?

5             MR. WILLSTATTER:  What about May 4?

6             THE COURT:  I just want to hear about anybody

7   else's issues.  Okay.

8             I mean, my guess is we're talking -- I still think

9   two weeks with all these experts is a little optimistic, so

10  I want to leave three.  I have a graduation in mid-May that

11  is going to have me out for one or two days.  How about

12  April 27?

13            Is that all right?

14            MR. HARTMAN:  It's fine for us, Judge.

15            MR. GREEN:  Yes.

16            THE COURT:  April 27 it is.  Let's adjust all the

17  other dates.

18            MR. WILLSTATTER:  One point on the summary charts

19  is that, you know it would be important for us to have the

20  summary charts because sometimes it's not clear what they

21  emanate from.  So if they're summary charts based on

22  cellphone or cell site evidence, we would need to know sort

23  of where it's coming from --

24            THE COURT:  If they're going to go into the jury

25  room, it needs to be clear where it's coming from.  I mean,

```
 1    what I usually see the government do, they put on the chart
 2    the exhibits from which they extracted the information.
 3              Look, these charts have to be turned over in
 4    sufficient time that the defense can check the Government's
 5    work, but if you get a chart March 1 that says this
 6    information comes from Exhibit 522 and you don't have
 7    Exhibit 522 until March 9, you're not going to be able to do
 8    much with it.  What I'll do is, since we now have a little
 9    more time, is I will have the government turn over its
10    exhibits a little further in advance of trial.
11              We originally had motions in limine coming in on
12    Monday.  I can leave that if everybody has already done them
13    or if they were going to be working all weekend on them, I
14    can push that off a little.
15              When Alice comes back out, I'm going to ask her
16    for a final pretrial conference.  Or Jen can do it.  Let's
17    see, can you find me, we're now going to start the 27th.  So
18    can we have a final pretrial conference maybe like the 22nd?
19    What are we doing April 22?
20              All right, final pretrial conference 11:00 a.m. on
21    the 23rd of April.  3500 material --
22              MR. HARTMAN:  I'm sorry, Judge, you said the 23rd
23    for the final pretrial?
24              THE COURT:  Final pretrial 11:00 a.m. on the 23.
25              Actually, you know what, I'm sorry, because we
```

1    have more time, let's make that earlier.  I think it's

2    better for the lawyers to know the rulings on the motions

3    *in limine*.  What do we have like around the 15th, 16th in a

4    that area?  Let's say 9:30 on the 16th.  April 16 at 9:30

5    will be the final pretrial conference and that way you'll

6    have time to absorb the rulings on the motions *in limine*.

7    So working backwards from that, why don't we say, how about

8    motions *in limine* March 2 and opposition March 16.  Requests

9    to charge and *voir dire* questions March 23.

10             MR. WILLSTATTER:  *Voir dire* and what did you say,

11   Judge?

12             THE COURT:  *Voir dire* and request to charge

13   March 23; Government exhibits, April 13; 3500, April 20th.

14             Let me say those again.  Motions *in limine*

15   March 2; opposition, March 16; requests to charge and

16   proposed *voir dire* questions, March 23; government exhibits,

17   March 13; final pretrial conference, March 16; 3500 --

18   excuse me, April, April 13 for the government exhibits;

19   April 16 for the final pretrial conference; April 20 for the

20   3500; April 27 for jury selection and trial.

21             While we're on the subject of jury instructions, I

22   had gotten at the end of January a letter from Mr. Green and

23   I got a response in mid-February from Mr. Hartman regarding

24   whether the indictment was duplicitous or whether it would

25   be cured by a special verdict and also raising a question of

1    the death-resulting charge conceivably being found without

2    the jury finding actual distribution.

3          So, the duplicity issue arises from the

4    possibility that some jurors could find that Victim One's

5    death was caused by the defendant's drugs and other jurors

6    Victims Two or Three without all 12 being unanimous, but the

7    government in its letter, I wouldn't say agrees with the

8    defendant but agrees it would be prudent to charge the jury

9    that they need to be unanimous as to any individual death

10   resulting from the offense and that a special verdict

11   requiring such unanimity is appropriate.  So I think that

12   takes care of that.

13         And then the other argument is, well, the charge

14   is conspiracy to distribute or possess with intent to

15   distribute and I guess I'm a little confused about what the

16   defendant's concern is because I don't understand how -- a

17   jury can't find that death resulted from the conspiracy

18   without finding that somebody distributed.  Obviously the

19   fact that somebody's got the drugs in their pockets isn't

20   going to kill anyone.  I mean, I can certainly instruct the

21   jury that they shouldn't consider whether death resulted as

22   to a particular defendant without finding actual

23   distribution either by the defendant or by a co-conspirator

24   for whose actions he's responsible, but I don't know why

25   that wouldn't solve the problem.  I don't think they have to

1    find that the defendant personally handed the drugs.

2           Do you think that solves the problem if I

3    instruct:  You should only consider whether death results if

4    you find -- I'm writing this down -- the defendant or a

5    co-conspirator for whose conduct the defendant would be

6    accountable actually distributed drugs to that victim or to

7    that individual.  I think it solves the problem.

