UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA,

       -v.-

                                14 Cr 462 (CS)

DENNIS SICA,

           Defendant.

--------------------------------------------------------X


DEFENDANT'S SENTENCING MEMORANDUM


GREEN & WILLSTATTER
*Attorneys for Dennis Sica*
200 Mamaroneck Avenue - Suite 605
White Plains, New York   10601
(914) 948-5656
theosgreen@msn.com


To:   All counsel (by ECF)

On behalf of Dennis Sica, we respectfully submit this sentencing memorandum to address what sentence will be sufficient, but not greater than necessary, to meet the goals of the Sentencing Reform Act.

Mr. Sica was convicted, upon his plea of guilty, of one count of conspiracy to distribute controlled substances (heroin and fentanyl). Mr. Sica admitted, as part of his plea allocution, that drugs sold in the course of the conspiracy contributed to the deaths of three people.

As an initial matter, the defense has the following objections to the presentence report:[1]

Para. 15: The defense objects to the inclusion of a statement attributed to Witness 3 that "Sica was selling approximately 250 bundles of 'Breaking Bad' heroin per day due to the drug's popularity." As discussed more fully herein, the defense spoke with "Witness 3" (Matt Leverich) disavowed having stated that Sica sold drugs in that quantity, nor do we believe the evidence supports a claim that Mr. Sica was sold drugs with that frequency or in such amounts.

Para. 26: As argued more fully herein, we contend that the 43 base offense level should not apply because Mr. Sica does not have a prior conviction for a "similar crime" within the meaning of the guidelines and associated commentary, inasmuch as he does not have a prior drug conviction where it was established that death or serious injury resulted. Accordingly, the base offense level should be 38 pursuant to USSG 2D1.1(a)(2).

Para. 30: The probation department argues that Mr. Sica should be found to have had a supervisory role because co-defendant John Rohlman gave Sica rides to make heroin sales or pick

---

[1]We sent these objections to the Probation Department on July 21, 2015. A copy of our objections, with fax confirmation, is annexed hereto as Exhibit A. The Probation Department issued its final report and recommendation on July 29, 2015, and asserted therein that we had not made any objections.

1

up heroin in exchange for free drugs or a portion of proceeds.  As argued herein, we contend that does not make Sica a supervisor of Rohlman.

Paras. 41 and 43: Both of these convictions should have no Criminal History Points because they pre-date the time period of the offense to which Mr. Sica pleaded guilty by more than ten years. Sentencing on the misdemeanor conviction in Para. 14 occurred on March 21, 2003 and sentencing on the misdemeanor conviction in Para. 43 occurred on November 12, 2003.  At the time of his plea allocution, Mr. Sica allocuted to a conspiracy that commenced in December 2013, more than ten years after both of those prior offenses.  Accordingly, pursuant to U.S.S.G. 4A1.2, Mr. Sica's criminal history score should be reduced by two points, putting him in Category V.

Paras. 47 and 49:  In light of the above, Mr. Sica's subtotal criminal history score should be 10 and his total criminal history score should be 12, establishing a criminal history category of V. His offense level, adjusted for acceptance of responsibility, should be 36.


Guidelines Calculation

A.  Objection to enhancement under USSG 2D1.1(a).

U.S.S.G. §2D1.1(a)(1) provides that a defendant's base offense level is 43

. . . if the defendant is convicted under 21 U.S.C. §841(b)(1)(A), (b)(1)(B), or (b)(1)(C), or 21 U.S.C. §960(b)(1), (b)(2), or (b)(3), and the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance and that the defendant committed the offense after one or more prior convictions for a similar offense.

2

In the absence of "one or more prior convictions for a similar offense", the base offense level is 38, under U.S.S.G. §2D1.1(a)(2).

>As originally written, Section 2D1.1(a)(1) provided that the base offense level of 43 applied for an offense that results in death or serious bodily injury with a prior conviction for a similar drug offense[.]   U.S.S.G. 2D1.1(a)(1) (1987 manual).

The original version of 2D1.1(a)(1) included an Application Note that stated: "'Similar drug offense' as used in §2D1.1(a)(1) means a prior conviction as described in 21 U.S.C. §§841(b) or 962(b)." U.S.S.G. §2D1.1(a)(1), Commentary, Application Note 1 (1987 manual).

Effective November 1, 1989, 2D1.1(a) (and the associated commentary) were amended (Amendment 123).  Specifically as to 2D1.1(a)(1), the original above-quoted language from 1987 was replaced by the language that remains in effect today.  Further, the Application Note that equated "similar drug offense" to a "prior conviction as described in 21 U.S.C . §§841(b) or 962(b)" was deleted and replaced by the language: "'Mixture or substance' as used in this guideline has the same meaning as in 21 U.S.C. §841."

