

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

October 2, 2015

**BY ELECTRONIC MAIL**
The Honorable Cathy Seibel
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

Re:   **United States v. Dennis Sica**,
14 Cr. 462 (CS)

Dear Judge Seibel:

The Government submits this letter in connection with the sentencing of defendant Dennis Sica, scheduled for October 8, 2015 at 10:30 a.m.

## Background

On June 17, 2014, a magistrate judge in this District issued arrest warrants for Dennis Sica, the defendant, and a co-conspirator on the basis of a 14-page federal complaint. *See United States v. Dennis Sica and John Rohlman*, 14 Mag. 1380. The Complaint charged Sica with conspiring with others to distribute and possess with intent to distribute (1) 100 grams and more of mixtures and substances containing heroin, and (2) 40 grams and more of mixtures and substances containing fentanyl. The Complaint further alleged that the use of controlled substances distributed by Sica resulted in the deaths of three individuals: Anthony Delello, Thomas Miller, and Laura Brown.

On June 19, 2014 Sica was taken into federal custody on a writ of habeas corpus ad prosequendum. He was presented before the Honorable Lisa Margaret Smith the same day and was ordered detained pending trial. On July 14, 2014, a grand jury sitting in this District returned a one-count Indictment charging the defendant with the same violation of Title 21, United States Code, Sections 841(b)(1)(B) and 846 charged in the Complaint.

On April 27, 2015, the day that jury selection in this case was scheduled to begin, the defendant pled guilty to the charge in the Indictment. During his guilty plea allocution, Sica agreed that his conduct was the cause-in-fact of the deaths of Delello, Miller and, Brown. Because Sica's distribution of heroin resulted in the death of another person, the charge to which

Honorable Cathy Seibel
October 2, 2015
Page 2 of 18

he pled guilty carries a mandatory minimum term of imprisonment of 20 years and a maximum term of imprisonment of life.

## **Offense Conduct**

From late 2013 to February 2014, Dennis Sica, the defendant, orchestrated a conspiracy to distribute a potent mix of heroin and fentanyl under the street name "Breaking Bad." The use of this drug caused the overdose deaths of Anthony Delello, Thomas Miller, and Laura Brown.

Multiple witnesses - both individuals who assisted the defendant in selling heroin, and individuals who bought heroin from him - would have testified that in late 2013, the defendant was an established heroin dealer in and around Hopewell Junction, New York. Roughly every week, the defendant purchased about 100 bundles of heroin, the rough equivalent of 50 grams, from a variety of suppliers in New York City and the northern counties. The defendant generally paid $40 to $50 per bundle of ten glassine bags; he resold the drugs at roughly twice that price.

Beginning in late 2013, the defendant began selling a particularly potent combination of heroin and fentanyl in glassine bags that were stamped with the words "Breaking Bad." Fentanyl is a synthetic opioid prescribed by doctors for use as a pan killer in extreme medical situations. It can be 50 to 100 times stronger than heroin.

The defendant obtained Breaking Bad pre-packaged and pre-stamped from a supplier based in the Bronx. When the defendant traveled to the Bronx to replenish his supply of Breaking Bad, other people drove him. The defendant's drivers included John Rohlman and Anthony Rivera, both of whom distributed drugs in Dutchess County on behalf of the defendant by personally supplying his customers when the defendant himself was unavailable. The defendant also obtained rides from heroin users, such as Bonnie Howell and Greyson Ciganer, whom he compensated with bags of drugs. One heroin user, Arthur DeSiervi, agreed for a time to store the defendant's drug supply in his house in exchange for permission to use some of the drugs. The defendant began storing the drugs with DeSiervi after the defendant's apartment mates broke into his bedroom and stole his drug supply.

To sell the heroin, the defendant took calls and texts on a cellphone he kept for just that purpose. He then arranged for the customers to come to his apartment in the Chelsea Cove apartment complex in Hopewell Junction, or to meet him at other locations, where he would be driven by one of his co-conspirators. The defendant sold heroin in parking lots, gas stations, roadsides, even in Dunkin Donuts. Ordinarily he took payment in cash, but also took prescription pills, which he used himself, abusively.

The defendant's drug business was so profitable, that he lived off of it. He kept drug money in safety deposit box at a TD Bank branch in Poughkeepsie. According to witnesses, he visited the box on a regular basis before and after drug runs. When investigators searched the box in February 2014, they found $10,543 cash.

Honorable Cathy Seibel
October 2, 2015
Page 3 of 18

One of the reasons that the defendant was able to prosper as a drug dealer during this period was that the Breaking Bad heroin that he sold was in high demand.  At one point the defendant, who had already sustained five felony drug convictions, told his best friend Matthew Leverich that he was selling as much heroin as he had ever sold in his life.  The defendant's business success had tragic consequences for Leverich.  As discussed below, shortly after the defendant boasted about the popularity of Breaking Bad, Leverich's sister, Laura Brown, suffered a fatal overdose after taking a particularly potent batch of Breaking Bad.

As a result of the defendant's choice to sell more and more powerful heroin and fentanyl, he benefitted by getting more drug profits, and risked even more harm to his customers.  In December 2013 to January 2014, at least five people, including Laura Brown, were hospitalized or killed from using the defendant's drugs.  The defendant knew this, and yet after each hospitalization and death just continued dealing the Breaking Bad.

In mid-December 2013, a young woman, Ashley Leone, became sick from using the defendant's drugs inside of his apartment in Chelsea Cove.  John Rohlman, who was also present at the apartment called 911.  When the sheriff's officers came, however, and spoke with the defendant, the defendant lied and stated that Leone had fallen and hit her head.

