UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA,                          14-cr-462 (CS)

      -against-                                               Declaration

DENNIS SICA,
                Defendant.

------------------------------------------------------------x

      I, Theodore S. Green, an attorney admitted to practice in this Court and in the Courts of New York, declare and affirm pursuant to 28 U.S.C. §1746, as follows:

      1. This declaration is submitted pursuant to the Court's order of November 20, 2018, directing that I file an affidavit responding to Mr. Sica's pending motion pursuant to 28 U.S.C. §2255. On June 19, 2014, I was appointed in the above-captioned case to represent Dennis Sica pursuant to the Criminal Justice Act (CJA). Mr. Sica was originally charged by complaint and subsequently charged by indictment with one count of conspiracy to distribute and possess with intent to distribute heroin and fentanyl in violation of 21 U.S.C. §§841(b)(1)(B) and 846. The indictment alleged, as an aggravating element, that drugs distributed in furtherance of the conspiracy caused the deaths of three people – Anthony Delello, Laura Brown and Thomas Miller.

      2. In preparing the case for trial, I examined discovery provided by the government, including extensive cell phone records, text messages, medical examiner reports, toxicology records, medical records, laboratory reports and records, and other discovery. After applying to the Court and obtaining authorization under CJA, I obtained the following services to assist the defense: private investigator Michael Benvie (formerly a law enforcement officer and currently employed as

1

the investigator for the Putnam County District Attorney's office), Mark Taff, M.D. (a board-certified forensic pathologist and formerly the chief medical examiner for Rockland County), toxicology expert Donald Hoffman, Ph.D. (an associate adjunct professor at John Jay College of Criminal Justice and formerly a research scientist and senior chemist for the Office of Chief Medical Examiner for New York City), and Cornerstone Discovery of Philadelphia, Pa., a firm that conducts digital forensic examinations of electronic evidence including cell phone and cell tower evidence. I also applied to have Richard Willstatter of our firm appointed as co-counsel, an application which was granted.

3. From an early stage of the case, I realized that challenging the causation of death with respect to drugs allegedly distributed was a key issue. The causation issues differed for each of the deceased. Relevant facts and trial defenses developed in our investigation, through review of evidence, consultation with experts, and interviewing witnesses included the following:

<u>Anthony Delello</u>

4. In the case of Delello, text messages and 3500 material revealed that Delello and his girlfriend, Kaitlyn Falgiano, were actively seeking to procure drugs the night before his death, both heroin and the prescription opiate Oxycodone, referred to in text messages as "blues." Delello and Falgiano initially reached out to an acquaintance who worked at a local Dunkin' Donuts that was connected to a Sunoco gas station. According to witness statements, this person provided Sica's phone number to Falgiano, who then provided it to Delello. (A. 53-54).[1]

---

[1] Parenthetical citations denoted by "A." are to pages of the appendix that was filed in Mr. Sica's direct appeal to the United States Court of Appeals for the Second Circuit. *United States v. Sica*, 15-3486-cr.

5. Delello also expressed an interest that night in procuring oxycodone from another source and exchanged text messages with another acquaintance who worked at the Sunoco station in an effort to find that drug. Moreover, Falgiano, in statements to the government, acknowledged that there was a "possibility" that Delello contacted yet another drug source that night about obtaining "pills" (A. 54).

6. At the time of the autopsy, a multi-panel urine screening test was conducted which presumptively disclosed the presence of opiates, oxycodone and benzodiazepine. Subsequent toxicology tests were conducted for the government by NMS Laboratories, which reported the presence of heroin (but not Fentanyl) and benzodiazepine, as well as codeine.[2] At least one test conducted by NMS also revealed the presence of substantial amounts of oxycodone, as well as some codeine, but NMS deemed these findings to be unreportable and did not include them as being present in the final report (A. 54-55, 72).

