UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                    :
DENNIS SICA,                                        :
                                                    :
                              Petitioner,           :      18 Civ. 8959 (CS)
                                                    :      14 Cr. 462 (CS)
            - v. -                                  :
                                                    :
UNITED STATES OF AMERICA,                           :
                                                    :
                              Respondent.           :
      .                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO PETITIONER DENNIS SICA'S
MOTION TO VACATE, SET ASIDE, OR CORRECT HIS SENTENCE
PURSUANT TO 28 U.S.C § 2255**


                                        GEOFFREY S. BERMAN
                                        United States Attorney
                                        Southern District of New York
                                        One St. Andrew's Plaza
                                        New York, New York 10007


Scott A. Hartman
Assistant United States Attorney
*Of Counsel*

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the motion filed by Dennis Sica ("Sica" or the "Petitioner") for relief pursuant to Title 28, United States Code, Section 2255 (the "Petition"). The Petition should be denied. The Court should summarily reject Sica's claims of ineffective assistance of counsel, which are contradicted both by the record in the criminal case and former counsel's affidavit in response to Sica's petition.

## PROCEDURAL HISTORY

Indictment 14 Cr. 462 (CS) (the "Indictment") was filed on July 14, 2014, charging Sica with one count of participating in a conspiracy to distribute and possess with intent to distribute mixtures and substances containing a detectable amount of heroin and fentanyl, in violation of Title 21, United States Code, Sections 846. The Indictment alleged that Sica conspired to distribute 100 grams and more of mixtures and substances containing heroin and 40 grams and more of mixtures and substances containing fentanyl, and that the use of the controlled substances distributed by Sica and his co-conspirators caused the deaths of three people.

On April 27, 2015, the day that jury selection was scheduled to begin in his trial, Sica pled guilty to the charge in the Indictment, which carried a mandatory minimum term of imprisonment of 240 months. On October 8, 2015, this Court sentenced Sica to a term of 420 months' incarceration, to be followed by four years' supervised release, and imposed forfeiture in the amount of $10,543 and a $100 mandatory special assessment.

Sica filed a direct appeal. On January 24, 2017, the Second Circuit affirmed Sica's conviction and sentence. On October 2, 2017, the United States Supreme Court denies Sica's petition for certiorari. *Sica v. United States*, 138 S.Ct. 181 (2017).

Sica's *pro se* motion pursuant to Section 2255 was received by the Clerk of Court on

2

September 27, 2018.

**STATEMENT OF FACTS**

**A.  The Offense Conduct**

From late 2013 to February 2014, Dennis Sica orchestrated a conspiracy to distribute a potent mix of heroin and fentanyl under the street name "Breaking Bad." The use of this drug caused the overdose deaths of three individuals: Anthony Delello, Thomas Miller, and Laura Brown.

From at least 2013, Sica was an established heroin dealer in and around Hopewell Junction, New York. Roughly every week, Sica purchased about 100 bundles of heroin, the rough equivalent of 50 grams, from a variety of suppliers in New York City and the northern counties. Sica generally paid $40 to $50 per bundle of ten glassine bags; he resold the drugs at roughly twice that price. (PSR ¶ 11).

Beginning in late 2013, Sica began selling a particularly potent combination of heroin and fentanyl in glassine bags that were stamped with the words "Breaking Bad." Fentanyl is an extremely powerful and dangerous synthetic opioid prescribed by doctors for use as a painkiller in extreme medical situations. It can be 50 to 100 times stronger than heroin. (PSR ¶ 11).

Sica obtained Breaking Bad pre-packaged and pre-stamped from a supplier based in the Bronx. When Sica traveled to the Bronx to replenish his supply of Breaking Bad, other people drove him. Sica's drivers included John Rohlman and Anthony Rivera, both of whom distributed drugs in Dutchess County on behalf of Sica by personally supplying his customers when Sica himself was unavailable. Sica also obtained rides from heroin users, such as Bonnie Howell and Greyson Ciganer, whom he compensated with bags of drugs. One heroin user, Arthur DeSiervi, agreed for a time to store Sica's drug supply in his house in exchange for permission to use some

of the drugs. Sica began storing the drugs with DeSiervi after Sica's apartment mates broke into his bedroom and stole his drug supply. (PSR ¶ 11, 19).