8           MR. GREEN:  Your Honor, the concerns in that

9    letter had to do with whether the indictment charging the

10   conspiracy is duplicitous because it charges both a theory

11   of possession with intent to distribute and a conspiracy

12   theory of distribution.

13          THE COURT:  Well, it can't be duplicitous because

14   it's a multi-object conspiracy.

15          MR. GREEN:  Well I think the reason is because, I

16   think the reasoning of the district court cases that I cited

17   in that letter was that, because of the aggravating element

18   that requires a distribution and that you can't have a --

19   and because that's considered a separate crime under the law

20   under *Apprendi*, you can't have an indictment that alleges

21   both because one is an impossibility with respect to the

22   aggravating charge.  The mere possession with intent to

23   distribute as a basis for convicting someone is, those cases

24   consider it or if they don't consider it a legal

25   impossibility they consider it essentially charging two

1    different offenses.  I know that your Honor --

2              THE COURT:  Why is an instruction to the jury that

3    you can't find death resulting without finding an actual

4    distribution solve that problem?  It would require a jury

5    finding, so it's not an *Apprendi* issue, and it solves the

6    possibility problem because there's no way the jury will

7    find death resulted if the drugs weren't distributed.

8              MR. GREEN:  Because you have another theory in

9    there of possession with intent to distribute which can't be

10   a basis for the aggravating charge.

11             THE COURT:  Exactly, which is why I'm telling them

12   you have to find distribution before you can --

13             MR. GREEN:  But I think those cases also, that's

14   why those courts also believe that it was duplicitous

15   because --

16             THE COURT:  Well those weren't conspiracies.

17   First of all --

18             MR. GREEN:  I think one -- I thought one of them

19   was.

20             THE COURT:  I mean*, King* was a substantive count,

21   but regardless distribution and possession with intent to

22   distribute are two different ways of violating the same

23   statute.  I'm sure if this were a substantive distribution

24   the government could break it up and say distribution with

25   death resulting and possession with intent to distribute.

 1  But here we have a conspiracy.  I'm essentially going to

 2  break it up the same way in the instructions.  I'll make

 3  sure the jury understands that before they can find that

 4  this offense resulted in someone's death they have to find

 5  that a conspirator actually distributed the drugs that

 6  caused the death.  You're not saying, I don't think, that

 7  the defendant has to personally have distributed the drugs,

 8  he just has to be accountable for them either because he's a

 9  co-conspirator or he had, he aided and abetted or he

10  willfully caused or something.

11          MR. GREEN:  We'll flesh that out in our request to

12  charge, but obviously it can't be a mere possession.

13          THE COURT:  Obviously.  Right.  All right, I think

14  we're in agreement.

15          And the last thing I want to talk about, and I'm

16  going to be cryptic because I've gotten a *ex parte*

17  application for some subpoenas from the defense, and I'm not

18  going to tell the government what they are for; however, I

19  don't think that the application addresses an issue I'm

20  concerned about and but which I haven't dealt with in a

21  while and I want the government to give me some law on.  And

22  the government will be doing it in a vacuum because they

23  don't know what the request is, but my memory of what you

24  can ask for via a 17(c) subpoena to be returnable in advance

25  of trial is that it has to be evidentiary and not, you know,

                   Angela O'Donnell, RPR, 914-390-4025

1   investigative and it can't just be, I want to subpoena a

2   bunch of stuff, and if some of it looks good, I'm going to

3   offer it at trial.  My memory is you have to have a somewhat

4   more concrete showing you are going to offer it at trial,

5   but my memory is imperfect and I haven't looked at it in a

6   while, so I want to give both sides, frankly, the

7   opportunity to give me the law on how sure it has to be that

8   the subpoenaed material is going to be offered or is it

9   enough that it could be offered depending on its contents?

10         I remember a body of case law saying you can't use

11  a 17(c) subpoena to fish for -- to do investigation or fish

12  for evidence that you may or may not use, but, as I said, my

13  information is not that fresh.

14         So, as to not delay things, I won't ask for that

15  on Monday but I'll ask for it on Tuesday, how's that, which

16  will be the 24th.  I'm sure the government has it in its

17  computers, it can just spit it out, since you won't be able

18  to tell me anything more than what the law is, and then I

19  will confer further with defense counsel.

20         That's all I had on my agenda.  Anything else we

21  should take up today?

22         MR. HARTMAN:  Judge, the only thing is I think we

23  probably need a speedy trial exclusion.

24         THE COURT:  Ah, yes, I will exclude the time

25  between now and April 27 under the Speedy Trial Act in the

1    interest of justice.  I find the ends of justice served by

2    the exclusion outweigh the best interest of the public and

3    the defendant in a speedy trial because it will enable the

4    defense to obtain and review the materials we've discussed

5    today that are necessary for adequate trial preparation and

6    for both parties to obtain the additional materials we've

7    discussed and for them to prepare.

8            Thank you all.

9            MR. HARTMAN:  Thank you.

10           (Proceedings concluded at 4:23 p.m.)

11                C E R T I F I C A T E

12   Certified to be a true and correct transcript of the

13   stenographic record to the best of my ability.

14           _____

15      Angela A. O'Donnell, RPR, Official Court Reporter

16   United States District Court, Southern District of New York

17

18

19

20

21

22

23

24

25