>In explaining the reason for Amendment 123, the Commission wrote:

>>The purpose of this amendment is to provide that subsections (a)(1) and (a)(2) apply only in the case of a conviction under circumstances specified in the statutes cited.  The amendment also clarifies that the term 'mixture or substance' has the same meaning as it has in the statute.

Federal Sentencing Guidelines Manual (2014), Appendix C - Vol. 1, Amendment 123, p. 53.

By deleting the prior commentary that equated "similar drug offense" to a "prior conviction" under 841(b), and by commenting that the amendment was to provide that 2D1.1(a)(1) and (2) "apply only in the case of a conviction under circumstances specified in the statutes cited," the commission limited application of the enhancement only to convictions (whether current or prior) that involved the elements of an aggravated 841(b) or 962(b) conviction (that is, one where death or serious bodily injury resulted and was an element of the conviction) and not just any conviction or "prior conviction" as defined in 841(b).   The "statutes cited" in 2D1.1(a)(1) and (2) are the aggravated versions of 841(b) and 962(b), which include an element of death or serious bodily injury resulting from the offense.

Clearly, the Commission intended by this amendment to narrow the applicability of the enhancement, particularly given that 2D1.1(a)(1) calls for an offense level of 43 with a guideline sentence of life imprisonment.   The now-deleted language that equated a prior "similar drug offense" to a "prior conviction" was broad enough to include crimes of simple possession and even drugs crimes classified in some states as misdemeanors ( if the allowable sentence exceeded one year) and diversionary dispositions where the defendant was not convicted in state court.  *See* 21 U.S.C. §§841(b) (providing for enhanced sentences for defendants with a "prior conviction for a felony drug offense");  802(44) (defining "felony drug offense" as "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances."); *Lopez v. Gonzalez*, 549 U.S. 47, 54 & n.4 (2006) (applying definition to simple possession); *United States v. Rivera-Rodriguez*, 617 F.3d 581, 609-10 (1st Cir.

2010)(diversionary disposition); *United States v. Meraz*, 98 F.2d 182, 183-84 (3d Cir. 1993) (diversionary disposition).

If the Commission meant to persist with such a broad definition of a prior "similar drug offense", it would not have completely eliminated the commentary that provided for such a broad definition, nor would if have stated that its intention was to provide that the enhancements would "apply *only in the case of a conviction under circumstances specified in the statutes cited*." [emphasis added]

We are aware of only two Circuits that have ruled on this issue – *United States v. Johnson*, 706 F.3d 728 (6th Cir. 2013) and *United States v. Westry*, 524 F.3d 1198, 1220, n.2 (11th Cir. 2008). *Westry* rejected a defendant's argument against broader application of "similar offense" in a footnote, with no discussion.  In *Johnson*, the Sixth Circuit wrote: "while the definition of 'similar drug offense' was removed from the commentary, the Sentencing Commission still directed courts to turn to the relevant statute to determine whether USSG §§2D1.1(a)(1) and (a)(2) were applicable.  Here, the relevant statute is 21 U.S.C. §841(b)(1)(C)."  The Court then asserted that, notwithstanding that the  guideline provision uses the term "similar drug offense" and the statute uses term "felony drug offense", the provisions "mirror one another in several respects", including that the statute calls for a life sentence where death results in those cases where the government elects to prosecute a defendant as a prior drug felon pursuant to the procedures in 21 U.S.C. §851.  The Sixth Circuit concluded "that the Sentencing Commission intended the term 'similar offense' to be synonymous with the term 'felony drug offense.'" *Johnson*, *supra*, 706 F.3d at 731.  We submit that this conclusion should not be followed by this Court.  The Commission may have intended the terms to be synonymous up until 1989, but that ended with Amendment 123, which deleted the commentary

that provided for such an equation of the two terms.   Further, in explaining the "purpose" of the Amendment, the Commission made clear that its intention was to limit the applicability of the 2D1.1(a)(1) and (a)(2) enhancements by ensuring that any enhancements under those subsections "apply only in the case of a conviction under circumstances specified in the statutes cited."   The statutes cited are the aggravated versions of an 841(b) offense that include an element of death or serious bodily injury, and that limitation applies to both the current conviction and any prior offenses relied on to enhance the offense level to the 43, the maximum level under the sentencing chart.

## B.  Objection to Enhancement for Aggravating Role

The Probation Report argues for an aggravating role adjustment of two levels under U.S.S.G. §3B1.1(c).   According to the PSR, Mr. Sica is considered "an organizer, leader, manager, or supervisor" because "Sica was driven by [John] Rohlman to make heroin sales or to replenish his supplies.   In exchange, Rohlman received drugs for his personal use or a portion of the drug proceeds."   PSR, ¶30.

A defendant may be considered a manager or supervisor if he exercised some degree of control over others involved in the commission of the offense.   *United States v. Al-Sadawi*, 432 F.3d 419, 426 (2d Cir. 2005).