Shortly thereafter, the defendant sold a lethal dose of heroin to Anthony Delello, a 20-year-old man who was slated to enter the Air National Guard.  On the night of December 28, 2013, Delello and his fiancée, Katilyn Falgiano, were looking for heroin.  They had used heroin before, but by late 2013 rarely used it.  Through a friend, Delello and Falgiano were put in contact with the defendant.  In calls and text messages on his drug cellphone, the defendant offered to sell them heroin, $100 for a bundle, and told them to come to his house.  They did, and bought Breaking Bad, which they used that night.  Delello was dead the next day.  He died on the floor beside Falgiano's bed, with foam in his mouth.  He had deadly levels of morphine in his body, which results from heroin use.  There were no traces of fentanyl.  The medical examiner determined that the cause of death was acute heroin intoxication.

The defendant learned within a day or two that Delello had died from using his heroin.  Friends of Delello's confronted the defendant and yelled at him about it when the defendant stopped at Dunkin Donuts to make a drug sale.  The defendant was not chastened by Delello's tragic death, however.  He continued to sell Breaking Bad.  But because he wished to avoid law enforcement scrutiny in the wake of Delello's death, the defendant enlisted John Rohlman, a heroin addict who had at times driven him in exchange for bags of heroin, to act as his street-level dealer.  The defendant gave Rohlman his drug cellphone.  He instructed Rohlman to delete all text messages in the phone, to lie if anyone asked about the phone, and not to answer calls from Delello's friend who had put Delello in touch with the defendant.  As for the heroin business, the defendant gave Rohlman a portion of his Breaking Bad heroin supply, and told Rohlman they would split the profits.

The agreement and the defendant's instructions to Rohlman were captured in part in their text message exchange and in Rohlman's text messages to others.  The following messages were

Honorable Cathy Seibel
October 2, 2015
Page 4 of 18

recovered from Rohlman's phone.  Outgoing messages are in bold font.  Exchanges with the
defendant are shaded.

| 1/1/2014 | 11:28:11 PM | Text | To | **Greggy**<br>**(845)891-7677** | **Yo im takin over for dennis if u ever need call my phone or his 7208 number I have his phone** |
|---|---|---|---|---|---|
| 1/2/2014 | 12:26:00 AM | Text | To | **Thomas Miller**<br>**(845)210-5223** | **Yoo im taking over for dennis so I have his shit for now on. So if u need something we dont gotta take a ride anymore ill have it on me personally. So im sellin now** |
| 1/2/2014 | 12:27:59 AM | Text | To | **Weeze**<br>**(845)842-0084** | **Yoo i just picked up shit for sale im going to have it on me from now on so we wont have any problems finding anything anymore. Just hit me up and im there. Bags for 10 buns for 100 I can prolly do 90 for you though possibly** |
| 1/2/2014 | 12:29:30 AM | Text | To | **(845)214-6120** | **Hey its john. If you ever need anything hit me up I got fire. Bags for 10 bs for 100** |
| 1/2/2014 | 12:30:36 AM | Text | To | **Tyler**<br>**(845)282-3416** | **Yo im takin over for dennis if u ever need call my phone or his 7208 number I have his phone** |
| 1/2/2014 | 12:38:26 AM | Text | From | Dennis<br>(845)522-6011 | Wow well ill figure it out listen erase every message out of my phone I gave u now I meant to do it |
| 1/2/2014 | 12:41:11 AM | Text | To | **Dennis**<br>**(845)522-6011** | **Ok I got you** |
| 1/2/2014 | 12:41:35 AM | Text | From | Dennis<br>(845)522-6011 | Goto messages the. Hit Menu button on bottom left then put check in every thread then hit delete button n will erase all do that now cuz been worried with shot |
| 1/2/2014 | 12:41:37 AM | Text | From | Dennis<br>(845)522-6011 | that happened with kid |
| 1/2/2014 | 12:42:10 AM | Text | From | Dennis<br>(845)522-6011 | Let me know u did it do I can go to bed |
| 1/2/2014 | 12:43:43 AM | Text | From | Dennis<br>(845)522-6011 | Let me know if ha e problem just check every thread of messages in right corner then hit delete |
| 1/2/2014 | 12:44:06 AM | Text | To | **Dennis**<br>**(845)522-6011** | **Doing it as I speak..taking a sec to delete them all there was a lot of threads** |

Honorable Cathy Seibel
October 2, 2015
Page 5 of 18

| 1/2/2014 | 12:45:50 AM | Text | From | Dennis (845)522-6011 | Gotta check everyone at once then press it don't do one at a time put check on everyone then hit the delete button |
|---|---|---|---|---|---|
| **1/2/2014** | **12:46:40 AM** | **Text** | **To** | **Dennis (845)522-6011** | **Yea thats what I did. Its just taking long to delete it all at once cause there was a lot of messages** |
| 1/2/2014 | 12:53:20 AM | Text | From | Dennis (845)522-6011 | Leave it alone fog five minutes then check n make sure as ll gone. Then let me know n be smarter than me n don't text too much n if get any calls from tim dunk |
| 1/2/2014 | 12:53:39 AM | Text | From | Dennis (845)522-6011 | or anyone who says his name ad friend of don't answer n if anyone calls n says anything bout u know nothing found phone weeks ago n can't find owner so answer |
| 1/2/2014 | 12:53:41 AM | Text | From | Dennis (845)522-6011 | tryin to figure who's phone ii t is |
| 1/2/2014 | 12:55:33 AM | Text | From | Dennis (845)522-6011 | I'll show u numbers not to answer tomorrow but that should start ringing early so be ready n send Steve to;me dud erase all yet |
| **1/2/2014** | **12:56:07 AM** | **Text** | **To** | **Dennis (845)522-6011** | **Ok I gotcha. Dont text too much. Dont answer tim and dont answer anyone whos says there a friend of...... and if anyone calls and says something about you know what I know nothing and I found the phone and im trying to find the owner.. and u want me to send steve to you** |
| **1/2/2014** | **12:56:11 AM** | **Text** | **To** | **Dennis (845)522-6011** | **Just missed you** |
| 1/2/2014 | 12:57:02 AM | Text | From | Dennis (845)522-6011 | Let me know all erasef |
| **1/2/2014** | **12:57:21 AM** | **Text** | **To** | **Dennis (845)522-6011** | **There all gone now** |
| 1/2/2014 | 12:58:19 AM | Text | From | Dennis (845)522-6011 | Good night thank u |
| **1/2/2014** | **1:00:01 AM** | **Text** | **To** | **Dennis (845)522-6011** | **No prob bro ill see you tomorrow** |