7. Had the case gone to trial, Dr. Taff was prepared to testify that persons who use opiates, such as heroin, in combination with benzodiazepines, like diazepam, put themselves at significantly increased risk of death by overdose. There is a synergistic effect when the drugs are combined. Benzodiazepines, like opiates, are central nervous system depressants and both drugs suppress one's ability to breathe. Together, the effect is exacerbated. In Dr. Taff's opinion, the cause of Delello's death was multiple or mixed drug intoxication and it was the use of a combination of drugs that

---

[2] Codeine (such as that found in prescription cough syrup) is known to be taken by drug users in combination with other drugs. Among other side effects, codeine can contribute to respiratory depression.
http://www.drugabuse.gov/publications/drugfacts/cough-cold-medicine-abuse (last visited May 3, 2016). Cough syrup is also mixed with Sprite or other sodas to produce a concoction known by drug users as "lean" or "purple drank."
http://www.narconon.org/drug-abuse/purple-drank-effects.html (Last visited May 3, 2016).

caused his death. According to Dr. Taff, in Delello's case, he was particularly susceptible to death from overdose because, as stated in the autopsy report, he was suffering from acute bronchopneumonia and pulmonary thromboembolism (i.e, a blockage in one or more pulmonary arteries in the lungs, usually due to blood clots)[3] (A. 55).

8. Based on our review of the evidence and consultation with experts, it was also my view that the circumstances of Delello's death, as reflected in witness statements, did not show that Delello died from a rapid reaction to some unusually potent brand of heroin. On the contrary, based on the statements of Falgiano and her mother, Debra Falgiano, Delello went to Ms. Falgiano's home that night, where both of them took heroin in the early morning hours before both went to sleep. Mrs. Falgiano would report that later, at about 10 a.m., she found Delello awake but vomiting something red, which she claimed to have attributed to his having consumed a Roy Rogers cocktail (a non-alcoholic drink made with grenadine) but which could have indicated that Delello had been drinking codeine cough syrup. However, later that day, at about 1:15 p.m., Mrs. Falgiano reportedly found Delello laying on the floor and put a blanket over him. (The Delello family would doubt this, as they found no blanket on Delello when they responded to the scene later that afternoon). She would then claim that a "short while later," her daughter told her to call 911 and she did, but records show that the 911 call was not made a "short" while after 1:15 p.m. but at 2:58 p.m. According to 3500 reports, Mrs. Falgiano would later tell law enforcement that, prior to the arrival of paramedics, she destroyed glassine envelopes which she asserted were stamped "Breaking Bad." (She would claim

---

[3] Dr. Taff accompanied defense counsel to the Dutchess County Medical Examiner's office where he personally viewed tissue slides through a microscope. From this inspection, Dr. Taff concluded that Mr. Delello had been suffering from a case of full blown pneumonia, the onset of which had preceded Mr. Delello's death by several days.

4

to find the drugs under a book; her daughter would claim they were kept in a shoe box). Moreover, Delello's family also found evidence that someone had gone through Delello's car and removed evidence of hypodermic syringes and illegal steroids. When police and paramedics were eventually summoned to the scene, Kaitlyn Falgiano insisted that neither she nor Delello had taken drugs that night and attributed the nausea that she had to eating "bad green beans" at work the night before[4] (A. 56-57).

Thomas Miller

9. The government acknowledged that Sica did not directly sell drugs to Mr. Miller and that co-defendant John Rohlman was the direct seller. According to Rohlman, Miller had purchased Breaking Bad from him before and used it in Rohlman's presence. Dr. Taff was prepared to testify that, as reflected in the autopsy report, Miller was suffering from untreated hypertension and had a 90 per cent occlusion (or blockage) of his coronary artery. This condition was sufficiently advanced to put him at risk of sudden cardiac death regardless of whether he had recently taken drugs. Further, that condition also put Miller at significantly greater risk of an overdose death. Moreover, while the NMS laboratory reported the presence of heroin and Fentanyl, the presumptive urine screening test conducted at the time of autopsy also disclosed the presence of benzodiazepine (A. 57, 71).