To sell the heroin, Sica took calls and texts on a cellphone he kept for that purpose. (PSR ¶ 14). He then arranged for the customers to come to his apartment in the Chelsea Cove apartment complex in Hopewell Junction, or to meet him at other locations, where he would be driven by one of his co-conspirators. In addition to the Chelsea Cove apartment complex, Sica sold heroin in parking lots, gas stations, and roadsides. (PSR ¶ 19).

Given its potency, Breaking Bad was in high demand. At one point, Sica told his best friend Matthew Leverich that he was selling as much heroin as he had ever sold in his life.  The success of Sica's drug business had tragic consequences for his customers. From December 2013 to January 2014, at least five people were hospitalized or killed from using Sica's drugs. Sica knew this, and yet after each hospitalization and death continued selling Breaking Bad. (PSR ¶ 14).

In mid-December 2013, a young woman, Ashley Leone, became sick from using Sica's drugs inside of his apartment in Hopewell Junction. John Rohlman, who was also present at the apartment called 911. When the sheriff's officers came and spoke with Sica, Sica lied and stated that Leone had fallen and hit her head.

Shortly thereafter, Sica sold a lethal dose of heroin to Anthony Delello, a 20-year-old man who was slated to enter the Air National Guard. (PSR ¶ 24). On the night of December 28, 2013, Delello and his fiancée, Katilyn Falgiano, were looking for heroin. They had used heroin before, but by late 2013 rarely used it. Through a friend, Delello and Falgiano were put in contact with Sica. In calls and text messages on his drug cellphone, Sica offered to sell them heroin, $100 for a bundle, and told them to come to his house. They did, and bought Breaking

4

Bad, which they used that night. Delello was dead the next day. He died on the floor beside Falgiano's bed, with foam in his mouth. He had deadly levels of morphine in his body, which results from heroin use. There were no traces of fentanyl. The medical examiner determined that the cause of death was acute heroin intoxication. (PSR ¶¶ 12, 13).

Sica learned within a day or two that Delello had died from using his heroin. (PSR ¶ 14). Friends of Delello's confronted Sica and yelled at him about it when Sica stopped at Dunkin Donuts to make a drug sale. Sica was not chastened by Delello's tragic death, however. He continued to sell Breaking Bad. But because he wished to avoid law enforcement scrutiny in the wake of Delello's death, Sica enlisted John Rohlman, a heroin addict who had at times driven him in exchange for bags of heroin, to act as his street-level dealer. Sica gave Rohlman his drug cellphone. He instructed Rohlman to delete all text messages in the phone, to lie if anyone asked about the phone, and not to answer calls from Delello's friend who had put Delello in touch with Sica. (PSR ¶ 14). As for the heroin business, Sica gave Rohlman a portion of his Breaking Bad heroin supply, and told Rohlman they would split the profits. (PSR ¶ 14).

Sica's plan to continue his heroin operation through Rohlman was unsuccessful. Although Sica attempted to tightly control Rohlman's distribution of the heroin, Rohlman did a poor job, partly because, contrary to Sica's instructions, Rohlman agreed to provide drugs to heroin users on credit and was then unable to collect from them. Within days Sica took back his drug cellphone and continued selling Breaking Bad himself.

On January 30, 2014, Sica made another trip to the Bronx for a supply of Breaking Bad. He returned with an extraordinarily lethal heroin/fentanyl mixture that, within two days, left two people dead, and nearly killed a third. That day, Laura Brown, the sister of Matthew Leverich, Sica's best friend, was looking for heroin. Because Sica was in the Bronx replenishing his supply

of Breaking Bad, Brown and her brother purchased heroin from another supplier. That evening, however, Brown found herself craving Breaking Bad because of the exceptional high produced by the potent heroin-fentanyl combination. Through her brother, Brown learned that Sica had returned to Hopewell Junction. So the two of them traveled to Sica's apartment, where they met Sica and purchased Breaking Bad. Brown dropped off her brother on her way home to New Milford, Connecticut. It was the last time he would see her alive. (PSR ¶ 17).