In the present case, we submit that Rohlman giving rides to Sica in exchange for drugs or drug proceeds does not rise to the level of exercising control over Rohlman.   Rather, it suggests at best an arms-length agreement between them where Rohlman was not taking orders from Sica but offering to provide services in exchange for some consideration.

With a base level of 38 minus two points for acceptance, the sentencing range would be 292-365 months at Category V and 324-405 months at Category VI.   If, over objection, two points were added to that offense level for aggravating role, the sentencing range would be 360 months to life under either Category V or VI.

<u>Appropriate Sentence</u>

As the Supreme Court reaffirmed in *Pepper v. United States*, 131 S. Ct. 1229 (2011), the cornerstone of federal sentencing is that the sentencing judge "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 1239-40 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).  That process is embodied in the advisory sentencing system instituted by the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), which "breathes life into the authority of district court judges to engage in individualized sentencing within reason in applying the § 3553(a) factors to the criminal defendants that come before them." *United States v. Jones*, 531 F.3d 163, 170-71 (2d Cir. 2008) (district court must make an "individualized assessment" of the sentence warranted by § 3553(a) "based on the facts presented" and "may not presume that the Guidelines range is reasonable") (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)); *see also United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc) ("A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime").  The deference granted a district court's determination springs from its "singular advantage of actual and extensive sentencing experience," as well as its familiarity with the individual case and the individual defendant before it.  *Jones*, 531 F.3d at 181-82 (citations omitted).

7

The Guidelines provide "the starting point and the initial benchmark" for the district court, but they do not usurp the district court judge's "superior position to find facts and judge their import under § 3553(a)." *Gall*, 552 U.S. at 49, 51.  Under § 3553(a), "[t]he court shall impose a sentence sufficient, but not greater than necessary" to fulfill the purposes of sentencing. 18 U.S.C. § 3553(a).

Where a guideline was not developed based on "empirical data and national experience", it is not an abuse of discretion to conclude that it "yields a sentence 'greater than necessary' to achieve §3553(a)'s purposes, even in a mine-run case." *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007).

Defendant's Background

Dennis Anselmo Sica II was born April 10, 1978, in Carmel, New York.  Both of Mr. Sica's parents had a strong work ethic (his father, Dennis Sr., owned a painting and wallpapering company while his mother owned and operated the Five Star Café, a deli in Valhalla, New York, not far from where Mr. Sica is currently detained) and Mr. Sica looked to them as a source of stability and support, and also as role models for himself.   Mr. Sica admired his father, who, in an addition to being a self-made businessman was also a decorated veteran who had served with the Marine Corps in Vietnam. However, he was  emotionally closer to his mother with whom he often confided about issues in his life.

As a youngster, Mr. Sica excelled at sports, particularly baseball, and he  probably would have been talented enough to play for his high school varsity team.  However, as he entered his teenaged years, Mr. Sica got an early introduction to alcohol and recreational drugs.  He began drinking at 14 and became a regular marihuana user by the age of 16 before migrating to Ecstasy and PCP, which he began using several times a week.   Mr. Sica dropped out of high school at age 17

and began working at his parents' businesses.   At around that time, Mr. Sica had his first serious conflict with the law, which resulted in his pleading guilty to two drug-related felonies, the convictions then being replaced by youthful offender adjudications that included a six month sentence and probation.

While on probation, Mr. Sica began to take positive steps towards getting his young life back on track.  In the fall of 1998, at the age of 20, Mr. Sica enrolled in Westchester Community College and for four successive semesters he showed a promising start to his higher education.  He completed his first two semesters with a cumulative 3.14 average, while taking a full course load.  The following two semesters, Mr. Sica passed all of his courses with a somewhat lower GPA but ending with a still-respectable cumulative average of 2.88.  He took a variety of courses, with an emphasis on the business field.  After finishing the Spring 2000 semester, Mr. Sica interrupted his schooling for a while because he had landed a good job with Local 38 of the Sheet Metal Workers Union, although he still had plans to return to college. (A copy of Mr. Sica's college transcript is annexed hereto as Exhibit B).

Mr. Sica looks back on this period as one of the most auspicious and productive of his life, which makes the events that soon  followed all the more tragic.  In October 2001,  Mr. Sica's mother, who was then managing the family deli in Valhalla, fell suddenly ill and was admitted to a hospital. Although doctors assured the family that her condition was stable, the following day, while being transported within the hospital for testing, her condition became critical and she died.  Her untimely death at the age of 50 would  become something of an obsession for Mr. Sica who, as noted, was very close to his mother and relied a great deal on her counsel.  Mr. Sica remains convinced that an autopsy should have been conducted (his father objected at the time, even though the funeral home

9

was recommending it) and to this day he harbors lingering thoughts that some misdiagnosis or malpractice played a hand in the death.