The defendant's plan to continue his heroin operation through Rohlman was unsuccessful. Although the defendant attempted to tightly control Rohlman's distribution of the heroin, Rohlman did a poor job, partly because, contrary to the defendant's instructions,

Honorable Cathy Seibel
October 2, 2015
Page 6 of 18

Rohlman agreed to provide drugs to heroin users on credit and was then unable to collect from them.  Again, the text messages recovered from Rohlman's phone are illuminating:

| **1/2/2014** | **12:20:43 PM** | **Text** | **To** | **Mo (845)702-9962** | **Na I got dennises shit for him so if u need any let me no** |
|---|---|---|---|---|---|
| 1/2/2014 | 1:57:51 PM | Text | From | Mo (845)702-9962 | then spot me niigggaaa |
| **1/2/2014** | **1:58:51 PM** | **Text** | **To** | **Mo (845)702-9962** | **Na im not spotting anybody at all. Sry bro I cant do it. I owe dennis too much money and he told me not too. Call dennis and ask him to spot you cause I cant sorry** |
| 1/2/2014 | 3:17:31 PM | Text | From | Dennis (845)522-6011 | I didn't tell u to spot bag I just said if peopple need shit to send them to me cuz ur out |
| **1/2/2014** | **3:33:06 PM** | **Text** | **To** | **Mo (845)702-9962** | **I cant bro** |
| 1/2/2014 | 3:37:54 PM | Text | From | Mo (845)702-9962 | I already no dennis told u not too im talkin to him now |
| 1/2/2014 | 3:47:04 PM | Text | From | Mo (845)702-9962 | I donk kno y u went to dennnis about that tho I was gonna keep it between u an me |
| **1/2/2014** | **3:55:19 PM** | **Text** | **To** | **Mo (845)702-9962** | **You told me you spoke to him bro? And I told you to ask him first didnt I? I told you im not spotting anybody at all period. Nobody. I dont do any spots unless dennis says yes. I owe him too much money to be spotting his shit bro. Im not gona risk oweing him more money then I already do** |

Within days the defendant became fed up with Rohlman's failure to pay him the portion of the drug proceeds to which he was entitled.  The defendant criticized Rohlman for failing to take seriously their joint business venture, and demanded that Rohlman use the salary he earned as a bagger at A&P grocery store to repay him:

| 1/9/2014 | 10:54:15 PM | Text | From | Dennis (845)522-6011 | This is not how teal businesses run u answer to someone when working together cuz obviously I need to know for reason so could u answer me |
|---|---|---|---|---|---|
| **1/9/2014** | **10:58:29 PM** | **Text** | **To** | **Dennis (845)522-6011** | **That wasnt my fault last night bro and ill be there at 1230 I just got here and I gotta help my brother in law move shit. Ill be there man trust me** |

Honorable Cathy Seibel
October 2, 2015
Page 7 of 18

| 1/11/2014 | 2:24:11 PM | Text | From | Dennis (845)522-6011 | Well I need something now u got paid yesterday I'm about to go down n I'm short do I hope u have or borrow something quick |
|---|---|---|---|---|---|
| **1/11/2014** | **2:31:17 PM** | **Text** | **To** | **Dennis (845)522-6011** | **I get paid 120 a week I gave it to my mom for my car I csnt try and borrow money until I get outa work at 5** |
| 1/11/2014 | 2:45:00 PM | Text | From | Dennis (845)522-6011 | O need money now john this ain't. Right so u better get on ur phone now n find some cuz I'm short cuz of u n need now u don't play games with peoplrs money |
| **1/11/2014** | **3:12:45 PM** | **Text** | **To** | **Dennis (845)522-6011** | **Im not trying to play games bro yoyr short cause of me? What about doug? Its not my fault all your people robbed me dry but im saying im trying to get money idk how though** |
| 1/11/2014 | 3:18:42 PM | Text | From | Dennis (845)522-6011 | 1 person robbed u u did it all n knew couldn't pay n u need to come up with it |
| **1/11/2014** | **3:31:20 PM** | **Text** | **To** | **Dennis (845)522-6011** | **Na I gpt robbed by more people than that I just didnt say anything and triedbto get the money first not saying I didnt do to much but between getting robbed and doing to much thats what happened** |
| **1/11/2014** | **3:34:12 PM** | **Text** | **To** | **Dennis (845)522-6011** | **Ill get the money** |
| 1/11/2014 | 3:35:13 PM | Text | From | Dennis (845)522-6011 | U need to get Mr money borrow from someone rob someone if there robbing u like that pick a herb figure something out |
| **1/11/2014** | **3:37:02 PM** | **Text** | **To** | **Dennis (845)522-6011** | **I dont know who i can borrow from how much do u need** |
| **1/11/2014** | **3:39:17 PM** | **Text** | **To** | **Dennis (845)522-6011** | **Like this didnt happen on purpose dennis** |
| 1/11/2014 | 3:41:53 PM | Text | From | Dennis (845)522-6011 | I need a couple hundred n ur gonna have to give me some of psycheck |
| **1/11/2014** | **3:49:15 PM** | **Text** | **To** | **Dennis (845)522-6011** | **I dont have my paycheck anymore I had to pay for my car my mom used my check already** |
| **1/14/2014** | **9:53:39 PM** | **Text** | **To** | **Dennis (845)522-6011** | **Ill come back I cant believe I drove that kid there for nothing im sick as fuck right now** |