Laura Brown

10. In the case of Laura Brown, one of the government's expected witnesses, Matt Leverich

---

[4] Evidently, the Falgianos were unaware of New York's "good Samaritan" law (New York Penal Law §220.78) which generally shields persons from prosecution for drug offenses when reporting an overdose to authorities. Had they known they themselves could not have been prosecuted for possession of any drugs at the scene, they might have more promptly called for help.

(Brown's brother) told the government and defense counsel that he and Brown had procured heroin from another source that day in Poughkeepsie named "Lefty" (also with the brand name "Breaking Bad"), but that Brown wanted to purchase Breaking Bad from Sica because she believed it to be stronger. Earlier that day, Brown had undergone surgery and was given Fentanyl while in the recovery room. Hospital staff advised Brown to rest at home and to avoid taking anything, including alcohol.[5] Instead, within a few short hours after discharge, Brown was procuring heroin with the help of her brother. Brown was home alone for almost a full day before her body was found and no one saw her take the drugs that contributed to her death or knew for sure which drugs she had taken. A search of her apartment revealed a large number of empty heroin bags with a number of different brand names (A. 57-58).

11. Leverich also advised the defense and the government that the scene at Brown's apartment, as depicted in police photographs, differed substantially from what he saw when he went into her apartment prior to the arrival of police. In particular, Leverich told defense counsel (and reaffirmed to the government) that he did not see any bags of Breaking Bad in the bathroom where he found Brown and instead found empty bags "of unknown brand" (A. 58). Photographs of the scene taken by a New Milford police officer show at one point an empty bag of what appears to be "Breaking Bad" on a dresser (A. 73, 58), while another photograph of the same dresser shows the bag missing (A. 74, 58). A photograph of the bathroom taken by one officer (that purportedly shows "Breaking Bad" in the bathroom) has its metadata missing (*i.e.*, the data that would show the date and time of the photograph) (A. 75, 58). We were prepared to argue at trial that there existed

---

[5]The defense learned the details of Ms. Brown's surgery and her receiving Fentanyl at the hospital, not from the government, but by obtaining and serving a subpoena on the hospital where the surgery was performed.

6

reasonable doubt that the drugs attributed to Sica caused her death.

12. In consultations that Mr. Willstatter and I had with Mr. Sica prior to trial, we cautioned Mr. Sica that one challenge posed by our causation defenses was that the government only needed to prove that one of the deaths was caused by drugs distributed through the offense conduct, whereas the defense would need to obtain a not guilty verdict on all three deaths in order to avoid a conviction on the aggravated charge. In discussing the relative merits of the defenses as to each death, I also advised Mr. Sica that, in my opinion, the most difficult one from a defense perspective was the Miller death. This is because there was less evidence that Miller had been taking drugs other than Breaking Bad, notwithstanding that a presumptive test had suggested the presence of benzodiazepine. Miller's body was found in his bedroom, with empty Breaking Bad bags near him. The defense, accordingly, would have to highlight that Miller could have died for unrelated reasons, owing to his heart condition.

13. During discussions with the government, AUSA Scott Hartman at one point raised the possibility that, if Mr. Sica chose to go to trial, the government might charge Mr. Sica under a prior felony information (PFI), pursuant to the provisions of 21 U.S.C. §851. Had the government done so, Mr. Sica would have been facing a mandatory sentence of life imprisonment upon conviction. I told Mr. Hartman that the government ought to tell me definitively whether it would be taking such a course and, on January 5, 2015, Mr. Hartman emailed me to advise that his office "will not be filing a PFI in this case under any circumstances", but that the government also could not "come off of the death enhancement." After receiving this email, I wrote to Mr. Sica the same day to inform him that the government would not be filing a prior felony information under any circumstances and that, accordingly, "you would not be facing the possibility of a mandatory life sentence in this case."

I added, "[h]owever, even without the prior felony information, your guidelines if you were convicted after trial of the aggravated charge would be life at level 43. The guidelines are advisory and not mandatory."