The next morning Brown failed to appear for work. A co-worker sent her a text message, but she did not respond. Brown's husband was overseas on business. It was not until two days later that Brown's brother and their father traveled to New Milford to check on her. They found Brown lying dead, face down on her bathroom floor. Breaking Bad bags were on the bathroom counter, beside a syringe. The medical examiner determined that the cause of death was heroin and fentanyl intoxication. (PSR ¶ 17).

The night after Sica sold Laura Brown the lethal dose of Breaking Bad, Thomas Miller, the father of two young girls, was also then looking for heroin. He contacted Rohlman, and he and Rohlman drove to Sica's apartment where Sica, through Rohlman, sold Miller Breaking Bad. Miller returned home that night to his mother's house in Pawling, New York. In his bedroom he injected the drugs. The next morning his mother found him in his bed, dead. Breaking Bad bags were nearby on the desk. Again, the medical examiner determined that the cause of death was acute heroin and fentanyl intoxication. (PSR ¶¶ 18-19).

Sica also sold the drugs to another young woman, Sydney White, on numerous occasions in late 2013 and early 2014. On January 31, 2014, White bought Breaking Bad from Sica. Shortly after using it she blacked out and was hospitalized due to the unexpected potency of the drug. (PSR ¶ 16).

6

After his arrest, Sica wrote letters to White while they were both detained at the Dutchess County Jail. In the letters, Sica, who by that time had learned of the deaths of at least Delello and Brown, demonstrated his complete lack of remorse for the lives he had destroyed. He speculated that he would be sentenced to probation in connection with the state drug charges he was then facing. He bragged that he was "a beast at beating cases, especially drug cases" and that he knew "motions and tricks to beat cases." He also expressed concern that White might have talked to law enforcement, who he characterized as "pigs," about the fact that he had supplied her with drugs, and he wrote disparagingly of "snitches." With respect to Brown, Sica expressed his belief that law enforcement "gave up" trying to prove his role in the death, because they "got nothing."

On July 14, 2014, the grand jury returned the Indictment, charging Sica with conspiring to distribute and possess with intent to distribute heroin and fentanyl, the use of which substances resulted in death.

## B. Sica's Guilty Plea

### 1. The Pimentel Letter

On April 27, 2015, the Government provided Sica a letter, pursuant to this Court's suggestion in *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991) (the "Pimentel Letter"), setting forth the Government's position as to how the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") would apply at Sica's sentencing. In the Pimentel Letter, the Government calculated Sica's base offense level for Count One to be 43, pursuant to U.S.S.G. § 2D1.1(a)(1), because Sica would be convicted under 21 U.S.C. § 841(b)(1)(B) and the offense of conviction would establish that death resulted from the use of the controlled substances distributed by him and that he committed the offense after one or more prior convictions for a similar offense. A two-level leadership enhancement was also warranted under

Sections 3B1.1(c). After applying a two-level downward adjustment, pursuant to Section 3E1.1 for acceptance of responsibility, the Pimentel Letter calculated Sica's offense level for Count One to be 43. That offense level, combined with Sica's Criminal History Category of VI, yielded an advisory sentence of life imprisonment under the Guidelines, with a mandatory minimum sentence of 20 years.