As a result of these events, Mr. Sica, then 23, became despondent with grief. Soon after his mother's death, he met up with one of his best friends from childhood, who was now struggling with heroin addiction. Mr. Sica had never taken heroin before, but he accompanied the friend when the latter went to purchase it. As his friend nodded off from a heroin injection, Mr. Sica, without the friend's permission, took a single bag from the friend and sniffed it. When the friend realized this, he became angry with Mr. Sica for putting himself at such risk, but Mr. Sica almost immediately felt the emotional pain that he was suffering disappear. From that moment on Mr. Sica would be dependent on the drug.

Within about ten months, Mr. Sica's friend would be dead, his body found on August 21, 2002, near Metro North railroad tracks in the town of Patterson, New York.[2] That same year, Mr. Sica's grandmother died. By this time, Mr. Sica was addicted to heroin and was regularly sniffing about twenty bags (two bundles) a day. In February 2003, he was arrested for possessing heroin. Despite the combination of his addiction and his legal troubles, Mr. Sica tried to resume his education and re-enrolled at WCC in the fall of 2003. He took four courses, either failed or unofficially withdrew from all of them, and his college career came to an end. In March of 2004, Mr. Sica pleaded guilty to felony charges in connection with this drug possession arrest and was sentenced to 1 to 3 years's imprisonment and served approximately a year in jail before being released to parole. There followed another heroin possession arrest in August 2006 (for which Mr.

---

[2]This death was mentioned in local news media in a story that dealt primarily with the unrelated death of a New Jersey youth.
http://www.nytimes.com/2002/08/21/nyregion/teenager-is-killed-walking-along-tracks.html

Sica was sentenced to three years imprisonment).  In 2008, while in prison, Mr. Sica settled a lawsuit arising from an injury to his ankle that had occurred back in 2000.  *Sica v. J.C. Enterprises*, Index No. 946/2001 (N.Y. Supreme Court, Putnam Cty.).  Because Mr. Sica was incarcerated at the time, Mr. Sica's father used the funds (several thousand dollars) to attend to his own personal financial needs. At the time, the elder Mr. Sica was experiencing serious financial difficulties and in April 2009 the family home was sold in a foreclosure proceeding.

http://archive.lohud.com/article/20090426/NEWS01/904260301/Kent-vet-loses-home-foreclosure-blames-bank.

Mr. Sica was released from prison in September 2009 and, a  few months later, in March 2010, he pleaded guilty to two sale counts, and was sentenced to six years' imprisonment.  He was sent to the Willard Drug Treatment Campus, an early-release "boot camp" program, and was paroled in 2011.  While out on parole, Mr. Sica's father became gravely ill (he was diagnosed with Stevens-Johnson syndrome, a rare and painful illness that afflicts the skin and mucous membranes) and, at this time,  the father gave a substantial amount of cash to Mr. Sica, at least part of which was intended to compensate Dennis for the funds that the father had spent.   Mr. Sica put much of this money into a safe deposit box.  His father soon died (he was 64 years old) and Mr. Sica returned to prison for a time on a parole violation before being released in the summer of 2013.  Mr. Sica would enroll in yet another drug program upon his release. Yet, while Mr. Sica, in the past, had successfully dealt with his prior dependence on drugs such as Ecstasy, heroin continued to be an intractable addiction.

Later that year, Mr. Sica  – now parentless and jobless – began living with a group of fellow addicts in an apartment at the Chelsea Cove apartment complex in Hopewell Junction, New York.

Mr. Sica supported his habit by selling drugs, often to his own roommates or other members of a relatively small community of users in the area. He also gave drugs to his roommates as a way of paying his rent. By this time, Mr. Sica was using both heroin and Klonopin, a drug of the benzodiazepine family similar to Valium. Like his fellow users, his life revolved around procuring drugs. Voluminous text messages have been produced in this case, and the conversations often show participants opening up to each other about their drug use in a way that is hardly reflective of the strictly-business relationship of buyer and seller. No attempt is made in these texts to even disguise what that the participants were buying or using drugs. On a number of occasions, Mr. Sica texts friends or acquaintances about his dire need for Klonopin and similar prescription drugs to avoid withdrawal symptoms, and his willingness to trade heroin for those drugs. Mr. Sica sold to end users and, as such, was at the lowest end of the distribution chain. Moreover, as reflected in his lifestyle at that time – he had no car, no expensive clothing or possessions, and was sharing an apartment in a decidedly unaffluent housing complex with a group of fellow users who were on the verge of being evicted – Mr. Sica did not enrich himself by selling drugs.