Honorable Cathy Seibel
October 2, 2015
Page 8 of 18

| 1/14/2014 | 9:54:26 PM | Text | From | Dennis (845)522-6011 | Try to call my old phonr |
|---|---|---|---|---|---|
| 1/19/2014 | 6:29:06 PM | Text | From | Dennis (845)522-6011 | I need u to help me out with money nit buying d from me urself yeah bring other people to me |
| **1/19/2014** | **6:44:19 PM** | **Text** | **To** | **Dennis (845)522-6011** | **I do bring people to you but you havent taken any money oof of what I owe you yet** |
| 1/19/2014 | 7:18:14 PM | Text | From | Dennis (845)522-6011 | U keep promising me substantial amounts every friday n u do nithing |
| **1/19/2014** | **7:21:30 PM** | **Text** | **To** | **Dennis (845)522-6011** | **Its only been 1 friday so far bro. Theres only one friday a week** |

Within days the defendant took back his drug cellphone and continued selling Breaking Bad himself, as he'd done before, and sadly, with the same and even worse results.

On January 30, 2014, the defendant made another trip to the Bronx for a supply of Breaking Bad. He returned with an extraordinarily lethal heroin/fentanyl mixture that, within two days, left two people dead, and nearly killed a third.

That day, Laura Brown, the sister of Matthew Leverich, the defendant's best friend, was looking for heroin. Because the defendant was in the Bronx replenishing his supply of Breaking Bad, Brown and her brother purchased heroin from another supplier. That evening, however, Brown found herself craving Breaking Bad because of the exceptional high produced by the potent heroin-fentanyl combination. Through her brother, Brown learned that the defendant had returned to Hopewell Junction. So the two of them traveled to the defendant's apartment, where they met the defendant and purchased Breaking Bad. Brown dropped off her brother on her way home to New Milford, Connecticut. It was the last time he would see her alive.

The next morning Brown failed to appear for work. A co-worker sent her a text message, but she did not respond. Brown's husband was overseas on business. It was not until two days later that Brown's brother and their father traveled to New Milford to check on her. They found Brown lying dead, face down on her bathroom floor. Breaking Bad bags were on the bathroom counter, beside a syringe. The medical examiner determined that the cause of death was heroin and fentanyl intoxication.

The night after the defendant sold Laura Brown the lethal dose of Breaking Bad, Thomas Miller, the father of two young girls, was also then looking for heroin. He contacted Rohlman, and he and Rohlman drove to the defendant's apartment where the defendant, through Rohlman, sold Miller Breaking Bad. Miller returned home that night to his mother's house in Pawling, New York. In his bedroom he injected the drugs. The next morning his mother found him in his

Honorable Cathy Seibel
October 2, 2015
Page 9 of 18

bed, dead.  Breaking Bad bags were nearby on the desk.  Again, the medical examiner determined that the cause of death was acute heroin and fentanyl intoxication.

In the defendant also sold the Breaking Bad to another young woman, Sydney White. Shortly after using it she blacked out and was hospitalized.  Ms. White had the fortune to survive, unlike Ms. Brown, Mr. Miller, and Mr. Delello, and she was prepared to testify at the defendant's trial about the drug deals she did with the defendant and the overdose she suffered.

White also provided the Government with letters the defendant wrote to her during the spring of 2014, while they were both detained at the Dutchess County Jail.[1]  In the letters the defendant, who by that time had learned of the deaths of at least Delello and Brown, conveyed his lack of remorse.  He speculated that he would be sentenced to probation in connection with the state drug charges he was then facing.  He bragged that he was "a beast at beating cases, especially drug cases" and that he knew "motions and tricks to beat cases."  He also expressed concern that White might have talked to law enforcement, who he characterized as "pigs," about the fact that he had supplied her with drugs, and he wrote disparagingly of "snitches."  With respect to Brown, the defendant expressed his belief that law enforcement "gave up" trying to prove his role in the death, because they "got nothing."

### The Presentence Investigation Report and the Defendant's Objections Thereto

In Presentence Investigation Report for (the "PSR"), the Probation Office joined the Government in calculating that the recommended sentence applicable to Sica under the Sentencing Guidelines is life imprisonment.  The Probation Office and the Government calculate Sica's offense level at 43 based on the following reasoning:

- Pursuant to U.S.S.G. § 2D1.1(a)(1), the base offense level applicable to the defendant is 43, because the defendant is convicted under 21 U.S.C. § 841(b)(1)(B) and the offense of conviction establishes that death resulted from the use of the substances and that the defendant committed the offense after one or more prior convictions for a similar offense.

- Because the defendant was an organizer, leader, manager, and supervisor in the criminal activity, pursuant to U.S.S.G. § 3B1.1(c), two levels are added.