14. My statement in that letter that Mr. Sica would be facing life guidelines after trial was based on USSG §2D1.1(a)(1), which calls for a guideline level 43 (and a life guideline)

> if the defendant is convicted under 21 U.S.C. §841(b)(1)(A), (b)(1)(B), or (b)(1)(C), or 21 U.S.C. §960(b)(1), (b)(2), or (b)(3), and the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance and that the defendant committed the offense after one or more prior convictions for a similar offense.

15. As set forth in greater detail below, I later argued to this Court (unsuccessfully) that 2D1.1(a)(1) should not apply and that instead 2D1.1(a)(2) should govern (with a base offense level of 38, not 43), based on the fact that Mr. Sica's prior drug felony convictions did not involve causing death or serious bodily injury and that, accordingly, those prior convictions were not offenses "similar" to the instant offense.

16. Trial of the matter was originally scheduled to commence in February 2015, but the defense moved for an adjournment after it became apparent that it required voluminous additional discovery, including extensive cell phone call records, text messages, and other materials. Trial was rescheduled to commence in April 2015. In the meantime, the parties engaged in plea discussions and, in a pre-trial draft plea letter dated April 8, 2015, the government proposed an "offer" that would call for a plea to the charge in the indictment, with a twenty year statutory minimum and guidelines of 360 months to life, but with the government reserving the right to argue for a sentence of up to forty years (and requiring the defendant to waive his appellate rights). We communicated this offer to Mr. Sica. The defense would not accept a plea on those terms (A. 62).

17. As trial neared, the parties also litigated *in limine* issues, including as to what jury instructions were required with respect to the "death results" element. Citing to *Burrage v. United States*, 134 S.Ct. 881 (2014), we proposed that the jury should be instructed as follows:

> The government must prove that there was an actual distribution of drugs to the specific persons referred to in the Indictment. And the government must prove that but for the use of those drugs, that person would not have died. In essence, the government must prove that the person's death resulted from the use of the specific drugs that are alleged to have been sold by the defendant and not from a combination of factors to which that drug merely contributed. In other words, it is not sufficient to convict a person of causing death if the drugs that are alleged against the defendant were only a contributing cause and not the cause (A. 23).

The government, also citing to *Burrage*, countered that the jury should be instructed as follows:

> I instruct you that, in order to find that the death of a particular individual resulted from the use of a controlled substance distributed through the conspiracy, you must find that the Government has proven that the controlled substance distributed by the defendant or a co-conspirator was the cause of the alleged victim's death. In other words, the Government must prove that the alleged victim would not have died on the date he or she did, but for the ingestion of the drugs distributed by the defendant or his co-conspirator. This does not mean that the drugs distributed through the conspiracy must be the only factor that brought about the alleged victim's death, and indeed it can be sufficient if drugs distributed through the conspiracy caused the alleged victim's death in combination with other causes, so long as you find that the Government has proven that the individual in question would not have died on the date he or she did, absent his or her ingestion of the drug or drugs distributed through the conspiracy (A. 24).

18. The defense also requested an instruction that the jury must find that it was reasonably foreseeable to the defendant that death would result from the distribution of the controlled substances. The defense noted that this was one of the issues taken up by the Supreme Court in *Burrage*, but which it declined to rule on. [In preparing this point, Mr. Willstatter conferred by telephone with the attorney who had argued *Burrage* before the Supreme Court.] The defense argued

9

that failure to give such an instruction would run counter to the presumption against strict liability criminal statutes, citing to *Staples v. United States*, 511 U.S. 600, 606 (1994) and *Liparota v. United States*, 471 U.S. 419, 426 (1985) (A. 38). The government opposed a foreseeability instruction, arguing that 21 U.S.C. §841(b)(1)(B) imposed no *mens rea* requirement with respect to the "death results" element (A. 36-40).