### 2.  The Plea Proceeding

On April 27, 2015, the day a jury was to be selected for his trial, Sica elected to enter a plea of guilty to Count One of the Indictment, without the benefit of a plea agreement with the Government.  During the plea allocution, the Court advised Sica that the charge to which he was pleading guilty would subject him to a 20 year mandatory minimum sentence, and could result in a sentence of life imprisonment, if the Court found such a sentence appropriate. Sica indicated that he understood. (4/27/15 Tr. at 10). Sica then admitted that "from December 2013 through the first part of 2014 in Dutchess County, [he] agreed with others to distribute narcotics," including, "more than 100 grams of heroin and more than 40 grams of fentanyl." Sica also admitted to knowing "that Anthony Delello, Thomas Miller and Laura Brown died as a result of taking drugs that were distributed as part of the conspiracy." (4/27/15 Tr. at 18). When questioned by the District Court, Sica's counsel further conceded on behalf of his client that, as a legal matter, "that the use of the drugs that were distributed as part of the conspiracy were a but-for cause" of the deaths of Delello, Miller, and Brown. (4/27/15 Tr. at 19).

At the conclusion of the proceeding, the Court accepted Sica's guilty. (4/27/15 Tr. at 21).

### C.  The Appeal

As noted, Sica appealed his conviction and sentence. On appeal, as relevant here, Sica argued that his guilty plea allocution provided an inadequate factual basis to find him guilty of

the offense of conviction. In particular, Sica argued that that the District Court was required to find that the deaths were reasonably foreseeable to him at the time he sold the drugs to the victims. The Second Circuit rejected Sica's argument. *United States v. Sica*, 676 Fed. Appx. 81, 84–85 (2d Cir. 2017) (summary order). The Court noted that Sica had failed to object to the adequacy of his plea before this court and that, in the absence of controlling authority clearly establishing a foreseeability requirement, Sica's argument must be deemed forfeited. *Id.* The Court went on to note that, in any event, every circuit to consider the matter had rejected Sica's argument and that, even if such a requirement existed, the facts of Sica's case support an inference that the deaths were foreseeable to him. *Id.*

## D. The Petition

As noted, on September 27, 2018, Sica, acting *pro se*, filed the instant petition.

## APPLICABLE LAW

To obtain relief from a conviction under Section 2255, a petitioner must demonstrate "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *Graziano v. United States*, 83 F.3d 587, 589-90 (2d Cir. 1996) (quotations and citations omitted); *see also Brecht v. Abrahamson*, 507 U.S. 619, 634 & n.8 (1993); *United States v. Wright*, 524 F.2d 1100, 1101 (2d Cir. 1975) ("[n]ot every error of law may be successfully asserted in proceedings under [§ 2255]; the error must be a fundamental one which inherently results in a complete miscarriage of justice[]").

A Section 2255 petition is not designed as a substitute for an appeal, *United States v. Frady*, 456 U.S. 152, 165 (1982), and a defendant cannot use a Section 2255 motion to relitigate questions that were raised on direct appeal or that could have been raised on direct appeal but

were not.  *See Riascos-Prado v. United States*, 66 F.3d 30, 33 (2d Cir. 1995); *Douglas v. United States*, 13 F.3d 43, 46 (2d Cir. 1993) ("any claim raised on direct appeal from conviction is precluded from consideration by this Court" on appeal from the denial of Section 2255 motion).

Where a Section 2255 petition is predicated on a claim that counsel was constitutionally ineffective, in order to succeed, the petitioner must (i) show that the representation he received "fell below an objective standard of reasonableness" under "prevailing professional norms," and (ii) "affirmatively prove prejudice."  *Strickland v. Washington*, 466 U.S. 668, 687-88, 693-94 (1984); *see United States v. De La Pava*, 268 F.3d 157, 163 (2d Cir. 2001).

Under the first prong, the reviewing court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'"  *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (*quoting Strickland*, 466 U.S. at 689).