The Deaths of Mr. Delello, Mr. Miller and Ms. Brown

Mr. Sica has accepted responsibility for his role in distributing, or being part of a conspiracy to distribute, drugs that contributed to the deaths of Anthony Delello on December 29, 2013, and Thomas Miller and Laura Brown on or about February 1, 2014. Mr. Sica is deeply remorseful over these deaths, a remorse that is reflected not least in his willingness to plead guilty knowing that the offense carries a twenty-year minimum. The facts surrounding the deaths take nothing away from Mr. Sica's remorse, but they are important both because the nature and circumstances of the offense are relevant under §3553(a) and because they underscore the significance of Mr. Sica's decision to

12

relieve the government of its burden of proof by pleading guilty.   In each case, other persons (who are either not being prosecuted or we expect will be prosecuted far less severely), played a part in obtaining or distributing the drugs.   And, sadly, the circumstances show the inescapable fact that the deaths occurred amongst members of a community of drug abusers who had voluntarily and knowingly agreed to participate with one another in highly risky behavior.

In the case of Mr. Delello, text messages and 3500 material show that Delello and his girlfriend were actively seeking to procure drugs the night before his death, both heroin and oxycodone, referred to in text messages as "blues." Mr. Delello had himself been dealing marihuana in significant quantities and had been a regular heroin user.   They initially reached out to an acquaintance who worked at a local Dunkin' Donuts that was connected to Sunoco gas station. According to witness statements, ths person provided Mr. Sica's phone number to Mr. Delello's girlfriend, who then provided it to Mr. Delello.  Both Mr. Delello and his girlfriend were well aware of the risks of taking heroin and, in text messages that night, they talk openly about past overdose deaths that they had heard about.  At one point, Mr. Delello remarked  that, apparently as a safety precaution, he had previously "made sure" that his friend at the Dunkin' Donuts "did it first."

Mr. Delello also expressed an interest that night in procuring oxycodone from another source and exchanged text messages with another acquaintance in an effort to find that drug.  Moreover, his girlfriend, in statements to the government, acknowledged that there was a "possibility" that  Mr. Delello contacted yet another drug source that night about obtaining "pills".  3506-G.

At the time of the autopsy, a multi-panel urine screening test was conducted which presumptively disclosed the presence of opiates, oxycodone and benzodiazepine.  Subsequent toxicology tests were conducted for the government by NMS Laboratories, which reported the

13

presence of heroin (but not Fentanyl) and benzodiazepine, as well as codeine.[3]   At least one test conducted by NMS also revealed the presence of substantial amounts of oxycodone, but NMS deemed these findings to be unreportable and did not include them as being present in the final report. (Copies of that test result, as well as the results of the multi-panel screening test are annexed as Exhibit C ).

   According to Mark Taff, M.D., a board-certified forensic pathologist, persons who use opiates, such as heroin, in combination with benzodiazepines, like diazepam, put themselves at significantly increased risk of death by overdose.  There is a synergistic effect when the drugs are combined.  Benzodiazepines, like opiates, are central nervous system depressants and both drugs suppress one's ability to breathe.  Together, the effect is exacerbated.  In Dr. Taff's opinion, the cause of Mr. Delello's death was multiple or mixed drug intoxication and it was the use of a combination of drugs that caused his death.  According to Dr. Taff, in Mr. Delello's case, he was particularly susceptible to death from overdose because, as stated in the autopsy report, he was suffering from acute bronchopneumonia and pulmonary thromboembolism (i.e, a blockage in one or more pulmonary arteries in the lungs, usually due to blood clots).[4]

––––––––––––––––––––

   [3]Codeine (such as that found in prescription cough syrup) is known to be taken by drug users in combination with other drugs.  Among other side effects, codeine can contribute to respiratory depression.
http://www.drugabuse.gov/publications/drugfacts/cough-cold-medicine-abuse.  Cough syrup is also mixed with Sprite or other sodas to produce a concoction known by drug users as "lean" or "purple drank".   http://www.narconon.org/drug-abuse/purple-drank-effects.html

   [4]Dr. Taff accompanied defense counsel to the Dutchess County Medical Examiner's office where he personally viewed tissue slides through a microscope.  From this inspection, it was readily apparent to Dr. Taff that Mr. Delello had been suffering from a case of full blown pneumonia, the onset of which had preceded Mr. Delello's death by several days.  According to 3500 material, Charles Catanese, M.D., who conducted the autopsy, was expected to testify that
(continued...)

The circumstances of Mr. Delello's death, as reflected in witness statements, also do not support the notion that Mr. Delello died from a rapid reaction to some unusually potent brand of heroin.  On the contrary, based on 3500 statements,  Mr. Delello went to the girlfriend's  home that night, where both of them took heroin in the early morning hours before both went to sleep.  The girlfriend's mother would report that at about 10 a.m. she found  Mr. Delello awake but vomiting something red, which she attributed to his having consumed a Roy Rogers cocktail (a non-alcoholic drink made with grenadine).  However, later that day, at about 1:15 p.m., the girlfriend's mother reportedly found Mr. Delello laying on the floor and put a blanket over him. She would then report that a "short while later", her daughter told her to call 911 and she did, but records show that the 911 call was not made a "short" while after 1:15 p.m. but at 2:58 p.m.  According to 3500 reports, the mother would admit that, prior to the arrival of paramedics, she destroyed bags of drugs which she asserted were stamped "Breaking Bad".  (She would claim to find the drugs under a book; her daughter would claim they were kept in a shoe box).  Moreover, Mr. Delello's family also found evidence that someone had gone through Mr. Delello's car and removed evidence of hypodermic syringes and illegal steroids.   3505-A; 3505-C; 3505-D; 3506-D; 3506-G; 3506-H; 3506-I.