- Because the defendant has clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction is warranted, pursuant to U.S.S.G. § 3E1.1(a).

With respect to criminal history category, both the Probation Office and the Government in its *Pimentel* letter initially determined that Sica's has 14 criminal history points and that his criminal history category is VI based upon the following reasoning:

---

[1] Copies of the letters are attached to this submission as Exhibit A.

Honorable Cathy Seibel
October 2, 2015
Page 10 of 18

- The defendant was convicted, on or about January 16, 1996, in Putnam County Court, of criminal possession of a controlled substance in the fourth degree, a felony, in violation of New York Penal Law, Section 220.09, and sentenced to 6 months' imprisonment.  Pursuant to U.S.S.G. § 4A1.2(e)(3), this conviction results in 0 criminal history points.

- The defendant was convicted, on or about March 5, 1996, in Putnam County Court, of criminal sale of a controlled substance in the fifth degree, a felony, in violation of New York Penal Law, Section 220.31, and sentenced to 6 months' imprisonment.  Pursuant to U.S.S.G. § 4A1.2(e)(3), this conviction results in 0 criminal history points.

- The defendant was convicted, on or about March 21, 2003, in Yorktown Town Court, of petit larceny, a misdemeanor, in violation of New York Penal Law, Section 155.25, and sentenced to a conditional discharge and a fine.  Pursuant to U.S.S.G. § 4A1.1(c), this conviction results in 1 criminal history point.

- The defendant was convicted, on or about March 11, 2004, in Putnam County Court, of attempted criminal possession of a controlled substance in the fourth degree, a felony, in violation of New York Penal Law, Section 220.09, and operating a motor vehicle impaired by drugs, a misdemeanor, in violation of New York Vehicle and Traffic Law, Section 1192, and sentenced to a term of 1 to 3 years' imprisonment.  Pursuant to U.S.S.G. §§ 4A1.1(a) and 4A1.2(a)(2), these convictions result in a total of 3 criminal history points.

- The defendant was convicted, on or about November 12, 2003, in Bronx County Criminal Court, of criminal possession of a controlled substance in the seventh degree, a misdemeanor, in violation of New York Penal Law, Section 220.03, and sentenced to time served (which was not more than sixty days' imprisonment).  Pursuant to U.S.S.G. § 4A1.1(c), this conviction results in 1 criminal history point.

- The defendant was convicted, on or about March 28, 2007, in Putnam County Court, of attempted criminal possession of a controlled substance in the fourth degree, a felony, in violation of New York Penal Law, Section 220.09, and driving while ability impaired by drugs after having previously been convicted of a similar offense, a felony, in violation of New York Vehicle and Traffic Law, Section 1192, and sentenced to a term of 3 years' imprisonment.  Pursuant to U.S.S.G. §§ 4A1.1(a) and 4A1.2(a)(2), these convictions result in a total of 3 criminal history points.

- The defendant was convicted, on or about November 10, 2010, in Putnam County Court, of criminal sale of a controlled substance in the third degree, a felony, in violation of New York Penal Law, Section 220.39, and sentenced to 6 years'

imprisonment.   Pursuant to U.S.S.G. § 4A1.1(a), this conviction results in 3 criminal history points.

- The defendant was convicted, on or about September 20, 2011, in Poughkeepsie Town Court, of driving while intoxicated, a misdemeanor, in violation of New York Vehicle and Traffic Law 1192, and sentenced to a conditional discharge. Pursuant to U.S.S.G. § 4A1.1(c), this conviction results in 1 criminal history point.

- Because the defendant committed the instant offense while on parole, pursuant to U.S.S.G. § 4A1.1(d), 2 criminal history points are added.

*Defense Objections to the PSR's Criminal History Calculation*

On September 3, 2015, Sica's defense counsel submitted a Sentencing letter in which, among other things, they objected to the imposition of criminal history points in connection with the defendant's March 21, 2003 conviction of petit larceny, for which he received a conditional discharge; and his November 12, 2003 conviction of criminal possession of a controlled substance in the seventh degree, for which he received time served (6 days).  The defendant argues that under U.S.S.G. § 4A1.2(e), neither sentence should result in criminal history points, because, in each case, (1) the defendant was sentenced to a term of imprisonment of less than one year and one month, and (2) the sentence was imposed more than 10 years before the defendant committed the instant offense.

The indictment in this case charged a conspiracy beginning in or about 2013 and continuing through in or about February 2, 2014.  At trial the Government would have proven that within several months of his release from state prison in July 2013, the defendant was actively selling heroin in and around Dutchess County.  Several witnesses described purchasing heroin from the defendant in October 2013.  Thus, while the defendant is correct that under U.S.S.G. § 4A1.2(e) he should not be assigned criminal history points in connection with his March 21, 2003 conviction, the Government continues to believe that he is properly assigned criminal history points in connection with the November 2003 conviction.  Accordingly, the Government's position remains that the defendant should be assigned to criminal history category VI.

*Defense Objections to the PSR's Offense Level Calculations*

The defendant also objects to the PSR's calculation of his offense level.  His chief argument is that the PSR incorrectly applies U.S.S.G. § 2D1.1(a)(1) to the facts of this case. That guideline provides that the base offense level is 43 "if the defendant is convicted under 21 U.S.C. § 841(b)(1)(A), (b)(1)(B), or (b)(1)(C) . . . and the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance and that the defendant committed the offense after one or more prior convictions for a similar offense."  The Probation Office concluded that this guideline is applicable to Sica, because the defendant was previously

Honorable Cathy Seibel
October 2, 2015
Page 12 of 18

convicted of a drug distribution felony that is "similar" to the instant conviction under 21 U.S.C.
§ 841(b)(1)(B).