19. The Court ruled in the government's favor on both charge issues (A. 138-145, 148-149). As to the causation requirement, the court ruled that, under *Burrage*, "[t]he Government has to prove that the drugs distributed by the defendant were a but for cause, not just a contributing cause. But the fact that there may have been other contributing causes doesn't prevent the drugs distributed by the Defendant from being a but for cause, assuming there is evidence to back that up. . . . It's clear from *Burrage*, it seems to me, that there can be other things that contribute to the death, as long as the Government proves that the drugs distributed by the Defendant are the but -- are a but for cause. It doesn't have to be the only but for cause" (A. 138-139).

20. After this ruling on the charge requests, Mr. Willstatter and I advised Mr. Sica, in substance, that the Court's anticipated jury instructions would pose a greater challenge to obtaining an acquittal. As the case neared trial, I also advised Mr. Sica that he was at risk of being sentenced to life imprisonment were he sentenced after a trial conviction.

21. On April 27, 2015, the date scheduled for jury selection, Sica advised counsel that he wished to enter a plea of guilty to the indictment and we so advised the Court.[6] The Court then

---

[6]That same date, the government provided a *Pimentel* letter which differed from the earlier April 8, 2015, draft plea offer in that the government was now opposing an additional
(continued...)

conducted a plea allocution (A. 167-168). During the plea allocution, the government, in proffering its anticipated trial proof, stated, among other things, that the use of drugs distributed by the defendant (in two cases directly, in one case by a co-conspirator) "was the but/for cause of the deaths of three individuals," Anthony Delello, Thomas Miller and Laura Brown (A. 166-167). The court asked Sica whether the prosecutor's recitation was accurate and Sica responded "Yes, ma'am" (A. 167). Sica had no direct or personal knowledge of the circumstances of any of the three deaths. In his factual allocution, Sica acknowledged that he had agreed with others to distribute 100 grams or more of heroin and 40 grams or more of Fentanyl, and that the three named individuals had died "as a result of taking drugs that were distributed as part of the conspiracy" (A. 167-168). The court then inquired of counsel whether the defense agreed that the government could present legally sufficient evidence at trial "that death resulted from distribution of drugs that were distributed as part of this conspiracy" and counsel responded, "We concede that the use of the drugs that were distributed as part of the conspiracy were *a but/for cause* of those person's deaths." (Emphasis added) (A. 168).

    22. In objections to the probation department, in a sentencing memorandum and at sentence, Sica opposed application of a sentencing enhancement under U.S.S.G. §2D1.1(a)(1) (A. 43-48, 66-68, 131-132, 175-182). That sub-section calls for an offense level of 43 if "the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance and that the defendant committed the offense after one or more prior convictions for a similar offense." The defense argued that "similar offense" means a prior offense establishing that death or serious bodily

---

[6](...continued)
point reduction for timely acceptance of responsibility, such that Sica, according to the government, faced life guidelines after a conviction by plea or trial.

injury resulted from the use of the substance. The defense argued that Sica's base offense level instead should be 38 under U.S.S.G. §2D1.1(a)(2). The government opposed that motion and the court ruled that the enhancement applied based on one of Sica's prior state convictions.

23. On appeal to the United States Court of Appeals for the Second Circuit, I raised an additional challenge to 2D1.1(a)(1) – one which I had not raised in the District Court – which is that 2D1.1(a)(1) required that the prior similar offense be "establish[ed]" by the offense of conviction, which, I contended, meant that the prior conviction had to be established by the procedures set forth in 21 U.S.C. §851. The Court of Appeals did not rule on the merits of that claim, instead determining that reversal was not required under plain-error review. *United States v. Sica*, 2017 U.S. App. LEXIS 1188 (2d Cir.), *cert. denied* 138 S.Ct. 191 (2017).

24. I am mailing a copy of this declaration to Mr. Sica (Reg. No. 71171-054), at FCI Ray Brook, Federal Correctional Institution, P.O. Box 900, Ray Brook, New York   12977.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   December 19, 2018

_____
Theodore S. Green