Under the second prong, a petitioner faces a "heavy burden" of showing "actual prejudice."  *Strickland*, 466 U.S. at 692. The petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 693-94.  Where a petitioner alleges that he would not have accepted a guilty plea but for counsel's unprofessional advice, the showing required to establish prejudice will depend on the nature of the advice at issue.  Where the challenged advice concerns only the petitioner's likelihood of conviction at trial, the petitioner must show both (i) a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial," and (ii) "that he would have been better off going to trial."  *Lee v.*

*United States*, 137 S. Ct. 1958, 1965 (2017).  In contrast, where counsel's alleged error is one that affected the petitioner's "understanding of the consequences of pleading guilty," beyond merely the likelihood of conviction, the likelihood of conviction at trial does not figure in the prejudice analysis.  *Id.*

## **ARGUMENT**

The Court should deny the Petition.  To the extent Sica seeks to re-litigate the issue of whether Title 21, United States Code 841(b)'s death-results provisions carry a foreseeability requirement, this argument has been considered and rejected both by this Court and by the Court of Appeals.  *United States v.Cabrera,* 972 F.2d 23, 25 (2d Cir. 1992) ("[S]ection 2255 may not be employed to relitigate questions which were raised and considered on direct appeal") (quotations and citations omitted).  Nor may Sica use his petition to press the merits of his statutory speedy trial claim, which was not raised either in the criminal case before this Court or on direct appeal and is, in any event, meritless.  *See United States v. Frady*, 456 U.S. 152, 167-168 (1982); *Bousley v. United States*, 523 U.S. 614, 621-622 (1998).

As for Sica's claims of ineffective assistance of counsel, Sica appears to make two distinct arguments.  First, Sica appears to argue that counsel performed inadequate investigation into the deaths of Delello, Miller, and Brown and that, as a result, Sica failed to appreciate the strength of his defense to the "death results" enhancement at the time of his guilty plea.  (Mot. at 18-19).  Second, Sica argues that counsel was ineffective for failing to move to dismiss due to the time that passed between the filing of the complaint in this matter and grand jury's returning an indictment.  (Mot. at 25).

Finally, Sica contends that his plea was not knowing and voluntary: either because counsel pressured Sica to plead guilty (Mot. at 19) or because Sica did not understand the

11

elements of the offense (Mot. at 30-33).

For the reasons discussed below, each of these claims fails.

**1.  Sica's Pretrial Investigation Claims**

As discussed, Sica appears to argue that trial counsel were ineffective for failing to adequately investigate the deaths at issue in this case.  He offers no support for this claim, and the evidence is very much to the contrary.  As the Court is aware from having presided over this matter, defense counsel actively investigated the circumstances of each of the deaths at issue in an effort to undermine the Government's claim that those deaths resulted from the distribution of drugs sold by Sica.  In addition to hiring an expert to evaluate the medical and toxological evidence in this case, defense counsel aggressively sought to procure additional evidence that could undermine the Government's theory – including by conducting their own searches and analysis of the victims' cellular telephones and phone records.  *See, e.g.*, 2/20/15 Tr. at 23-25 (discussing defense counsel's efforts to search the cellular phone of Laura Brown).  The affirmation of prior counsel (14 Cr. 462, ECF No. 116) provides additional detail regarding defense counsel's efforts to develop evidence to undermine the Government's theory on the death results element.  Indeed, as counsel's affirmation makes clear, the facts that Sica contends would have been revealed by a "thorough investigation," (Mot. at 11-15), were, in fact, largely developed by counsel.

Nor is there any support for Sica's suggestion that defense counsel failed to share with him their findings regarding the potential weaknesses in the Government's proof.  First, as discussed in defense counsel's declaration, counsel repeatedly conferred with Sica about these issues, which were central to the Government's claims and Sica's defenses.  Second, these matters were discussed frequently and openly at court proceedings for which Sica was present.

*See, e.g.*, 2/20/15 Tr. at 16 ("And so we know that the victims in this case were regular users of heroin and apparently and possibly regular users of heroin-fentanyl mixes. So they had other sources that could have caused their deaths."); 4/16/15 Tr. at 113 ("If there is a synergistic effect, which is what the expert is going to testify to, that benzodiazepines of heroin are much more dangerous if they are taken together, then it is, then it is -- and if that is what caused the person's death, that is not the same as the poison analogy.").  *See* M*cLean v. United States*, No. 08-cr-789 (RJS), 2016 WL 3910664, at *8 (S.D.N.Y. July 31, 2016) (In the context of a Section 2255 motion "a hearing is not required 'where the allegations are insufficient in law, undisputed, immaterial, vague, palpably false or patently frivolous.'" (quoting *United States v. Malcolm*, 432 F.2d 809, 812 (2d Cir. 1970))).