When police and paramedics were eventually summoned to the scene, the girlfriend insisted that neither she nor Anthony had taken drugs that night and attributed the nausea that she had to

---

[4](...continued)

the pneumonia was suddenly brought on by the overdose itself.  However, Dr. Catanese did not perform any microscopic examinations of tissue samples.  Instead, that examination was done during follow-up work conducted by Dennis Chute, M.D., the chief medical examiner of Dutchess County.  Dr. Chute's office evidently had a close working relationship with law enforcement (the multi-panel urine screening conducted during the Delello and Miller autopsies was actually part of pilot program initiated in conjunction with local law enforcement) and a Dutchess County deputy sheriff was present during Delello's autopsy.

15

eating "bad green beans" at work the night before.[5]

After learning about Mr. Delello's death, Mr. Sica became worried (and, accordingly, asked Rohlman to delete text messages from that night), but not because he believed he had distributed some unusually potent brand of heroin.  In fact, there is no evidence that the heroin that Mr. Delello took was unusually potent and Mr. Sica did not know the circumstances of the death – including the evidence that Mr. Delello was seeking out and took other drugs that night.

In the case of Mr. Miller, the government acknowledged that Mr. Sica did not directly sell drugs to Mr. Miller and  that co-defendant John Rohlman was the direct seller.   According to Rohlman, Mr. Miller had purchased Breaking Bad from him before and used it in Rohlman's presence.  Dr. Taff was prepared to testify that, as reflected in the autopsy report,  Mr. Miller was suffering from untreated hypertension and had a 90 per cent occlusion (or blockage) of his coronary artery. This condition was sufficiently advanced to put him at risk of sudden cardiac death regardless of whether he had recently taken drugs.   Further, that condition also put Mr. Miller at significantly greater risk of an overdose death.  Moreover, while the NMS laboratory reported the presence of heroin and fentanyl, the presumptive urine screening test conducted at the time of autopsy also disclosed the presence of benzodiazepine.

In the case of Laura Brown, one of the government's expected witnesses, Matt Leverich (Ms. Brown's brother) told the government and defense counsel that he and Ms. Brown had procured heroin from another source that day in Poughkeepsie named "Lefty" (also with the brand name "Breaking Bad"), but that Ms. Brown wanted to purchase Breaking Bad from Mr. Sica because she

---

[5]Evidently, neither the girlfriend nor her mother were unaware of New York "good Samaritan" law (New York Penal Law Section 220.78) which generally shields persons from prosecution for drug offenses when reporting an overdose to authorities.

believed it to be stronger.  Earlier that day, Ms. Brown had undergone surgery, was given Fentanyl

while in the recovery room and, within a few short hours after discharge, was procuring heroin with

the help of her brother.  Ms. Brown was home alone for almost a full day before her body was found

and no one saw her take the drugs that contributed to her death or knew for sure which drugs she had

taken.  A search of her apartment revealed a large number of empty heroin bags with a number of

different brand names.[6]  Mr. Sica recognizes that it is likely that at least some of the drugs she took

that day and that contributed to her death came from him and has accepted responsibility for that.

However, it is hardly a foregone conclusion that a jury would have found the circumstantial proof

sufficient to establish that beyond a reasonable doubt or that one particular brand of drug was the

but-for cause  of her death.  Thus, Mr. Sica's decision to plead guilty is all the more significant.

General Deterrence

In general, "there is little evidence that increases in the length of already long prison

sentences yield general deterrent effects that are sufficiently large to justify their social and economic

costs."  Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013).

---

[6]Mr. Leverich, both in his 3500 material and in an interview with defense counsel, also disavowed a statement attributed in the government's complaint to the effect that he was told by Mr Sica that he sold heroin at the rate of 250 bundles a day.  Mr. Leverich also advised the defense and the government that the scene at Ms. Brown's apartment, as depicted in police photographs, differs substantially from what he saw when he went into her apartment prior to the arrival of police.  In particular, Mr. Leverich told defense counsel (and reaffirmed to the government) that he did not see any bags of Breaking Bad in the bathroom where he found Ms. Brown and instead found empty bags "of unknown brand."  3510-J.  Photographs of the scene taken by a New Milford police officer show at one point an empty bag of what appears to be "Breaking Bad" on a dresser, while another photograph of the same dresser shows the bag missing.   We also note that a photograph of the bathroom taken by one officer (that purportedly shows "Breaking Bad" in the bathroom) has its metadata missing (*i.e.*, the data that would show the date and time of the photograph).  A copy of those photographs, including the one showing the missing metadata, are annexed hereto as Exhibit D.