In objecting to the applicability of Subsection (a)(1), the defendant argues, in essence,
that the phrase "similar offense" in that guideline should be understood to mean a prior
conviction for disturbing drugs the use of which resulted in death or serious bodily injury. The
defendant cites no legal authority for this proposition and acknowledges that the only two Courts
of Appeals to consider the issue have rejected his argument. *See United States v. Johnson*, 706
F.3d 728 (6th Cir. 2013); *United States v. Westry*, 524 F.3d 1198, 1220 n2 (11th Cir. 2008).

The lack of authority for the defendant's position is unsurprising. The plain language of
the Guideline makes clear that in determining whether Subsection (a)(1) applies, the Court
should look to the "offense" of which the defendant was previously convicted and not any
sentencing factors or other background facts to that conviction. If the Court concludes that that
"offense" was "similar" to the offense of which the defendant was convicted in the instant
case - that is a violation of  21 U.S.C. § 841(b)(1)(A), (b)(1)(B), or (b)(1)(C), or 21 U.S.C.
§ 960(b)(1), (b)(2), or (b)(3) and that, in the instant case, death or serious bodily injury resulted,
then the Guideline applies.

As the Sixth Circuit noted in *Johnson*, this reading of Section 2D1.1(a)(1) is consistent
with the general effort by the drafters of the Sentencing Guidelines to structure the offense levels
to match the mandatory minimum sentences provided by statute. *See Johnson*, at 731; *see also*
USSG § 2D1.1 cmt. background (2014) ("The base offense levels in § 2D1.1 are either provided
directly by the Anti–Drug Abuse Act of 1986 or are proportional to the levels established by
statute . . . ."). Indeed, Title 21, United States Code, Section 841(b)(1)(B), the offense of which
Sica was convicted, specifies a mandatory minimum sentence of life imprisonment in cases
where the offense conduct occurred "after a prior conviction for *a felony drug offense* has
become final" . . . "if death or serious bodily injury results from the use" of drugs distributed by
the defendant in connection with the instant offense. In other words, the statute, like the
Guideline, does not require that the prior offense be one that resulted in death or serious bodily
injury.

The defendant attempts to garner support for his interpretation of Subsection (a)(1) by
looking to the amendment history of the Guideline, but there too his arguments come up short.
Subsection (a)(1) in its present form was promulgated by the Sentencing Commission in 1989.
Prior to that time, Subsection (a)(1) provided simply that the base offense level was 43 "for an
offense that results in death or serious bodily injury with a prior conviction for a similar drug
offense." An application note defined "similar drug offense" to mean "a prior conviction as
described in 21 U.S.C. §§ 841(b) or 962(b)."

In its pre-amendment form, the Guideline was not clear about which offenses of
conviction would trigger the applicability of Subsection (a)(1). The Guideline might have been
read to indicate that a predicate drug felon who was convicted under 21 U.S.C. § 841(b)(3) of
distributing Schedule IV controlled substances would be subject to Subsection (a)(1) where death
resulted from the use of such substances. The amendment made clear, however, that the weighty

Honorable Cathy Seibel
October 2, 2015
Page 13 of 18

penalties set forth in 2D1.1(a)(1) and (a)(2) apply only in the case of a defendant convicted in the instant case under 21 U.S.C. § 841(b)(1)(A), (b)(1)(B), or (b)(1)(C), or 21 U.S.C. § 960(b)(1), (b)(2), or (b)(3).  As the Sentencing Commission explained, the purpose of the amendment was to "provide that subsections (a)(1) and (a)(2) apply only in the case of a conviction under circumstances specified in the statutes cited" - what is, when one of the listed offenses is the offense of conviction.  U.S.S.G. Appx. C, Vol. I, Amendment 123 at 53 (2014).  In other words, the Commission sought to make clear that the Guideline tracks the mandatory minimum sentences in the statute.

The defendant argues that the Commission went further with Amendment 123, abandoning its efforts to track the mandatory sentencing scheme and providing that a prior drug felony would result in an increase in the base offense level only when that felony too resulted in the death or serious injury of another person.  If the Commission had intended such a significant change in the sentencing scheme, however, one would expect to see some mention of it in the Amendment or the accompanying materials.  In the absence of such a discussion, the defendant is left with nothing to support his argument other than mere *ipse dixit*.  Given the absence of support for the defendant's argument and the plain language of the Guideline, this Court should follow the two Circuit courts that have ruled on this issue and hold that the base offense level of 43 prescribed by Subsection (a)(1) is the correct one in this case.

In addition to attacking the Probation Office's decision of which base offense level to use, the defendant objects to the characterization of him as an organizer or a leader of the drug conspiracy, a characterization that results in a two-point increase in offense level, pursuant to U.S.S.G. § 3B1.1(c).

Section 3B1.1(c) of the Sentencing Guidelines pro-vides for a two-level increase in a defendant's offense level "if it is shown by a preponderance of the evidence that [the] defendant was an 'organizer, leader, manager or supervisor' of another 'criminally responsible' participant in the criminal scheme."  *United States v. Brinkworth*, 68 F.3d 633, 641 (2d Cir. 1995) (citation omitted).  Whether a defendant qualifies for this sentencing enhancement depends upon the degree of discretion exercised by him, the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy. *Id*. at 642.