Even if Sica could demonstrate that counsel's performance were somehow deficient, and he cannot, Sica cannot demonstrate that the outcome of the proceeding would have been any different had he been represented by a different lawyer.  Sica's claims relate to how he weighed the likelihood that the trial jury would find the death-results element proven.  As the Supreme Court made clear in *Lee*, in this context, in order to show prejudice, Sica must demonstrate "that he would have been better off going to trial."  137 S. Ct. at 1965.  As the Court knows, however, the evidence of Sica's guilt was overwhelming.  As defense counsel recognized at the time of the plea, even if Sica had successfully challenged one or two of the deaths, the likelihood that the jury would hold fail to hold him responsible for any of the three deaths was vanishingly small. Sica therefore cannot show that he was prejudiced in any way by the advice that he received regarding the likelihood of conviction.  Indeed, Sica's decision to accept responsibility likely made the difference between his being sentenced to a term of years and his receiving a life sentence.

13

### 2. Sica's Speedy Trial Claims

Sica's claim that counsel acted ineffectively in failing to move to dismiss on statutory speedy trial grounds fares no better.  Here Sica is simply wrong on the facts.  Under Title 18, United States Code, Section 3161(b), "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested."  Here, as reflected on the docket sheet, Sica was arrested on June 19, 2014, at which time he appeared before Magistrate Judge Smith and counsel was assigned for him.  On July 14, 2014, the grand jury returned an indictment.   Sica's belief that the Speedy Trial Act was violated appears to stem from an errant docket entry indicating that he was arrested on June 9, 2014.  As the docket sheet reflects, however, the complaint was not submitted until June 17, 2014.  The June 9, 2014, entry therefore appears to be a typographical error on the part of the docketing clerk.

In sum, because there is no merit to Sica's speedy trial claim, counsel cannot be said to have been ineffective for failing to raise it.

### 3. Sica's Challenge to the Knowing and Voluntary Nature of His Plea

Finally, Sica challenges the knowing and voluntary nature of his plea.  He appears to argue both that he was pressured by defense counsel to plead guilty and that he failed to appreciate the nature of the offense to which he was pleading guilty.

At the outset, it bears noting that the portion of Sica's claim that relates to the plea colloquy is barred because he failed to raise it during his direct appeal.  "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998) (internal quotation marks

14

and citations omitted).  Sica has not identified any basis to conclude that he falls within either exception to the procedural bar and, given the facts of this case, the Government can discern none.[1]

Both components of Sica's claim are also belied by the record.  First, as discussed in counsel's declaration in response to Sica's petition, the decision to plead guilty was Sica's alone. Sica chose to plead guilty on the morning of jury selection, well after defense counsel and the Government had finished plea discussions and prepared the case for trial.  Sica's claim that defense counsel induced him to plead guilty by telling him that he faced a mandatory life sentence if convicted at trial is both contradicted by counsels affirmation and patently incredible given that Sica pled guilty without the benefit of a plea agreement to the very charges upon which he was to begin trial.  Indeed, after Sica informed the Government of his intention to plead guilty, the Government provided him with a Pimentel letter that clearly set out the statutory maximum (life) and mandatory minimum (20 year) sentences that were applicable to the charges in the Indictment and contained no mention of an enhancement under Section 851.