17

"Empirical studies have shown that longer sentences have minimal or no benefit on whether offenders or potential offenders commit crimes.  The National Academy of Sciences (NAS) concluded that 'insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects." Oliver Roeder et al.*, What Caused the Crime Decline?*, Brennan Center for Justice at New York University School of Law 26 (February 12, 2015).

https://www.brennancenter.org/sites/default/files/analysis/What_Caused_The_Crime_Decline.pdf

The general deterrence rationale for high sentences under the Guidelines cannot be supported by empirical data.  *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); Zvi D. Gabbay*, Exploring the limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007).  For example, "there is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." *Id.*

With respect to drug cases, it has been recognized that "[c]ompared to other offenses, the effect of sentencing and incarceration on drug offenses is quite limited" because "street-level drug sellers are often replaced quickly by other sellers seeking to make profits from the drug market.  As criminologist Alfred Blumstein has noted, '. . . drug markets are inherently demand driven.  As long as the demand is there, a supply network will emerge to satisfy that demand.  While efforts to assault the supply-side may have some disruptive effects in the short term, the ultimate need is to reduce the demand in order to have an effect on drug abuse in the society."  Thus, "[d]espite the fact that the number of persons in prison or jail today for drug offenses is more than ten times the number in

1980, drug use rates remain substantial, with data indicating a general increase over the past few years. Thus, during a period when the number of persons in prison for drug law violations was growing at a rate faster than other offense types, the underlying behavior appears to have experienced very little impact." The Sentencing Project, *Incarceration and Crime: A Complex Relationship* at 6. http://www.sentencingproject.org/doc/publications/inc_iandc_complex.pdf. "Most drug policy analysts agree that . . . imprisoning individual drug dealers seldom reduces the availability of drugs or the number of traffickers." National Research Council*, The Growth of Incarceration in the United States: Exploring Causes and Consequences* 88, 146 (Jeremy Travis et al. eds., 2014), http://nap/edu/catalog.php?record_id=18613.

Recently, the Office of National Drug Control Policy announced that it would be funding an effort to address a burgeoning heroin problem in the Northeast by focusing on treatment, rather than punishment. *U.S. Budgets Cash to Treat Heroin Abuse in the Northeast*, N.Y. Times, August 17, 2015. And, according to a report of The Pew Charitable Trusts issued last month:

> [T]he best available data suggest that increased penalties for drug offenders – both at federal and state levels – have not significantly changed long-term patterns of drug availability or use. . . . Just as enhanced criminal penalties have not reduced the availability or use of illegal drugs, research shows that they are unlikely to significantly disrupt the broader drug trade.

http://www.pewtrusts.org/~/media/Assets/2015/08/PSPP_FedDrug_brief.pdf

In the present case, Mr. Sica was part of a community of drug abusers in the Dutchess County area. He has admitted his participation in a conspiracy to sell drugs and he is being punished as a

seller, but he was also a user who lived with and socialized with fellow users and was part of that sub-culture. The customers he sold to were also often people he did drugs with. In that respect, he was not on the same level as dealers who are higher up the distribution chain. Indeed, the source of the "Breaking Bad", to our knowledge, remains at large to this day. (During early stages of this case, Mr. Sica, through counsel, had brought up the possibility of Mr. Sica assisting the government by telling the government what he knew about the source. While it is not certain that Mr. Sica would have been able to provide enough information to locate the source, the government did not express interest in pursuing such efforts).

Of particular importance here is an annexed letter from one of Mr. Sica's close friends. She writes quite eloquently about what it meant to be part of this sub-culture and empathizes with the tragic deaths that occurred in this case. At the same time, she understands, as many of us cannot, the unique way that drugs like heroin can take over a person's life and that this pathology cannot be cured by simply warehousing in prison a defendant such as Mr. Sica. She views such a result as misguided and unjust. "It has and always will be a problem," she writes. "Like nothing else heroin sells itself." She knows that Dennis himself was addicted to heroin and benzodiazepine and was also suffering "the all-consuming fear of the physical pain of detox." Exhibit E. Also annexed in Exhibit E are letters from Mr. Sica's siblings and family friends, which also describe Mr. Sica as a person with many good qualities but whose life was taken over by addiction.

If there has been an upsurge in heroin use – and overdose deaths – that has migrated from inner cities to suburban or rural communities, the solution, we submit, is not to impose exorbitant sentences on a few select individuals. On the contrary, that only engenders a false sense that our government is taking "tough" measures to tackle the problem when, in reality, it is not getting to the

root of the problem at all.

The statute to which Mr. Sica pleaded guilty attaches no specific culpable mental state to the death-results element, such as recklessness or negligence, and no one contends that the deaths were intentional.  To put the matter in some perspective, under the Federal sentencing guidelines, a person convicted a involuntary manslaughter would face a base offense level of 12 for a death resulting from criminal negligence and a base offense level of 18 for a death resulting from reckless conduct. U.S.S.G. §2A1.4. Those guidelines would call for a sentence far less than the guidelines under 2D1.1(a)(1) or (2).