Generally, a defendant is a "manager or supervisor" of a criminal enterprise "if he 'exercise[s] some degree of control over others involved in the commission of the offense, ... or 'play[s] a significant role in the decision to recruit or to supervise lower-level participants.' *United States v. Payne*, 63 F.3d 1200,1212 (2d Cir. 1995) (citations omitted); *see United States v. Greenfield*, 44 F.3d 1141,1147 (2d Cir. 1995); *United States v. Liebman*, 40 F.3d 544, 548 (2d Cir. 1994); U.S.S.G. § 3B1.1, comment. (n.1) (defining a "participant" as someone who is criminally responsible for the commission of the offense, even if he has not been convicted).  In the context of narcotics offenses, the Second Circuit has recognized certain hallmarks of managerial or supervisory authority.  For example, the Court of Appeals has upheld application of the two-level enhancement where the evidence established that the defendant was the person responsible for "the distribution of heroin and collection of proceeds."  *United States v. Rivera*,

Honorable Cathy Seibel
October 2, 2015
Page 14 of 18

971 F.2d 876, 893 (2d Cir. 1992); *see also United States v. Beaulieau*, 959 F.2d at 379-80 (two-point role enhancement affirmed where defendant supplied and set the price for cocaine sold in the transactions with co-defendant); *United States v. Rodriguez-Gonzalez*, 899 F.2d 177, 183 (2d Cir. 1990) (two-point role enhancement affirmed where defendant negotiated price, held drugs in his own apartment, and directed the activity of one other person for one week).

The recruitment of another person to join the criminal scheme in any fashion is generally sufficient to trigger the enhancement. *United States v. Jacobo*, 934 F.2d 411,418 (2d Cir. 1991) (upholding two-level enhancement for defendant who obtained cocaine and hired another to carry it for him); *see also United States v. McGregor*, 11 F.3d 1133, 1139 (2d Cir. 1993) ("In the usual case, obtaining the services of a participant would make one a supervisor subject to an enhanced sentence.").

In this case, the record is clear that the defendant recruited multiple individuals to assist him in his drug operation and that he supervised and managed their involvement. These include not only heroin addicts, who drove him to make sales and to resupply in exchange for bags of heroin, but also individuals such as John Rohlman and Anthony Rivera, who made sales for him. While, under the authorities set forth above, the mere recruitment of any of these individuals would be sufficient to trigger the enhancement, the defendant's supervisory role was greater than that. The text messages set forth above make clear that during the period in January 2014 in which Rohlman sold heroin for the defendant, the defendant actively supervised his day-to-day activities  giving instructions on who to sell to personally and who to send directly to the defendant, directing him how to handle requests to purchase on credit, and reminding Rohlman that theirs was a "business" and that Rohlman needed to "answer to" him. On these facts, there can be no serious dispute that the enhancement applies.[2]

## The Appropriate Sentence

Although the Guidelines no longer play a mandatory role at sentencing, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." United States v. Booker, 543 U.S. 220, 252 (2005). "Pursuant to the 'remedy opinion' [in Booker], the now advisory Guidelines are to be considered together with the other factors set forth in 18 U.S.C. § 3553(a), by judges fashioning sentences." United States v. Fernandez, 443 F.3d 19, 26 (2d Cir. 2006); see also Booker, 543 U.S. at 261-62. Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," Gall v. United States, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the

---

[2] The defendant also objects to the PSR's description of the drug quantity involved in the conspiracy. At the time that the Complaint was filed, the Government believed in good faith that the defendant was responsible for the distribution of 100 bundles of heroin per day. As indicated in the description of the offense conduct provided above, the Government now believes that the evidence at trial would have established that during the height of the conspiracy in late 2013 and early 2014 the defendant was purchasing and reselling approximately 100 to 200 bundles of heroin per week. In any event, because of the nature of the offense of which the defendant was convicted, the quantity of heroin involved in the conspiracy does not factor into the Sentencing Guidelines calculation.

Honorable Cathy Seibel
October 2, 2015
Page 15 of 18

initial benchmark" in sentencing proceedings. Id. at 596; see also United States v. Rattoballi, 452 F.3d 127, 133 (2d Cir. 2006) (the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'") (quoting United States v. Jiminez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)); see also Fernandez, 443 F.3d at 33-34 ("It was not error for the [District Court] to employ the Guidelines range as a starting point and then to determine whether the arguments presented pursuant to the § 3553(a) factors warranted 'lighten[ing]' of . . . or fashioning of 'an alteration to' . . . the advisory Guidelines sentence").

The Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." Fernandez, 443 F.3d at 27; see also Kimbrough v. United States, 128 S. Ct. 558, 574 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'") (quoting Rita v. United States, 127 S. Ct. at 2464-65).

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2) the need for the sentence imposed—

        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B) to afford adequate deterrence to criminal conduct;

        (C) to protect the public from further crimes of the defendant; and

        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3) the kinds of sentences available;

    (4) the kinds of sentence and the sentencing range established [in the Guidelines];

    (5) any pertinent policy statement [issued by the Sentencing Commission];

    (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

    (7) the need to provide restitution to any victims of the offense.

Honorable Cathy Seibel
October 2, 2015
Page 16 of 18

18 U.S.C. § 3553(a).

In this case, a particularized consideration of the factors set forth in Section 3553(a) demonstrates that a sentence substantially greater than the applicable mandatory minimum is appropriate and necessary in this case and, indeed, that a Guidelines sentence of life imprisonment would not be inappropriate given the defendant's callous disregard for human life, the devastating consequences of that disregard, and his extensive criminal history record.