Moreover, the transcript of Sica's plea colloquy makes clear both that the decision to plead guilty was his own and that he adequately appreciated the nature of the offense.  During his plea, Sica responded affirmatively when the Court asked him whether he had received a copy of the indictment, read it, and discussed it with his lawyers (4/27/15 Tr. at 8-9), whether he understood the specific offenses with which he was charged (4/27/15 Tr. at 9), and whether he

---

[1] To the extent Sica alleges merely a technical violation of Rule 11, such a claim is not cognizable on a motion pursuant to Section 2255.  *United States v. Timmreck*, 441 U.S. 780, 783-84 (1979)  (A Section 2255 movant can successfully challenge a guilty plea conviction based on a Rule 11 violation only by establishing that the violation constituted a "constitutional or jurisdictional" error, or by showing that the error resulted in a "complete miscarriage of justice.").

understood that at trial the Government would be required to prove each element of the charge

beyond a reasonable doubt (*Id*.).  Sica also confirmed the accuracy of the Government's proffer

regarding the proof in his case.  (4/27/15 Tr. at 18).  Sica also admitted in his own words to each

element of the charge, acknowledging:

> From December 2013 through the first part of 2014 in Dutchess County, I agreed
> with others to distribute narcotics. I concede that the narcotics we agreed to
> distribute in the conspiracy included more than 100 grams of heroin and more
> than 40 grams of fentanyl.  I have learned that Anthony Delello, Thomas Miller
> and Laura Brown died as a result of taking drugs that were distributed as part of
> the conspiracy.

4/27/15 Tr. 18.  Finally, Sica confirmed that no one had promised, threatened, or forced him to

plead guilty.  (4/27/15 Tr. 15).

A defendant's statements at his plea allocution "carry a strong presumption of verity."

*Blackledge v. Allison*, 431 U.S. 63, 74 (1977).  "Absent credible reasons for rejecting appellant's

statements, [such statements] establish that the plea was entered knowingly and voluntarily."

*United States v. Arias*, 166 F.3d 1201, 1201 (2d Cir. 1998) (summary order); a*ccord United

States v. Gonzalez*, 970 F.2d 1095, 1100 (2d Cir.1992) (statements at plea allocution are

"conclusive" absent reasons "justifying departure from their apparent truth") (citation omitted).

As shown above, the record clearly establishes that Sica understood well the nature and

consequences of his decision when he elected to enter his plea of guilty.  Moreover, nothing in

Sica's petition "justif[ies] departure from [the] apparent truth" of Sica's statements at the time of

his guilty plea.  Rather, the claims in his petition are conclusory, unsupported by specifics, and

belied by the record.  Far from overcoming the presumption of verity that attaches to Sica's

statements at the time of his guilty plea, the assertions in his petition are precisely the type of

"conclusory allegations unsupported by specifics" that are subject to summary dismissal. *Blackledge*, 431 U.S. at 74.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully requests that the Court deny the Petition without a hearing. In addition, because Sica has not made a substantial showing of the denial of a constitutional right, the Court should refuse to issue a certificate of appealability, pursuant to 28 U.S.C. § 2253(c)(2), and should certify that any appeal from such a decision would not be taken in good faith, pursuant to 28 U.S.C. § 1915. *See Lozada v. United States*, 107 F.3d 1011, 1016-17 (2d Cir. 1997), abrogated on other grounds by *United States v. Perez*, 129 F.3d 255, 259-60 (2d Cir. 1997).

Dated:          New York, New York
                February 5, 2019

                              Respectfully submitted,

                              GEOFFREY S. BERMAN
                              United States Attorney for the
                              Southern District of New York


                      By:     _____/s/_____
                              Scott A. Hartman
                              Assistant United States Attorneys
                               (212) 637-2357

**AFFIRMATION OF SERVICE**

I, Scott A. Hartman, affirm under penalty of perjury as follows:

1.        I am an Assistant United States Attorney in the Southern District of New York.

2.        On February 5, 2019, I caused a copy of the forgoing Memorandum of Law of the United States of America in Opposition to Petitioner Dennis Sica's Motion to Vacate, Set Aside, or Correct His Sentence Pursuant To 28 U.S.C § 2255, to be served on Dennis Sica, Reg. No. 71171-054, FCI Ray Brook, P.O. Box 900, Ray Brook, NY 12977, via Certified Mail.

Dated:   New York, New York
            February 5, 2019

\_\_\_\_\_/s/_____
Scott A. Hartman
Assistant United States Attorneys
 (212) 637-2357

18