Mr. Sica exercised his right to plead guilty shortly before jury selection and, as a result, the government has declined to move for an additional point reduction for timely acceptance of responsibility.  Under the government (and the Probation Department's) guideline calculation, this single point makes the difference between a life guideline and a guideline of 360 months to life. While we submit that a sentence of 360 months would itself be excessive, we also submit that application of 3553(a) factors warrant the Court in avoiding the Draconian impact of this extra point. As we noted at the time of the plea proceeding, the defense engaged in serious plea discussions with the government prior to trial and the best offer that was made was a plea to a twenty year minimum with guidelines of 360 months to life, but with the government reserving the right to argue for a sentence of up to forty years (and requiring the defendant to waive his appellate rights).  This was really no offer at all and, in the meantime, we were continuing to gather forensic evidence and other information to support our trial defense, as well as digesting voluminous telephone records that were disclosed only weeks before the scheduled adjourned trial date.   Moreover, as trial neared, the parties and the Court were also addressing *in limine* rulings, particularly on what legal principles and

jury instructions would apply to the but-for causation requirements of the "death results" provision of 21 U.S.C. §841, as elaborated on in *Burrage v. United States*, 134 S.Ct. 881 (2014). The rulings on those issues had a significant impact on Mr. Sica's weighing of his options. Given all of the circumstances, and the enormity of the decision confronting Mr. Sica, it is hardly surprising that he pleaded guilty when he did and it is far too slender a reed on which to rest a life versus non-life sentence.

We are aware of no empirical evidence relied on by Congress or the Sentencing Commission to support the notion that imposing unusually high sentences on the relatively small number of defendants who are prosecuted under the "death results" aggravated versions of 18 U.S.C. §841(b) serves some important policy rationale towards reducing the problem of heroin use in the United States, or for that matter its retail distribution. The "death results" provisions of 841(b) were part of the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207, which ushered in the array of mandatory minimums for 841 offenses that remain in force today. The Act was passed as emergency legislation, in response to a wave of publicity and public opinion (much of it now discredited) about both the crack-cocaine epidemic and some well-publicized overdose deaths. "The 1986 Act was expedited through Congress. As a result, its passage left behind a limited legislative record. While many individual members delivered floor statements about the Act, no committee produced a report analyzing the Act's key provisions." United States Sentencing Commission, *Report on Cocaine and Federal Sentencing Policy*, Chpt. 6: "The National and Law Enforcement Response to Cocaine*".*

http://www.ussc.gov/report-cocaine-and-federal-sentencing-policy-2.

In particular, the introduction of "death results" provisions, with 20-year mandatory

minimums, appears to have been animated in large part by the highly-publicized death of college basketball star Len Bias, who that summer became the first-round draft pick of the Boston Celtics. At the time, it was mistakenly believed that Bias had died after free-basing cocaine, although much later it would be confirmed that he took powdered cocaine.  *Id.   See e.g.*, 132 Cong Rec. 26,729 (Sept. 27, 1986) ("[I]t took the tragic and unnecessary deaths of two promising young athletes to finally inspire this Nation to act on the drug problem.") (statement of Sen. Bingaman); *id.* at 26,731 ("S. 2787 also imposes prison terms of 20 years to life for drug trafficking where, as in the Len Bias case, death results.") (statement of Sen. D'Amato).

The hasty manner in which the legislation was enacted, the atmosphere of media-led opinion of dubious validity, and the lack of any serious Congressional study and reporting, all bespeak a decided lack of empirical evidence for the "death results" provisions of both 841(b) and the Sentencing Guidelines.

As a practical matter, it would seem to us that the problems inherent in proving that a particular drug sold was a but-for cause of a particular death means that those prosecuted for deaths would tend to be persons, like Mr. Sica, who are at the low end of the distribution chain, while insulating drug wholesalers and importers who are actually introducing drugs into the stream of commerce on a much larger scale.    Mr. Sica  is before the Court having accepted responsibility for an offense that will subject him to no less than a 20-year sentence.  If that minimum is imposed, Mr. Sica will be in his mid-fifties before he is eligible for parole.  That is an extraordinarily high punishment.  A greater sentence, we submit, would be more than necessary to carry out the purposes of Section 3553(a) and, accordingly, we respectfully urge the Court to impose a sentence of 240 months.

23

Dated: September 2, 2015

Respectfully submitted,

/s/
THEODORE S. GREEN
GREEN & WILLSTATTER
*Attorneys for Dennis Sica*
200 Mamaroneck Avenue - Suite 605
White Plains, New York   10601
(914) 948-5656
theosgreen@msn.com

To:   All counsel (by ECF)

24