Of paramount importance in this analysis is the nature and circumstances of the offense, which weigh heavily in favor of a substantial sentence. The facts of this case are, simply put, shocking. Over the course of a few short months in late 2013 and early 2014, the defendant was personally responsible for the distribution of very large quantities of incredibly lethal drugs in Dutchess County. To be sure, he found a willing market for his drugs. But the defendant exploited the addictions of his drug customers, and their cravings for ever more potent opiates, in order to maximize his personal profit.

The defendant knew that the drugs that he was selling were dangerous, more dangerous even than heroin he had sold in the past or heroin that would otherwise be available in the area. Ashley Leone overdosed at his home and lost consciousness. On more than one occasion, the defendant bragged to customers and associates about the potency of Breaking Bad and the fact that even a small dose of one to two bags could produce a powerful high.

The substantial risk that the defendant's actions would lead to a fatal overdose was thus plain from the beginning. But the defendant showed no regard whatsoever for the lives of his customers or those of the family members and the communities who suffer every time a life is lost to drug overdose. And, as it turned out, the consequences of the defendant's callousness were tragic.

In December 2013, Anthony Delello overdosed on the defendant's drugs. Whether or not the drugs that the defendant dispensed to Delello on that night were particularly powerful, Delello's death made plain to the defendant, to the extent it was not already obvious, that lives hung in the balance. A different person, even a different drug dealer, might have repented after Delello's death. The defendant might have viewed Delello's death as a wake-up call, a tragic event that, nonetheless, could serve as the impetus the defendant needed to reform his life and end his longtime commitment drug dealing.

That was not the defendant's reaction, however. The defendant did not repent but, instead, took steps to avoid law enforcement scrutiny by recruiting John Rohlman to sell his deadly drugs for him. And, having done so, he continued to sell Breaking Bad in ever greater quantities, knowing full well that the product he was selling was poison, a deadly substance that had killed and would likely kill in the future.

Indeed, within weeks, because of the defendant's conduct two more people - Thomas Miller and Laura Brown - were dead. These deaths were both predictable and entirely preventable. The defendant, in his sentencing submission, notes that Miller suffered from a

Honorable Cathy Seibel
October 2, 2015
Page 17 of 18

coronary blockage and that Brown had taken other drugs on the day that she died.  At trial, however, the Government would have called expert witnesses whose testimony combined with the other evidence in the case would have proven beyond any reasonable doubt that Brown and Miller would not have died had they not ingested the defendant's deadly drugs.  And, indeed, in his own guilty plea, the defendant admitted that fact.  This Court should be under no illusions, were it not for the defendant's actions, Delello, Miller and Brown would in all likelihood be alive today.

The facts of this case make abundantly clear the "absurdity" of the claim that drug offenses are non-violent and victimless.  *See Harmelin v. Michigan*, 501 U.S. 957, 960 (1991).  The victims in this case are not just Anthony Dellelo, Thomas Miller, and Laura Brown, who lost their lives because of the defendant's drugs, but also their families, who are victims in both fact and law.  *See* 18 U.S.C. § 3771(e).  The defendant, by his actions, did violence to Anthony Delello's mother, Thomas Miller's adolescent daughters, and Laura Brown's husband, as well as to the broader families and communities of the overdose victims.  The Government has previously provided the Court and defense counsel with letters from family and friends of Anthony Delello that convey in stark and deeply moving terms the suffering of the victims in this case.  The Government expects that several other family members will address the Court at sentencing.

The history and characteristics of the defendant would also support the imposition of a Guidelines sentence in this case.  The instant conviction represents the defendant's sixth drug felony and there is no evidence that prior periods of incarceration or interactions with the criminal justice system deterred the defendant in any way from continuing to engage in criminal conduct.  To the contrary, just months after being released from state prison, while he was still on parole, the defendant returned to selling heroin and his conduct as outlined above, was more serious, and had more serious consequences, than any of his prior criminal conduct.  A lengthy sentence is thus necessary to achieve the goals of specific deterrence and to promote respect for the law on the part of the defendant.

In this regard, the Government is particularly troubled by statements that the defendant made in letters to Sidney White while the two were incarcerated together at the Dutchess County.  Those statements, which are summarized above appeared to indicate that even after the defendant learned of the deaths of Anthony Delello and Laura Brown he showed a shocking lack of remorse.  Given the existence of these letters, the defendant's present statements of remorse are difficult to credit, as is the suggestion that he will not reoffend in the future.  The interest in "protect the public from further crimes of the defendant" thus weighs heavily in favor of a lengthy period of incarceration, if not a sentence of life imprisonment.  18 U.S.C. § 3553(a)(2)(C).

Finally, the goals of "affording adequate deterrence to criminal conduct" and promoting "respect for the law" more generally are especially important in this case.  The defendant was a well-known drug dealer in Dutchess County who bragged about his ability to manipulate the justice system.  An extraordinarily lengthy prison is necessary to send a message to other drug

Honorable Cathy Seibel
October 2, 2015
Page 18 of 18

dealers that if they engage in risky activities and cause extraordinary harm, the punishment will be commensurate.

      In sum, the defendant is a dangerous individual whose conduct had life altering consequences for the defendants, their families, and the Dutchess County community.  As such, and for the reasons stated above, the Government respectfully submits that a sentence substantially greater than the applicable mandatory minimum, including a Guidelines sentence of life imprisonment, would be warranted in this case and sufficient but not greater than necessary to serve the purposes of sentencing.  Thank you for your consideration.

                Respectfully submitted,

                PREET BHARARA
                United States Attorney

      By:  /s/
                Scott Hartman / Benjamin Allee
                Assistant United States Attorneys
                Southern District of New York
                (212) 637-2357 / (914) 993-1953

CC:    Theodore Green (by e-mail)
        Richard Willstatter (by e-mail)